# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| RAYMOND PROFESSIONAL GROUP, INC.,<br>et al., | ) | Bankruptcy No. 06 B 16748 |
| Debtor. | ) | |
| | ) | |
| RAYMOND PROFESSIONAL GROUP, INC.,<br>et. al. | ) | |
| Plaintiff, | ) | |
| | ) | |
| RAYMOND MANAGEMENT SERVICES,<br>INC. n/k/a RAYMOND PROFESSIONAL<br>GROUP - DESIGN/BUILD, INC., | ) | |
| Co-Plaintiff to Count VI | ) | |
| v. | ) | Adversary No. 07 A 00639 |
| | ) | |
| WILLIAM A. POPE COMPANY | ) | |
| Defendant. | ) | |
| | ) | |
| WILLIAM A. POPE COMPANY, | ) | |
| Counter-Plaintiff to Count VI | ) | |
| v. | ) | |
| RAYMOND PROFESSIONAL GROUP, INC.<br>and RAYMOND MANAGEMENT SERVICES,<br>INC. n/k/a RAYMOND PROFESSIONAL<br>GROUP-DESIGN/BUILD, INC., | ) | |
| Counter-Defendants. | ) | |
| | ) | |
| NATIONAL FIRE INSURANCE COMPANY<br>OF HARTFORD, a Connecticut Corporation | ) | |
| Intervening Plaintiff | ) | |
| v. | ) | |
| RAYMOND PROFESSIONAL GROUP, INC.,<br>RAYMOND PROFESSIONAL GROUP-<br>DESIGN/BUILD, INC. and<br>WILLIAM A. POPE COMPANY | ) | |
| Intervening Defendants. | ) | |

## MEMORANDUM OPINION ON WILLIAM A. POPE COMPANY'S
## MOTION TO RENEW ITS MOTION TO DISQUALIFY

On December 18, 2006, Debtor, Raymond Professional Group, Inc. ("RPG") filed its

voluntary petition for relief under chapter 11 of the Bankruptcy Code. Raymond Professional

Group is the 100% shareholder of Raymond Management Services, Inc. n/k/a Raymond

Professional Group–Design/Build, Inc. ("RMS").[1]  Raymond Professional Group provided

shared corporate services to each of its subsidiaries, including RMS.  The subsidiaries provided

engineering, architectural, design/build and other technical services to private and government

clients, primarily in the power, industrial and process market sectors.  Raymond Management

Services also filed for voluntary chapter 11 relief in case no. 06-bk-16753 on December 18,

2006.[2]  An Order providing for joint administration has been entered.

Prior to filing of the bankruptcy cases, RMS was involved in a three-year long arbitration

with William A. Pope Company ("Pope" or "Defendant") based on a contract between those

parties.  During the year 2000, RMS entered into a contract with AES Medina Valley Cogen,

LLC ("AES") to construct a cogeneration power plant facility in Mossville, Illinois.  Raymond

Management Services was to perform all engineering, procurement, and construction services

necessary to satisfy certain specified performance criteria for the lump sum price of

approximately $34 million (the "EPC Contract").  On September 12, 2000, RMS entered into a

subcontract with William A. Pope Co. ("Pope" or "Defendant") whereby Pope became

responsible for performing all construction services and certain other services in the EPC

Contract (the "Subcontract").  Raymond Management Services and Pope each agreed to perform

---

[1]  Additional wholly-owned subsidiaries include Raymond Professional Group–A/E, Inc.
f/k/a Doyen & Associates; Raymond Professional Group–Government, Inc.; and Raymond
International, Inc.  Raymond Professional Group–Puerto Rico Engineering PSC is an affiliate of
RPG through common ownership (collectively with RPG and RMS, the "Raymond entities").

[2]  The remaining Raymond entities have also each filed voluntary chapter 11 petitions:
Raymond Professional Group–A/E, case no. 06-bk-16749; Raymond Professional
Group–Government, case no. 06-bk-16750; Raymond International, case no. 06-bk-16754; and
Raymond Professional Group–Puerto Rico, case no. 16755 (collectively with RPG and RMS,
"Debtors").

tasks within their respective scope of work, and thereafter equally share any resulting profits or losses on the project. The parties agreed to establish a bank account (the "Initial Account") into which RMS would deposit any amount collected from AES above the parties' expenses. Raymond Management Services funded the Initial Account with more than $2 million of project receipts from AES.

After the Initial Account was funded, certain disputes arose regarding expenses the parties claimed to have incurred, as well as performance-based claims concerning certain pipe welds constructed by Pope. The parties entered into an Interim Settlement Agreement dated September 26, 2001, pursuant to which RMS deposited additional funds into the Initial Account.

On March 12, 2003, the funds were transferred, with the permission of Pope, to a new account (the "Account") with JP Morgan Chase Bank, N.A. ("Chase"). The Account documents required the dual signatures of Douglas J. Chidley ("Chidley"), Debtors' President, and Paul L. Troyke ("Troyke"), Pope's President, to withdraw funds. The Account was originally titled "Raymond Professional Group–Pope Joint Account."

The cost and performance-based disputes between the parties were arbitrated under American Arbitration Association procedures as required by the arbitration provision of the Subcontract. On November 30, 2006, the Arbitration Panel (the "Panel") entered an award requiring RMS to pay Pope $3,634,714 (the "Award"). The Award was based on "Audit Issues" only; Pope defeated all of RMS' performance-based claims. That award has since been confirmed and judgment entered in this court. Raymond Mgmt. Servs. v. William A. Pope Co., 397 B.R. 414 (Bankr. N.D. Ill. 2008); (Adversary No. 07-00137, Docket No. 63).

Ownership of the Account was not an issue raised by the parties in the Arbitration, and it was not decided by the Panel. The Supplement to Opinion confirming the Arbitration Award so concluded. (Adversary No. 07-00137, Docket No. 62.)

On July 17, 2007, RPG filed this five count Adversary Complaint against Pope seeking (1) a declaration determining RPG's ownership of the Account; (2) to avoid any trust imposed on the Award under 11 U.S.C. § 544(a); (3) to avoid the Award as a preference under 11 U.S.C. § 547(b); (4) to avoid the Award as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B); and (5) to disallow Pope's claim for the amount of the Award under 11 U.S.C. § 502(d). In its Amended Answer to Complaint, Pope asserted a counterclaim seeking *inter alia* a declaration that the funds in the Account are held in trust for it pursuant to the Illinois Mechanics Lien Act. 770 ILCS 60/21.02. Pope has consistently argued that it owns or holds a beneficial interest in the funds in the Account.

On December 21, 2007, Pope filed a Motion to Disqualify Schiff Hardin LLP ("Schiff") as Counsel for Debtors, (Bankr. Docket No. 223), arguing that Schiff failed to disclose its pre-petition representation of certain Debtor entities, and that Schiff breached its fiduciary duty and duty of loyalty to the bankruptcy estates.

In its Motion, Pope also argued that by taking a position as to ownership of the Account, Schiff has reduced the assets available for distribution to creditors of RMS and, therefore, breached its fiduciary duty to the RMS bankruptcy estate. It relied on Rule 2014 Fed. R. Bankr. P.

In early 2008, the parties agreed that rather than proceeding to decide ownership of the Account as between RPG and RMS (which might bring Schiff into conflict and require

-4-

disqualification of the firm and its attorneys), it was more practical to decide first whether Pope

owns the Account. If Pope owns the Account or the funds are held in trust for the benefit of

Pope, the Account would not be property of either bankruptcy estate, and Pope would likely not

have standing or interest in pursuing its Motion to Disqualify.

Raymond Professional Group and RMS have since filed an Amended Complaint adding

Count VI seeking a declaration that Pope does not own the Account; that the Account is not an

escrow account; and that the funds in the Account are not held in trust pursuant to the Illinois

Mechanics Lien Act. Pope has counterclaimed asserting ownership of the Account. The parties

agreed that Pope's Motion to Disqualify is not to be dealt with until after Count VI is decided.

Trial on Count VI was scheduled and evidence was taken, though no ruling will be made until

after final arguments.

On July 2, 2008, Pope filed a Motion for Leave to file a supplemental brief in support of

its earlier Motion to Disqualify. In its Supplemental Brief it is represented that during discovery

Pope learned that Schiff had received a check drawn on the Account and containing the dual

signatures of Douglas Chidley and Paul Troyke for the payment of attorneys fees then due to

Schiff. Pope argued that payment of attorneys fees created an attorney-client relationship

between Schiff and Pope, and that Schiff's representation of RPG and RMS's interests adverse to

Pope created a direct conflict of interest that had to be decided prior to the trial on Count VI.

The issue was fully briefed by the parties, and an evidentiary hearing was held on

December 4th and 5th, 2008. The issues to be decided at the evidentiary hearing were whether

there was ever an attorney-client relationship between Schiff and Pope that creates a conflict for

Schiff, and, if so, whether any such conflict was waived. The arguments raised in Pope's original

Motion to Disqualify were not at issue at this hearing. Following the hearing, it was announced

from the bench that the Renewed Motion would be denied. Therefore, the trial of Count VI went

forward.

For the following reasons, it is found and held that there never was an attorney-client

relationship between Schiff and Pope; even if there was, it was waived by Pope's failure to

timely raise an objection to the purported conflict alleged in its Supplemental Brief. Therefore,

Pope's Renewed Motion to Disqualify on the grounds of a direct conflict of interest as asserted in

the Supplemental Brief will be denied.

## RELEVANT FACTUAL BACKGROUND

### *Stipulated Facts*

The following facts are stipulated to by the parties:

1. Raymond Professional Group, Inc. is an Illinois corporation.

2. Raymond Management Services is an Illinois corporation.

3. Douglas Chidley is the President of RPG, RMS, Doyen, RPG Government, RPG

   International, and RPG Puerto Rico.

4. Jean Chidley is the Secretary and Treasurer of RPG, RMS, Doyen, RPG Government,

   RPG International, and RPG Puerto Rico.

5. Julia Hazekamp is referenced in correspondence as a Financial Analyst for Doyen.

6. Schiff represented RMS in the Arbitration (defined below).

7. David Howard, of Schiff, was counsel for RMS prior to this adversary proceeding, and

   now represents RPG and RMS in this adversary proceeding.

8. David Howard represented RMS in the Arbitration.

9.   Mark Friedlander, of Schiff, represented RMS and RPG prior to this adversary proceeding.

10.  Mark Friedlander was counsel for RMS in the Arbitration (defined below).

11.  Mike Dubois was Vice President of RMS.

12.  Mike Dubois was General Manager of RMS.

13.  Pope is an Illinois corporation.

14.  At all relevant times, Pope performed general construction services in Illinois.

15.  Paul Troyke is the President of Pope.

16.  Geri Votava is the Vice President and Secretary of Pope.

17.  AES Medina Valley Cogen, LLC ("AES") is the entity with which RMS entered into an engineering, procurement, construction and start-up contract for a particular type of power plant known as a cogeneration facility in Mossville, Illinois.

18.  The American Arbitration Association (the "AAA") is the organization that administered the arbitration between RMS and Pope, No. 51 Y 11001689 03 (the "Arbitration").

19.  As stated in recital D of the Pope Subcontract (defined below):

With the knowledge and approval of [Pope], RMS has executed [the EPC Contract] to provide design build and related services for [AES] for the purpose of owning and operating [the Project]. Prior to executing the EPC Contract, RMS and [Pope] had been performing preliminary services for the Project under a letter of intent between RMS and [AES], which has since been superseded and subsumed within the EPC Contract.

20.  RMS and Pope signed and entered into a Subcontract Agreement, effective September 12, 2000 (the "Pope Subcontract").

21.  Mike Dubois signed the Pope Subcontract on behalf RMS.

-7-

22. Paul Troyke signed the Pope Subcontract on behalf of Pope.

23. The Pope Subcontract incorporates the entire EPC Contract, including appendices.

24. In the Pope Subcontract: a. "GC" refers to Pope; b. "RMS" refers to RMS; c. "Engineer"

refers to Doyen; and d. "Client" refers to AES.

25. Paragraph 7 of the Pope Subcontract states:

Payment. The revenues paid to the Project shall be allocated as follows: First, to
pay the costs incurred by the Project to third parties; second, to reimburse RMS
and [Pope] for their own costs and the time spent by their own personnel on the
Project, including costs incurred in the preparation of the proposal; third, to
provide an allowance to each of RMS and [Pope] for the succeeding month's
projected expenses; and finally, the remainder shall be divided equally between
RMS and [Pope]. Both Parties agree to share openly with the other their costs and
the basis for such costs. (For the purposes of this paragraph, Engineer's costs and
personnel are treated as RMS's costs and not as those of a third party.) As of
December 31, 2000, the Parties will jointly determine and agree to expended
project costs and related profitability. In the event that either Party at any time
believes that an independent audit of the Project's profitability is warranted, then
the Parties agree to engage a firm for this purpose. An escrow account will be
established whereby each Party will make appropriate cash contributions that
represents [sic] the cash amount collected over and above the agreed to costs.
Distributions from the escrow account will made [sic] only with the agreement of
the principals of both Parties. RMS issues pay requests to [AES] shortly after the
first of each month. [Pope] shall submit to RMS its pay request for a month
promptly following the last Friday of the month. The EPC Contract obligates
[AES] to pay undisputed amounts within 15 days of receipt of the pay request.
The undisputed amounts of [Pope's] pay request will be paid by RMS immediately
following receipt of payment from [AES]. [Pope] shall be responsible for
providing to RMS all documentation for [Pope's] scope of services that RMS is
obligated to provide to [AES] under the EPC Contract.

26. Paragraph 11 of the Pope Subcontract states:

Dispute Resolution. Any disputes between or among RMS, [Pope] and [Doyen]
shall be resolved in accordance with the dispute resolution procedures of the EPC
Contract, and the Parties hereby agree to joinder of their claims with any claims
involving the Client in the procedures initiated under the EPC Contract. The
[Pope] Subcontract shall be governed by the laws of the state of Illinois. Any
term of this Agreement may be modified or deleted, but only if the modification

or deletion is put in writing and signed by the parties. RMS and [Pope] respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto. Neither party to this [Pope] Subcontract shall assign the [Pope] Subcontract as a whole without the written consent of the other. This [Pope] Subcontract represents the entire and integrated agreement between RMS and GC for the Project and supersedes all prior negotiations, representations or agreements, either written or oral.

27.   A true and correct copy of the Pope Subcontract is attached as Exhibit 2 to the Complaint.

28.   In February 2001, an account at American National Bank & Trust Company ("ANB") bearing account number XXXXXX7555 was established (the "Initial Account").

29.   The Initial Account was established pursuant to the Pope Subcontract.

30.   The Initial Account was entitled the "Raymond Professional Group Inc/Pope Acct."

31.   Bank documents associated with the Initial Account indicate that both Paul Troyke's and Douglas Chidley's signatures were required to withdraw any funds from the Initial Account.

32.   Bank documents associated with the Initial Account indicate that both Paul Troyke's and Douglas Chidley's signatures were required to make any changes to the Initial Account.

33.   On February 20, 2001, Geri Votava sent a letter to Jim Walkington (the "Votava February 20, 2001 Letter").

34.   A true and correct copy of the Votava February 20, 2001 Letter is attached as Exhibit 5 to the Complaint as the page that is Bates labeled 072745.

35.   Pope enclosed with the Votava February 20, 2001 Letter a signed signature card for the Initial Account (the "Initial Account Signature Card").

36.   Pope enclosed with the Votava February 20, 2001 Letter a signed letter of direction for the Initial Account (the "Initial Account Letter of Direction").

37.  A true and correct copy of the Initial Account Signature Card is attached to the Complaint as the pages that are Bates labeled 072746 and 072747 of Exhibit 5 to the Complaint.

38.  A true and correct copy of the Initial Account Letter of Direction is attached to the Complaint as the pages that are Bates labeled 072748 and 072749 of Exhibit 5 of the Complaint

39.  Paul Troyke signed the Initial Account Signature Card.

40.  Paul Troyke signed the Initial Account Letter of Direction.

41.  At the time Paul Troyke signed the Initial Account Signature Card, the account number, title and taxpayer identification number were blank.

42.  At the time Paul Troyke signed the Initial Account Letter of Direction, the account number, title and taxpayer identification number were blank.

43.  Attached as Exhibit 6 to the Complaint is a true and correct copy of the Initial Account Signature Card in the form that was sent to ANB (the "Executed Initial Account Signature Card").

44.  The Executed Initial Account Signature Card identifies the "Account Number" as XXXXXX7555.

45.  The Executed Initial Account Signature Card identifies the "Account Title" as "Raymond Professional Group Inc/Pope Acct".

46.  The Executed Initial Account Signature Card is Bates numbered 072751.

47.  On September 26, 2001, RMS, Pope and NFIC entered into an Interim Settlement Agreement (the "ISA").

48.  A true and correct copy of the ISA is attached as Exhibit 11 to the Complaint.

49.   The term "Raymond" in the ISA refers to RMS.

50.   Recital B of the ISA states that "Raymond and Pope have established a bank account

number [XXXXXX7555] (the 'Account') to which both are necessary signatories and

from which funds can be withdrawn only by mutual consent."

51.   Paragraph 7 of the ISA states that:

Pope shall be paid $2,808,671 from the Account after the payments described in
Paragraph 5 above [payments for third-party costs for subcontractors, vendors and
other suppliers]. If insufficient funds are available to pay this sum, then payment
shall be made to the extent that funds are available, with any remaining balance to
be paid promptly after and to the extent additional funds are received into the
Account. This payment shall be made to Pope prior to any payment or other
distribution to [RPG, Inc.] or any of its subsidiaries or affiliates.

52.   On November 19, 2001, AES was instructed to wire any future Project payments directly

into the Initial Account.

53.   On a date between the date when the Initial Account was opened and March 12, 2003,

ANB was acquired by Bank One (the "Bank One Acquisition").

54.   From and after the date of the Bank One Acquisition, Bank One held the Initial Account.

55.   On December 7, 2006, one of the attorneys for RMS advised Jerome Gardocky of NFIC

via electronic mail that:

I am enclosing a copy of the Arbitration Panel's ruling in the above-referenced
arbitration. As you can see, the ruling awarded Pope approximately $3.6 million,
the vast majority of which would be satisfied from the remaining balance of a
bank account that is jointly owned by Raymond and Pope. At the present time
there is approximately $3.1 million in that account. Raymond does not have
sufficient other assets to satisfy the remaining balance of the award and its other
remaining creditors. In the event Raymond does not appeal all or a portion of the
arbitration award, we expect that Raymond will seek bankruptcy protection and/or
will file an assignment for the benefit of creditors and that the William A. Pope
Company will look to the bond to satisfy any unpaid portion of the award.

Accordingly, the purpose of this letter is to provide you with notice of the foregoing.

56. On December 18, 2006 (the "Bankruptcy Petition Date"), RPG, RMS, Doyen, RPG Government, RPG International and RPG Puerto Rico each filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code").

57. Raymond Professional Group, Inc. listed the Current Account as an asset of Raymond Professional Group, Inc. on its Schedule B. Personal Property filed January 2, 2007.

## Additional Findings of Fact

The following additional facts are derived from evidence admitted at the hearing:

58. Ms. Votava testified that as part of the EPC Contract, AES held back five percent (5%) from each month's invoice as retainage. (Votava Test.) Mr. Friedlander testified that AES had a contractual right to withhold a portion of each payment, and that it was typical in the construction industry for retainage to be ten percent (10%) of monthly invoices. (Friedlander Test.) Neither party offered the EPC Contract in order to establish the precise amount of retainage, but it is unnecessary to decide this issue in order to reach the ultimate legal conclusion.

59. In or about August 2001, RMS and Pope began to take steps to secure the release of retainage from AES. (Id.) The EPC Contract was between RMS and AES and, therefore, Mr. Friedlander, one of RMS's attorneys from Schiff, handled the negotiations for the release of retainage. (Friedlander Test.)

60. In or about December 2001, approximately $1.7 million was being held back by AES as retainage. (Votava Test.)

-12-

61.  On December 6, 2001, Ms. Hazekamp sent a letter to Ms. Votava requesting that a Pope
representative countersign four checks in compliance with the controls in place on the
Initial Account. (Pope Ex. 16.) One of those checks was made payable to Schiff Hardin
& Waite in the amount of $38,772.90 (the "Schiff Check"). (Pope Exs. 16-17.)

62.  Ms. Votava requested that Mr. Troyke sign the Schiff Check, and she returned it to RMS.
(Votava Test.) The AES Medina Valley Cogeneration Project, Joint Account Transaction
Report dated June 20, 2002, shows that the Schiff Check cleared on January 7, 2002.
(Pope Ex. 18.)

63.  Ms. Votava testified that a Pope representative signed the check because, at the time it
was signed, Mr. Friedlander was working on the release of retainage from AES. (Votava
Test.) According to Ms. Votava, she believed that in negotiating for the release of
retainage, Mr. Friedlander, and Schiff, were representing Pope's interests as counsel for
the Project. (Id.)

64.  Mr. Friedlander was ultimately successful in getting some of the funds released.
(Friedlander Test.) According to Ms. Votava, $789,000 was released in February 2002,
and almost $1 million was released in January 2003. (Votava Test.)

65.  On cross-examination, Ms. Votava testified that she never spoke to Mr. Friedlander or
anyone else at Schiff about representing Pope. (Id.) According to Ms. Votava, Pope did
not have a retainer agreement with Schiff before or during August 2001, when
negotiations for the release of retainage began. (Id.) Ms. Votava testified further that
Schiff never provided invoices for services directly to Pope, but that RMS reported its
attorney fee costs to Pope on a monthly basis. (Id.)

66.  According to Ms. Votava, she never confirmed her belief that Schiff was the attorney for the Project; she never sought legal advice from Mr. Friedlander or anyone else at Schiff. (Id.)

67.  According to Paragraph 6 of the Interim Settlement Agreement (the "ISA") between RMS and Pope:

> Raymond and Pope agree that the second priority for disbursing funds from the Account shall be to pay Raymond third-party subcontractors, vendors and other suppliers, except that neither Pope nor Raymond Professional Group Inc., or any of its subsidiaries, or affiliates, shall be considered a subcontractor of Raymond for the purposes of the disbursements described in this paragraph. Raymond and Pope shall actively cooperate with each other to minimize and to facilitate the disbursements to subcontractors described in Paragraphs 5 and 6.

> (Pope Ex. 15.)

68.  On cross-examination, Ms. Votava testified that she understood that the Schiff Check was being paid pursuant to Paragraph 6 of the ISA. (Votava Test.)

69.  Ms. Votava acknowledged that Pope and RMS were represented by separate counsel—Clausen for Pope, and Schiff for RMS—during negotiation of the ISA. (Id.)

70.  The ISA was executed on September 26, 2001. (Pope Ex. 15.)

71.  According to Ms. Votava, she did not believe that there were ongoing disputes between Pope and RMS after the ISA was executed. (Votava Test.)

72.  However, according to Paragraph 9 of the ISA:

> Raymond contests Pope's entitlement to certain Project costs incurred by Pope through August 31, 2001, and is withholding payment from Pope with regard to said invoices, and in the amounts listed below. The quantification represents the parties' best estimate as to the value of each item Raymond contests is due Pope, and is based on information available as of the date of this Agreement.

(Pope Ex. 15.) Paragraph 10 outlines additional continuing disputes between RMS and Pope regarding Project accounting, and Paragraph 11 requires that payments made pursuant to the ISA are subject to a final accounting. (Id.)

73. Ms. Votava acknowledged the Pope and RMS disputed the amount due to each party out of the account. (Votava Test.) These disputes were addressed during the Arbitration. (Id.)

74. Ms. Votava attended the Arbitration proceeding every day. (Id.) Pope's counsel was present at the Arbitration. (Id.) Ms. Votava understood that during the Arbitration Pope and RMS were adverse, and that Schiff represented RMS. (Id.) According to Ms. Votava, no one from Pope raised an objection to Schiff's representation of RMS during the Arbitration. (Id.)

75. Ms. Votava testified that she did not believe that Schiff's representation of RMS during the Arbitration was a conflict, because Schiff and RMS told the Arbitration panel that the Account was owned by RMS and Pope, and that the panel was to allocate distribution of funds to RMS and Pope. According to Ms. Votava, it was not until Schiff, on behalf of RPG, took a contrary position regarding ownership of the Account in bankruptcy that she believed that there was a conflict of interest.

76. The related bankruptcy cases were filed on or about December 18, 2006. However, Pope did not make its Motion to Disqualify until December 21, 2007, and did not allege a direct conflict of interest until July 2, 2008, when it made its Motion for Leave to File Supplemental Brief in Support of its Motion to Disqualify. (Bankr. Docket. No. 305.) In

-15-

its Supplemental Brief, Pope alleges that it did not become aware of the Schiff Check and, therefore, the direct conflict of interest arising therefrom, until June 9, 2008.

77.   However, on cross-examination, Ms. Votava acknowledged that the Schiff invoices were produced to Pope during the Arbitration as part of the audit conducted by Afrik/Chez on behalf of RMS.

78.   Ms. Votava testified that Pope never sought legal advice from the attorneys at Clausen or from Schiff regarding propriety of counter-signing the Schiff Check.

79.   Mr. Friedlander, one of RMS's attorneys at Schiff, testified that he never represented William A. Pope Co. at any time. (Friedlander Test.)  He never offered to represent the interests of Pope. (Id.)  He never had a retainer agreement with Pope. (Id.)  Finally, he never received any confidential information from Pope for the purpose of seeking legal advice. (Id.)

80.   According to Mr. Friedlander, the AAA has rules and procedures for document production, and a full exchange of documents was ordered by the Arbitration panel. (Id.)  Any confidential information received by Schiff from Pope during the Arbitration was not produced for purposes of receiving legal advice. (Id.)

81.   Furthermore, Mr. Friedlander testified that he never represented the Project. (Id.)  He was only an attorney for the Raymond entities ever. (Id.)

82.   According to Mr. Friedlander, the work that he did negotiating the release of retainage necessarily benefitted Pope. (Id.)  AES was holding back Project money, and the money released benefitted RMS and RMS subcontractors, including Pope. (Id.)  There were other subcontractors who benefitted from the negotiations besides Pope. (Id.)

-16-

83.   Findings of fact contained in the Conclusions of Law shall constitute additional Findings

of Fact.

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court

pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of

the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C.

§ 1409. Count VI is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## CONCLUSIONS OF LAW

Disqualification is a drastic remedy, and should be granted cautiously because motions to

disqualify can be misused to harass one's opponent in litigation. Int'l Ins. Co. v. City of Chicago

Heights, 643 N.E.2d 1305, 1313 (Ill. App. Ct. 1994) (citations omitted). "A party seeking

disqualification based on prior representation must establish the existence of a prior attorney-

client relationship and then establish that the prior and subsequent representations are

substantially related." In re Estate of Klehm, 842 N.E.2d 1177, 1184 (Ill. App. Ct. 2006) (citing

Gagliardo v. Caffrey, 800 N.E.2d 489, 494 (Ill. App. Ct. 2003)). The initial question, therefore,

is whether Pope had an attorney-client relationship with Schiff.

a.      Pope did not have any attorney-client relationship with Schiff.

Pope cites Zych v. Jones for the proposition that "[t]he relationship of an attorney and

client is a contractual relationship. It is only created by a retainer or an offer to retain or a fee

paid." 406 N.E.2d 70, 74 (Ill. App. Ct. 1980) (citations omitted). Pope argues that Troyke's

counter-signature on the Schiff Check disbursing funds from the joint account for the payment of

Schiff's attorney fees created an attorney-client relationship. In Zych, plaintiff sued defendant

-17-

for legal malpractice, and the appellate court reversed the lower court's grant of summary

judgment in plaintiff's favor because there was a genuine issue of material fact concerning

whether an attorney-client relationship existed.  Id. at 74-75.  However, since Zych, the Illinois

Supreme Court has held that privity of contract is no longer an indispensable element for finding

an attorney-client relationship in legal malpractice cases.  Warren v. Williams, 730 N.E.2d 512,

515 (Ill. App. Ct. 2000) (citing Pelham v. Griesheimer, 440 N.E.2d 96, 99 (1982)).

     This analogous to the nature of the attorney-client relationship between an insured and an

attorney whose fees are actually paid by the insurer.  The fiduciary duties protected by the

conflict rules are owed to the client-insured, not the insurer who is paying the attorney fees.  That

is because the payment of attorney fees alone does not create an attorney-client relationship.  Int'l

Paper Co. v. Lloyd Mfg. Co., Inc., 555 F. Supp. 125, 132 (N.D. Ill. 1982) ("What determines

whether an attorney-client relationship exists has nothing to do with the payment of legal fees.")

(citing Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1317 (7th Cir. 1978)).

     "Instead, an attorney-client relationship exists 'when the lay party submits confidential

information to the law party with reasonable belief that the latter is acting as the former's

attorney. . . .'" Id. (quoting Kerr-McGee, 580 F.2d at 1321).  Mr. Friedlander testified that in

negotiating for the release of retainage on the Project, he never received any confidential

information from Pope.  (Finding of Fact, supra ¶ 79.)  Any confidential information received by

Schiff from Pope was the result of discovery production ordered by the Arbitration Panel, and

was not given for the purpose of seeking legal advice.  (Id. at ¶ 80.)

     Furthermore, while Ms. Votava testified that she believed that in negotiating for the

release of retainage Schiff was acting as counsel for the Project and that those negotiations

benefitted Pope, (id. at ¶ 63), it is now found and held that such belief was entirely unreasonable and unfounded. Ms. Votava testified that she had experience retaining counsel for Pope in the past, and that such retention often started with a handshake. (Votava Test.) However, Ms. Votava did not demonstrate that such a handshake agreement existed here. According to her testimony, she never spoke with Mr. Friedlander or anyone else at Schiff about representing Pope; Pope never had a retainer agreement with Schiff; and Schiff never billed Pope directly for any service purportedly rendered on behalf of Pope. (Findings of Fact, supra ¶ 65.) Furthermore, Ms. Votava never in any way corroborated her supposed belief that Schiff was representing the Project. (Id. at ¶ 66.) Indeed, it was clearly unreasonable for anyone at Pope to believe that Schiff was representing Pope when Pope's representatives never even spoke to any attorney from Schiff. Accordingly, her testimony about her supposed belief was not credible.

Attorney liability extends to intended third-party beneficiaries of an attorney-client relationship. Gagliardo, 800 N.E.2d at 497 (citing Pelham, 440 N.E.2d at 100). In order to establish third-party beneficiary status, Pope would have to show that RMS entered into a contract with Schiff for the provision of legal services for the direct benefit of Pope, and not that Pope merely received some incidental benefit. Pelham, 440 N.E.2d at 98. However, "while the attorney for the executor owes a fiduciary duty to act with due care to protect the interests of the beneficiaries [for purposes of a legal malpractice action], the attorney does not have an attorney-client relationship with the beneficiaries." In re Estate of Kirk, 686 N.E.2d 1246, 1250 (Ill. App. Ct. 1997) (citing In re Estate of Halas, 512 N.E.2d 1276, 1280 (1987)). Contra Gagliardo, 800 N.E.2d at 497.

The facts of Gagliardo are distinguishable from the facts here. In that case, plaintiff and her minor children were the sole beneficiaries of her deceased husband's estate. Defendant, the husband's sister, was the executor of the estate and the husband's business partner. Defendant attempted to purchase the husband's share of the business, and plaintiff sued to have her removed as executor based on conflict of interest. Plaintiff also moved to disqualify defendant's attorney, arguing that he had previously represented the estate. The opinion reasoned that because there was not an adversarial relationship between plaintiff and the estate, and plaintiff was the sole beneficiary of the estate, the attorney effectively represented plaintiff. Id. at 497. The opinion conceded that the published holding only applies to "the narrow circumstances of this case." Id.

In this case, Pope has failed to establish either that it was an intended beneficiary of the contract between RMS and Schiff, or that it was the sole beneficiary of that contract so that it could come within the narrow exception in Gagliardo. Mr. Friedlander testified that Pope necessarily received some benefit from the release of retainage, (Findings of Fact, supra ¶ 82), but this does not establish that Pope was an original intended beneficiary of the contract. Moreover, other subcontractors besides Pope benefitted from the release of retainage, (id.), and therefore, Pope was not the sole beneficiary of Schiff's services.

Accordingly, it is found and held that there was never an attorney-client relationship between Pope and Schiff.

-20-

b.    <u>Even if there were an attorney-client relationship, any conflict arising therefrom was
waived.</u>

Disqualification destroys the attorney-client relationship and, therefore, deprives a party

of the counsel of its choice. <u>Klehm</u>, 842 N.E.2d at 1181. It is a harsh remedy. <u>Id.</u> "In an effort

to discourage tactical gamesmanship, courts have determined that motions to 'disqualify should

be made with reasonable promptness after a party discovers the facts which [led] to the motion."

<u>Id.</u> (quoting <u>Kafka v. Truck Ins. Exch.</u>, 19 F.3d 383, 386 (7th Cir. 1994)) (additional citations

omitted).

> In determining whether a moving party has waived its right to object to an
> attorney's representation of an adverse party on conflict of interest grounds in
> civil cases, courts have considered such factors as the length of delay in bringing
> the motion to disqualify; when the movant learned of the conflict; whether the
> movant was represented by counsel during the delay; why the delay occurred; and
> whether disqualification would result in prejudice to the moving party.

<u>Id.</u> at 1182. In <u>Klehm</u>, the opinion found that a four year delay was unreasonable, pointing out

that courts "have denied motions to disqualify brought after comparable and even shorter periods

of delay." <u>Id.</u> at 1183. <u>See also</u> <u>First Nat'l Bank of Elgin v. St. Charles Nat'l Bank</u>, 504 N.E.2d

1257, 1264 (Ill. App. Ct. 1987) (finding waiver after approximately seventeen (17) months).

Pope argues that it did not learn of the conflict until June 2008. However, representatives

from Pope were certainly aware that its representative countersigned and deposited the Schiff

Check when that check was written in 2001. Therefore, Pope knew of the supposed conflict

approximately seven years before the year 2008. Even if it were credible to believe that Pope did

not believe that there was a conflict until the Raymond entities took an allegedly contrary

position regarding ownership of the Account in bankruptcy, the bankruptcy case was filed in

December 2006, and Pope did not raise the Schiff Check as a grounds for disqualification until

June 2008. Furthermore, while it is possible that a lay party would not understand that this transaction gave rise to a potential conflict of interest, Pope was represented by Clausen throughout the entire period. Raised on the eve of the Count VI trial, disqualification would have resulted in extreme prejudice to RMS. Based on the foregoing history it is certainly appropriate to find that Pope waived any right to claim that a conflict existed by reason of a supposed attorney-client relationship when the check was countersigned in the year 2001.

## CONCLUSION

For the foregoing reasons it is found and held that there was never an attorney-client relationship between Pope and Schiff and, therefore, there was and is no conflict of interest. Even if there were a conflict of interest, it was waived by Pope's failure to timely raise an objection. A separate Order will therefore be entered denying Pope's Renewed Motion to Disqualify.

This Opinion and Order only address Pope's allegations of a direct conflict of interest raised in its Supplemental Brief. Any ruling on Pope's original Motion to Disqualify based on the question of whether Schiff can represent both RPG and RMS is reserved until judgment is entered on the Count VI issues as to whether or not Pope owns the Account.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 10th day of February 2009.

-22-