## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE )
)
RAYMOND PROFESSIONAL GROUP, INC., )
et al., )            Bankruptcy No. 06 B 16748
          Debtors. )
 )
_____ )
RAYMOND PROFESSIONAL GROUP, INC., )
et. al. )
          Plaintiff, )
 )
RAYMOND MANAGEMENT SERVICES, )
INC. n/k/a RAYMOND PROFESSIONAL )
GROUP–DESIGN/BUILD, INC., )
          Co-Plaintiff to Count VI )
     v. )            Adversary No. 07 A 00639
 )
WILLIAM A. POPE COMPANY )
          Defendant. )
_____ )
WILLIAM A. POPE COMPANY, )
          Counter-Plaintiff as to Count VI )
     v. )
 )
RAYMOND PROFESSIONAL GROUP, INC. )
and RAYMOND MANAGEMENT SERVICES, )
INC. n/k/a RAYMOND PROFESSIONAL )
GROUP–DESIGN/BUILD, INC., )
          Counter-Defendants. )
_____ )
NATIONAL FIRE INSURANCE COMPANY )
OF HARTFORD, a Connecticut Corporation )
          Intervening Plaintiff )
     v. )
 )
RAYMOND PROFESSIONAL GROUP, INC., )
RAYMOND PROFESSIONAL GROUP– )
DESIGN/BUILD, INC. and )
WILLIAM A. POPE COMPANY )
          Intervening Defendants. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AFTER TRIAL ON COUNT VI

**Table of Contents**

**HISTORY AND PLEADINGS**

**FINDINGS OF FACT**

    *Summary of the Findings of Fact*

**JURISDICTION**

**CONCLUSIONS OF LAW**

    *Introduction*

    I.    FUNDS IN THE ACCOUNT ARE HELD IN A PREBANKRUPTCY TRUST
        FOR POPE UNDER THE ILLINOIS MECHANICS LIEN ACT.

        a.    Pope did not waive its lien rights by virtue of the September 26, 2001
            "Final" Lien Waiver.

        b.    Pope was not required to file and therefore did not fail to file timely its
            lien claim. Accordingly, it did not allow its rights under the Mechanics
            Lien Act to lapse.

        c.    The January 30, 2003 Final Lien Waiver applied to Pope's outstanding
            lien claim which exceeded the amount of the AES Settlement.

    II.    RAYMOND MANAGEMENT SERVICES AND POPE OWNED THE
        ACCOUNT AS TENANTS IN COMMON SUBJECT TO OUTCOME OF THE
        ARBITRATION AND MECHANICS LIEN TRUST RIGHTS. POPE NOW
        HOLDS THE SOLE MECHANICS LIEN TRUST RIGHTS IN THE ACCOUNT.

        *Conclusion as to the Mechanics Lien Act and Ownership of the Account*

    III.    POPE'S ALTERNATIVE TRUST THEORIES ARE WITHOUT MERIT.

        a.    There is no constructive trust.

        b.    There is no resulting trust.

    IV.    THE INITIAL ACCOUNT AND CURRENT ACCOUNT IS NOT AND NEVER
        WAS AN ESCROW ACCOUNT. POPE WAIVED THE CONTRACTUAL
        REQUIREMENT FOR AN ESCROW.

V.      POPE HAS NOT ESTABLISHED THAT THERE WAS AN ACTIONABLE
        MISREPRESENTATION OR THAT IT REASONABLY RELIED ON ANY
        MISREPRESENTATION BY RAYMOND.

VI.     TO THE EXTENT NOT ALLOWED HEREIN, THE INTERVENING
        COMPLAINT BY NFIC IS NOT SUSTAINED; AND JUDGMENT WILL
        ENTER AGAINST THE COMMITTEE.

**CONCLUSION**

**APPENDIX: DETAILED FINDINGS OF FACT**

## HISTORY AND PLEADINGS

On December 18, 2006, Raymond Professional Group, Inc. ("RPG") and Raymond

Management Services, Inc. n/k/a Raymond Professional Group–Design/Build ("RMS") filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code in related bankruptcy

cases 06-16748 and 06-16753, respectively.  Raymond Professional Group is the 100 percent

shareholder of RMS.[1]  Raymond Professional Group provided shared corporate services to each

of the debtor-subsidiaries, including RMS.  The subsidiaries provided engineering, architectural,

design/build and other technical services to private and government clients, primarily in the

power, industrial and process market sectors.

On July 17, 2007, RPG filed this Adversary Complaint against William A. Pope

Company ("Pope"), originally in five counts, seeking (1) a declaration determining that RPG

owns the Account; (2) pursuant to 11 U.S.C. § 544(a), to avoid any trust found to have been

imposed on the Award; (3) to avoid the Award as a preference under 11 U.S.C. § 547(b); (4) to

avoid the Award as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B); and (5) to disallow

Pope's claim for the amount of the Award under 11 U.S.C. § 502(d).  In its Amended Answer to

Complaint, Pope asserted a counterclaim seeking *inter alia* a declaration that funds in the

Account are held in trust for its benefit pursuant to section 21.02 of the Illinois Mechanics Lien

---

[1]Additional wholly-owned subsidiaries include debtors Raymond Professional
Group–A/E, Inc. (bankruptcy case no. 06-16749), Raymond Professional Group–Government,
Inc. (bankruptcy case no. 06-16750), and Raymond International, Inc. (bankruptcy case no. 06-
16754).  Raymond Professional Group–Puerto Rico Engineering PSC (bankruptcy case no. 06-
16755) is an affiliate of RPG through common ownership.  (Collectively with RPG and RMS,
the "Debtors".)  An Order providing for joint administration has been entered.

Act. 770 Ill. Comp. Stat. Ann. 60/21.02 (West 2001) *amended by* 770 ILCS 60/21.02 (Supp.

2007) [hereinafter 770 ILCS 60/21.02].

Raymond Professional Group and RMS (collectively "Raymond") have since filed an

Amended Complaint adding Count VI seeking a declaration that Pope does not own the bank

account; that the account is not an escrow account; and that the funds in the account are not held

in trust pursuant to the Illinois Mechanics Lien Act. The Official Committee of Unsecured

Creditors (the "Committee") filed an Amended Third-Party Complaint joining in the relief

sought by RPG and RMS. Pope has counterclaimed in Count VI asserting ownership of the

account as an asserted "joint account" or as an "escrow," or through mechanics lien or trust rights

thereon. National Fire Insurance Company of Hartford ("NFIC") filed an Amended Intervening

Complaint in Count VI requesting a declaration that funds in the Account are assets of RMS and

Pope, and are to be used to satisfy obligations of RMS and NFIC under a Payment Bond that had

been provided under the EPC Contract; and also directing J.P. Morgan Chase Bank, N.A. (where

the Account is presently on deposit) to release the funds in the account to NFIC to satisfy

obligations of RMS and NFIC under the Payment Bond. Count VI and all issues therein were

bifurcated for trial separately from the other counts in the Adversary proceeding. The trial

concluded and written post-trial arguments were received in the form of Proposed Findings of

Fact and Conclusions of Law.

The proceedings have often been characterized by personal attacks on the credibility of

witnesses and the professional integrity of counsel. In their post-trial briefs, Raymond and Pope

argued in broad brush attacks that their opponent's Proposed Findings of Fact and Conclusions of

Law provided incomplete or inaccurate record citations, and otherwise mischaracterized the

-2-

record. (Pope Response at 12-13 n.7; Raymond Reply at 14 n.9-11.) They suggested that these inaccuracies "are made throughout," (Pope Resp. at 12 n.7), and asked the Court to "take extreme caution when evaluating each and every fact . . . to verify that the 'fact' is actually established by the record." (Raymond Reply at 14.) In light of these arguments, those parties were each ordered to file a Response to the Proposed Findings of Fact of the other party admitting or denying each proposed fact and citing to the trial record in support of their denials.[2] (Docket No. 391.) The parties' Responses filed as a result of that Order revealed that few of the proposed facts of each are actually disputed by the other.

Some of the stipulated facts and facts established by evidence are redundant and many are not directly relevant or necessary in resolving Count VI. Moreover, some of the stipulated documents admitted into evidence and referenced by the parties in their Proposed Findings of Fact and Conclusions of Law are duplicative.[3] Raymond used much trial time and argument trying to re-litigate issues that had been decided by the Arbitration Panel. Over Pope's objections to relevancy, Raymond was permitted to offer this evidence in support of its theory that Pope let its rights under the Mechanics Lien Act lapse by failing to perfect timely its lien claim. For reasons discussed below, however, it is now found and held that those arguments are without merit. Nevertheless, the parties were given wide latitude in presenting their positions, and all

_____

[2] This Order was entered pursuant to the District Court Local Rules, Appendix A, Guidelines for Proposed Findings of Fact and Conclusions of Law, *available at* http://www.ilnd.uscourts.gov/LEGAL/NewRules/proposed_findings_guidelines.htm (last visited Mar. 27, 2009), incorporated in this Adversary proceeding by Local Bankruptcy Rule 1002-C.

[3] In at least one instance, Raymond objected to the relevancy of a set of documents, (see Joint Trial Exhibits ("JTEx") 31, 31(a)), yet stipulated to the admission of the same documents when they were offered as exhibits attached to their Complaint. (See JTExs 237-38.) Joint Trial Exhibits 237 and 238 were duly admitted into evidence.

stipulated and proven facts and documents have been included here in order to create a full record for the possible appeal.

After considering the evidence, including stipulated evidence and arguments presented by the parties, the following Findings of Fact and Conclusions of Law are made and will be entered. Pursuant thereto it will be adjudged and declared on Count VI that: (1) the funds in the Current Account were and are impressed with a statutory trust under section 21.02 of the Illinois Mechanics Lien Act of which Pope is the sole beneficiary, and therefore those funds are not property of the bankruptcy estate of any Debtor; (2) the Initial and Current Accounts are not and were never escrow accounts; (3) the Initial and Current Accounts were always held under the foregoing statutory trust subject to claims and disputes between RMS and Pope that were resolved by Arbitration and by judgment confirming the Arbitration Award which determined that the Account is due to Pope and nothing is due to RMS from that Account or from Pope; and (4) Pope's remaining claims as to constructive trust and resulting trust, and its defense of equitable estoppel are held to be without merit.  Finally, (5) National Fire Insurance Co. and the Committee of Unsecured Creditors adopted Pope's and Raymond's arguments, respectively, and therefore the Committee is denied relief and NFIC is denied any relief sought by it that is not granted herein.

## FINDINGS OF FACT

The parties stipulated to a timeline and outline of facts which were admitted into evidence pursuant to the Second Amended Final Pre-Trial Order entered on November 20, 2008 (Docket No. 239).  The evidence presented at trial provided the further clarifying detail needed to decide the case.  The Stipulations are included in the Appendix hereto and incorporated by this

-4-

reference. The evidence stipulated to and admitted at trial was voluminous, though much of it was not directly useful in analysis of the case. Therefore it is helpful to a reader to place the detailed Findings of Fact at the end as an Appendix while this Summary of the Findings of Fact may clarify directly relevant facts that guide the ruling. Both the Appendix and the following Summary are Findings of Fact made and to be entered following trial of Count VI.

### *Summary of the Findings of Fact*

On September 12, 2000, RMS entered into the EPC Contract with AES for the engineering, procurement, construction and start-up of a cogeneration power facility (the "Project"). (Finding of Fact ("FOF") 46.) The EPC Contract called for RMS to be paid a lump sum of $34,600,000. (FOF 50.) Between the beginning of construction on the Project in July 2000, and the execution of the EPC Contract in September 2000, RMS was providing engineering, procurement, construction and start-up services pursuant to a Letter of Intent with AES (the "LOI"). (FOF 84, 86.) Raymond Professional Group was not a party to the LOI, (see FOF 86), and was not a party to the EPC Contract, nor did it have any contract with AES for the Project. (FOF 51-52.)

In January 2001, RMS and Pope executed the Subcontract effective September 12, 2000. (FOF 89-92.) Raymond Professional Group was not a party to the Subcontract, and did not have any contract with Pope for the Project. (FOF 93-94.) Thus, RPG has no apparent contractual claim against the Account because the Account was established by RMS and Pope pursuant to their contractual relationship, (though Count VI does not resolve any issue as to whether RPG would have any claim to monies in the Account as part of its bankruptcy estate should RMS prevail here).

Pursuant to paragraph 7 of the Subcontract, RMS and Pope agreed to allocate Project revenues as follows: (1) to reimburse costs incurred by third party subcontractors; (2) to reimburse RMS and Pope for their costs; (3) to provide an allowance for RMS' and Pope's projected monthly expenses; and (4) to divide the remaining profit or loss from the Project equally. (FOF 101.) In addition, paragraph 7 called for creation of an escrow account in which to deposit excess Project funds. (Id.) Finally, pursuant to paragraph 7, RMS and Pope agreed to "jointly determine and agree to expended project costs and related profitability" as of December 31, 2000. (FOF 101, 160.)

The amount of the Pope Subcontract, including profit, was $22,010,000. (FOF 108.) Pope's cost budget was approximately $18-19 million. (FOF 107.) Pope secured performance and payment bonds in the penal sum of $22 million. (FOF 109-10.) Raymond Management Services secured performance and payment bonds from National Fire Insurance Company ("NFIC") in the penal sum of $12,600,000. (FOF 68-79.)

Pursuant to the Profitability Report as of February 23, 2001, the Project had "Profitability (Excess Cash)" of $773,896 as of December 31, 2000, and $1,361,034 as of January 31, 2001, for a total of $2,134,930. (FOF 167.) On February 2, 2001, Mr. Chidley, as President of RMS, and Mr. Troyke, as President of Pope, met to discuss the opening of the escrow account called for in the Subcontract. (FOF 117.) Mr. Chidley told Mr. Troyke that articles of escrow would have to be drafted explaining RMS' and Pope's intent relative to an escrow account; that there would be an escrow agent fee; and that escrow accounts are not interest bearing. (FOF 118.)

Mr. Troyke wanted to obtain the highest possible rate of return on the deposited funds. Therefore, Mr. Chidley and Mr. Troyke agreed to open a commercial checking account requiring

-6-

the dual signatures of a RMS representative and a Pope representative to disburse funds or make changes to the account. (Id.) Pope thereby waived the escrow requirement in the Subcontract, and no escrow account was ever established. (See discussion below in Conclusions, Part IV.) In February 2001, the Initial Account was opened with the $2,134,930 excess cash as of January 31, 2001. (FOF 162-67.)

Thereafter billing disputes continued between RMS and Pope regarding the accuracy of Pope's claimed costs and whether or not Pope's invoices included profit. (See FOF 158.) Raymond Management Services stopped remitting payment to Pope for Pope's work after March 2001. (FOF 178.) According to the Sworn Statement for Contractor to Owner dated March 6, 2001, and submitted by RMS to AES in connection with the RMS February 2001 pay request, Pope's Balance to Complete was to cost $3,198,057.34. (FOF 174.)

On May 23, 2001, Pope made a claim on the RMS Payment Bond issued by NFIC. (FOF 180.) On June 19, 2001, Pope executed a Notice of Claim of Subcontractor, 770 ILCS 60/24 which was delivered to AES. (FOF 181-83.) From June 2001 through October 3, 2001, AES withheld payment for RMS' invoices covering work performed in May 2001. (FOF 184.)

On September 26, 2001, RMS, Pope and NFIC entered into an Interim Settlement Agreement (the "ISA"), (FOF 194), in order to facilitate the payment of Project funds from AES and agree on the minimum amount due to Pope at the time. (See FOF 199.) The ISA called for the payment of certain amounts from RMS to Pope in exchange for Pope's execution of a waiver of lien. (FOF 202.) Specifically, pursuant to paragraph 7 of the ISA, RMS agreed to pay Pope $2,808,671 from the Account or as funds became available in the Account. (FOF 206.) At the time of the ISA, Pope claimed that it was owed more than that amount from RMS. (FOF 212.)

-7-

Raymond Management Services concedes that only $220,000 of the amounts called for in paragraph 7 were ever paid to Pope. (FOF 273-76.)

On September 26, 2001, a Pope representative executed a "Final Waiver of Lien and Release" on its behalf. (FOF 217-19.) The September 26, 2001 "Final" Lien Waiver contained an exception for Pope's "claim for any retainage withheld for not-yet-completed punch list work [and] for any sums owed for the work which is the subject of the pending but not-yet-resolved change order requests." (FOF 223.) That language was drafted by counsel for RMS. (FOF 244.) AES initially objected to Pope's excepting from waiver and release its claims for retainage and contract change orders. (FOF 245.) Counsel for RMS told AES that Pope would submit a revised lien waiver but disagreed with AES' characterization of the lien waiver as "insufficient and defective," because "it is unfair and unreasonable for AES to request that the Lien Waivers be final and absolute, without exception, because they are not being exchanged for final payment." (FOF 248.)

AES did subsequently accept the September 26, 2001 Final Lien Waiver, and on October 3 and October 12, 2001, AES made three payments totaling $1,815,917 for RMS' invoices for May through July 2001. (FOF 250.) On September 27, 2001, Pope sent AES a letter withdrawing its June 19, 2001 Notice of Claim. (FOF 252-53.) The amount of difference between Pope's September 26, 2001 Lien Waiver and the immediately preceding partial lien waiver, or $305,118.71, was used to pay Pope subcontractors. (FOF 226.)

Raymond argues that Pope fully and finally waived its lien rights by virtue of the September 26, 2001 Lien Waiver. However, merely because the September 26, 2001 Lien Waiver was entitled a "Final Waiver of Lien and Release" does not make it so. A waiver of

mechanics lien will not be given effect beyond its terms, and waivers specified to be partial lien

waivers will be enforced as such. (See discussion below in Conclusions, Part I.A.) The

September 26, 2001 Lien Waiver specifically excepted from waiver and release Pope's claims for

retainage and contract change orders and, therefore, Pope did not thereby waive its lien claims to

payment for those additional matters. (Id.)

After November 2001, disputes existed between AES and RMS regarding approximately

$1 million withheld as retainage, and approximately $2.8 million for contract change orders.

(FOF 317.) On June 6, 2002, RMS recorded a lien against the real estate on which the Project is

located for approximately $3.8 million. (FOF 320-21.) Pope assisted RMS in attempting to

collect funds from AES in connection with the Retainage and Extra Work. (FOF 324.) Its

representative attended two meetings between AES and RMS where a settlement of those claims

was discussed. (FOF 332.) On or about January 30, 2003, AES and RMS entered into the AES

Settlement Agreement, (FOF 326), whereby RMS agreed to accept $2.5 million in exchange for a

waiver and release of all claims against AES. (FOF 334.) Pope agreed with RMS as to that

settlement amount, and gave its waiver of lien along with RMS' lien waiver so that AES would

agree to pay the settlement. (See FOF 332.)

Raymond argues that by the time RMS paid the $2.5 million, Pope had let its rights under

the Illinois Mechanics Lien Act lapse by failing to follow the strict statutory requirements of that

Act. However, RMS' Sworn General Contractor's Statement served to put AES on notice of

Pope's claim as required by section 24 of the Mechanics Lien Act. (See discussion below in

Conclusions, Part I.B.) In addition, contrary to Raymond's argument that Pope was required to

perfect its lien claim within four months of providing labor or materials, the applicable provision

of the Illinois Mechanics Lien Act gives a subcontractor two years to file a lien claim against an

owner, (id.), and AES paid the agreed settlement of $2.5 million before the two years expired in

return for final waivers of lien from RMS and Pope.

The AES Settlement Agreement required Pope as well as RMS to provide their respective

final waivers of mechanics lien. According to the Pope January 30, 2003 Final Lien Waiver, that

waiver was given in exchange for "Ten Dollars ($10.00), and other good and valuable

consideration. . . ." (FOF 350.) In addition, that Final Lien Waiver included a section entitled

"Contractor's Affidavit" in which Pope acknowledged having received $19,656,738.54. (FOF

352.) The difference between the amount thereby shown on the January 30, 2003 Final Lien

Waiver and the prior September 26, 2001 Lien Waiver, amounted to $2,505,603.51. All of that

sum except for the $220,000 used to pay Pope pursuant to paragraph 7 of the ISA, was used to

pay Pope subcontractors from the Initial Account between October 1, 2001 and November 25,

2002. (FOF 353.) The January 30, 2003 Contractor's Affidavit listed Pope's total contract value

for the Project as $22,900,000, (FOF 354), leaving an unpaid balance due and claimed of

$3,243,261.46. (FOF 355.)

Raymond argues that at most $10.00 could be held in trust under the Mechanics Lien Act,

disregarding the other words in the lien waiver ("other good and valuable consideration") which

did not make a precise dollar claim. However, the Contractor's Affidavit identified what the

"other good and valuable consideration" consisted of. That affidavit served to put AES on

notice, consistent with the RMS March 6, 2001 Sworn Statement, that Pope asserted a lien claim

in excess of $3 million. The evidence shows that, except for the $220,000 paid to Pope, all

-10-

amounts paid between September 2001 and November 2002, and reflected in the acknowledged $19,656,738.54, were used to pay Pope's subcontractors, not Pope.

At that time, Pope held and asserted an inchoate lien claim that exceeded the amount of the $2.5 million AES Settlement amount. The Illinois Mechanics Lien Act protects an owner who follows the statutory procedures from having to pay more than it owes on the prime contract. AES was on notice that Pope claimed more than the settlement amount, and therefore it required a waiver of lien before paying any more sums to RMS. It is of no legal consequence what consideration Pope recited in the Final Lien Waiver as long as that document satisfied the requirements of a lien waiver so as to protect AES from any lien claim in exchange for the payment of the $2.5 million settlement. Therefore, Pope is able to recover on its lien claim. (See discussion below in Conclusions, Part I.C.)

On February 4, 2003, AES caused $2.5 million to be deposited directly into the Account. (FOF 367.) Subsequently, Pope renewed its demand for payment from RMS, and RMS made a written demand for an accounting of Project costs in Arbitration. (FOF 370-72.) The cost and performance-based disputes were arbitrated under American Arbitration Association (the "AAA") procedures as required by an arbitration provision of the Subcontract. The purpose of the arbitration was to resolve the dispute regarding claimed costs, and provide an accounting of project revenue to be divided between RMS and Pope.

On November 30, 2006, the Arbitration Panel issued its Award. (FOF 484.) The Award found that "[t]he total amount to be paid Pope is $3,634,714," (FOF 496), which was to be satisfied from the funds in the Account and interest accrued thereon, and any additional funds required were due from RMS. (Id.) The Award denied all RMS claims. Since the Award was

-11-

larger than the funds on deposit in the Account, the Award meant that the entire Account was due

to Pope. The Award has since been confirmed and judgment thereon entered in favor of Pope

through an Adversary proceeding in this Court. Raymond Mgmt. Servs. v. William A. Pope Co.

(In re Raymond Prof'l Group, Inc.), No. 07-A-00137, 397 B.R. 414 (Bankr. N.D. Ill. 2008) at

Docket Nos. 56, 59 *supplemented by* 400 B.R. 621 (Bankr. N.D. Ill. 2008) at Docket Nos. 62, 63.

That judgment was not appealed, and therefore it stands to fix the amount of debt owed by RMS

to Pope and to determine that the entire Account was to be the source of payment to Pope

through their contractual agreement.

In confirming the Award, it was found and held that the issue as to ownership of the bank

account was not litigated by parties in the Arbitration proceeding and was not adjudicated by the

AAA Panel Award. Id. The instant litigation is to determine whether or not Pope owns the

account or otherwise has an interest in the funds deposited therein which should be recovered by

Pope in whole or partial satisfaction of the debt owed to it.

For the foregoing reasons discussed in detail below, it will be found and held that Pope

did not waive its lien rights by virtue of the September 26, 2001 Lien Waiver or let its lien rights

lapse by failing to follow the statutory requirements of the Mechanics Lien Act. Rather, Pope

held a valid inchoate lien claim as of January 30, 2003. AES and RMS requested and required

Pope to provide a lien waiver in exchange for the $2.5 million AES Settlement. Pursuant to

section 21.02 of the Mechanics Lien Act, those funds were held in trust and deposited into the

Account subject to RMS' and Pope's claims against one another under the Subcontract. The

Arbitration Panel found that RMS was owed nothing on the Subcontract. Having no debt owed

to it, any mechanics lien interest of RMS and mechanics lien trust rights in the Account protect

nothing for RMS. Therefore, it will be found and held that all funds in the Account (which are less than amount of the Award to Pope) are held in trust under the Illinois Mechanics Lien Act for the sole benefit of Pope, and therefore are not property of the bankruptcy estate of any Debtor.[4]

All other issues in Count VI of the Adversary proceeding are then easily resolved. The Committee of Unsecured Creditor's position fails with that of Raymond. Whether or not National Fire Insurance Co. is liable to Pope under the Payment Bond for any deficiency after the funds in the Account are used to pay Pope lies outside the bankruptcy court's core and related jurisdiction and, therefore, cannot be decided here.

Detailed numbered Findings of Fact are included as an Appendix hereto and incorporated here by this reference.

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This Adversary proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

---

[4]Following trial, the parties were ordered to supply a bank record showing the amount on deposit. The bank statement through June of 2009 was supplied and filed of record, (Docket No. 414), showing a balance on deposit of $3,331,121.

## CONCLUSIONS OF LAW

### *Introduction*

The key issue that must be decided in Count VI of Plaintiffs' Amended Complaint is whether or not the Current Account is property of the RMS bankruptcy estate or was subject to the mechanics lien interest of Pope and is now held in trust for Pope.

Pursuant to 11 U.S.C. § 541(a)(1), the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." However:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Accordingly, property held in trust for the benefit of others at the time of the filing of the bankruptcy petition is not property of the estate. United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.10 (1983); Marrs-Winn Co., Inc. v. Giberson Elec., Inc. (In re Marrs-Winn Co., Inc.), 103 F.3d 584, 589 (7th Cir. 1996).

As the Account is the largest potential asset of either Debtor, Raymond argues that it would be inequitable for Pope to obtain priority rights over it thereby leaving nothing for other creditors. (Raymond Post-Trial Brief at 10.) "However, the estate's rights are limited to those had by the debtor: 'whatever rights a debtor had at the commencement of the case continue in bankruptcy--no more, no less.'" Matter of Jones, 768 F.2d 923, 927 (7th Cir. 1985) (quoting Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir.1984)). "Property interests are created and defined by state law." Butner v. United States, 440 U.S. 48, 55 (1979). Looking to state law to determine the estate's interest "prevent[s] a party from receiving 'a windfall merely by reason

-14-

of the happenstance of bankruptcy.'" Id. (quoting Lewis v. Mfr. Nat'l Bank, 364 U.S. 603, 609

(1961)). In this case, by looking to state law under which Pope is found to be beneficiary of a

trust under the Illinois Mechanics Lien Act, other creditors are prevented from receiving a

windfall at Pope's expense.

In its Counterclaim to Count VI, Pope alleges three alternative theories as to why funds in

the Initial and Current Accounts are not property of either of the Debtors bankruptcy estates,

namely: (1) the funds in the Account are held in trust for the benefit of Pope under the Illinois

Mechanics Lien Act, 770 ILCS 60/21.02; (2) the Account is an escrow account of which Pope is

now the beneficiary; and (3) alternatively, the account is jointly owned by Pope and RMS.

Whether a claimed interest in property is property of the estate is a "federal question to be

decided by federal law; however, courts must look to state law to determine whether and to what

extent the debtor has any legal or equitable interests in property as of the commencement of the

case." Butner, 440 U.S. at 55. The parties agree that Illinois law applies, and Illinois state law

determines Pope's interest, if any, in the Account. As discussed below, Pope prevails under its

mechanics lien trust theory, not on the others.

I.   FUNDS IN THE ACCOUNT ARE HELD IN A PREBANKRUPTCY TRUST FOR
     POPE UNDER THE ILLINOIS MECHANICS LIEN ACT.

According to the Illinois Mechanics Lien Act:

Construction Trust Funds. Any owner, contractor, subcontractor, or supplier of
any tier who requests or requires the execution and delivery of a waiver of
mechanics lien by any person who furnishes labor, services, or materials for the
improvement of a lot or a tract of land in exchange for payment or the promise of
payment, shall hold in trust the unpaid sums subject to the waiver of mechanics
lien, as trustee for the person who furnished the labor, services, or materials.

770 ILCS 60/21.02(a). The Mechanics Lien Act thereby imposes a statutory trust on money

-15-

owed by an owner (in this case AES) in favor of the contractor (in this case RMS) and its

subcontractor (in this case Pope) until waivers of lien are supplied to the owner and money is

paid. In addition to the owner and contractor, the language of the statute specifically

contemplates that a "subcontractor, or supplier of any tier" can request or require a waiver of

lien, and therefore holds in trust sums due but was paid to these parties. Therefore, the money

paid by the owner remains in the trust as it passes through to contractors and subcontractors so as

to protect the suppliers at any tier until all are paid.

The Statute has five elements: (1) when an owner or contractor requests or requires (2)

the execution and delivery of a waiver of mechanics lien (3) by any person who furnishes labor,

services, or materials for the improvement of land (4) in exchange for payment or the promise of

payment, (5) the sums subject to the waiver of mechanics lien are held in trust.

Here, AES, the owner, agreed with RMS to settle all claims against it for payment of $2.5

million. The payment was conditioned on RMS and Pope each providing waivers of lien. Those

lien waivers were given, and the $2.5 million was deposited into the Initial Account.

In interpreting the Mechanics Lien Act, "[m]echanic's liens are purely statutory, in

derogation of the common law, and must be strictly construed." Midwest Envtl. Consulting &

Remediation Servs., Inc. v. Peoples Bank of Bloomington, 620 N.E.2d 469, 472 (Ill. App. Ct.

1993) (citing Hoier v. Kaplan, 145 N.E. 243, 244 (Ill. 1924)). On the other hand, "[t]he object

and purpose of the Act is to protect those who in good faith furnish material or labor for the

construction of a building." Norman A. Koglin Assocs. v. Valenz Oro, Inc., 659 N.E.2d 971,

975 (Ill. App. Ct. 1995) aff'd 680 N.E.2d 283 (Ill. 1997) (citing State Bank of Lake Zurich v.

Winnetka Bank, 614 N.E.2d 862, 869 (Ill. App. Ct. 1993)). The Act balances the owner's benefit

-16-

of the bargain with the subcontractor's right to be paid for the labor and materials furnished in good faith. Premier Elec. Constr. Co. v. American Nat'l Bank of Chicago, 658 N.E.2d 877, 883 (Ill. App. Ct. 1995) (citing Edward Hines Lumber Co. v. Dell Corp., 364 N.E.2d 368, 375 (Ill. App. Ct. 1977)). Terms of the Mechanics Lien Act should be construed in a way to carry out its remedial purpose. Petroline Co. v. Advanced Envtl. Contractors, Inc., 711 N.E.2d 1146, 1149 (Ill. App. Ct. 1999) (citing 770 ILCS 60/39).

Those principles have been reconciled as follows: "The statute is strictly construed as to the requirements which bring one within the statute, but this strict construction applies only to the requirements upon which the right to a lien depends and is not used to invalidate a lien which had properly attached." Koglin Assocs., 659 N.E.2d at 975 (quoting State Bank of Lake Zurich, 614 N.E.2d at 869).

Pope cites Doing Steel, Inc. v. Castle Constr. Corp., No. 02-C-1674, 2002 WL 31664476, at *4-5 (N.D. Ill. Nov. 21, 2002), for the proposition that language of section 21.02 of the Mechanics Lien Act is unambiguous and, therefore, must be given its plain meaning. See also Safeco Ins. Co. v. Wheaton Bank & Trust Co., No. 07-C-2397, 2008 WL 216396, at *5 (N.D. Ill. Jan. 24, 2008); James Cape & Sons Co. V. Bowles (In re Bowles), 318 B.R. 129, 142 (Bankr. E.D. Wis. 2004). Pope argues that it provided the January 30, 2003 Final Lien Waiver in exchange for AES depositing $2.5 million into the Initial Account and, therefore, those funds are held in trust for the benefit of Pope.

Raymond argues that Doing Steel and Bowles can be distinguished from the facts presented here, because in those cases the subcontractors seeking to impress the funds with a statutory trust conceded that they did not provide lien waivers. 2002 WL 31664476, at *5; 318

-17-

B.R. at 142. In those cases, it was held that application of the Mechanics Lien Act was clear: If

no lien waiver is provided there can be no statutory trust. (Id.)

To challenge Pope's statutory lien and trust rights, RMS disputes the legal effect of

Pope's January 30, 2003 Final Lien Waiver arguing that Pope had previously waived its lien

rights by virtue of the Pope September 26, 2001 Lien Waiver. Alternatively, Raymond argues

that Pope let its lien rights lapse by failing to perfect them after September 2001 pursuant to

procedures set forth in 770 ILCS 60/7, 24 (West 2009). Finally, Raymond argues that if any

sums are held in trust, only the amount of $10.00 is the subject of the January 30, 2003 Final

Lien Waiver, even though that document recited that it was given for "$10.00 and other good and

valuable consideration." (JTEx 164.)

    a.    <u>Pope did not waive its lien rights by virtue of the September 26, 2001 "Final"
Lien Waiver.</u>

Pope first argues that the September 26, 2001 Lien Waiver was rejected by AES and,

therefore Pope did not waive any lien rights as a result thereof. Raymond asserts that the

September 26, 2001 Lien Waiver was eventually accepted by AES. Indeed, it is clear that after

initially objecting to its form and content, AES did accept the September 26, 2001 Lien Waiver.[5]

---

[5]Assuming *arguendo* that AES did not accept the September 26, 2001 Lien Waiver,
Raymond argues that Pope waived its lien rights by entering into the Interim Settlement
Agreement, and that based on promises made in the ISA, Pope is estopped from now relying on
the Mechanics Lien Act. (Raymond Post-Trial Brief at 6-10.) Raymond further argues that Pope
had a contractual obligation pursuant to paragraph 3 of the ISA to provide an acceptable lien
waiver, and failure to do so constitutes a breach of the ISA. (Id. at 12-13.) Although the
relevancy of these arguments are partially affected by the finding that AES accepted the
September 26, 2001 Lien Waiver, it must be found and held that Raymond waived its remaining
promissory estoppel arguments by not timely raising them before trial as required by the Pre-
Trial Order.

    A Second Amended Final Pre-Trial Order was entered herein on November 20, 2008,

AES originally objected to the fact that the Lien Waiver "except[ed] claims for retainage, punch list work and scope change requests." (FOF 245; JTEx 95.) Although AES' counsel testified that AES never accepted the September 26, 2001 Lien Waiver, (FOF 250), the evidence admitted at trial establishes that counsel for RMS eventually persuaded AES to accept the Lien Waiver, and that AES paid out monies in reliance thereon. In particular, between October 3 and October 12, 2001, AES made three payments totaling $1,815,917 an amount that corresponds to the total amount of RMS' invoices for May through July 2001. (Id.) Since AES

---

which required the parties to file Proposed Findings of Fact and Conclusions of Law seven days prior to the trial. According to the Order, "Any party not filing proposed Conclusions of Law or a brief may be found to have waived legal issues not thereby presented." In addition to its Proposed Findings of Fact and Conclusions of Law, Raymond chose to file a Pretrial Statement. Final pretrial orders are designed to prevent unfair surprise and give parties an opportunity to fairly prepare for and defend against new claims. Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.), 351 B.R. 529, 596 (Bankr. N.D. Ill. 2006) (citing Gorlikowski v. Tolbert, 52 F.3d 1439, 1443-44 (7th Cir. 1995)).

Nowhere in its Proposed Findings and Conclusions or its Pretrial Statement did Raymond articulate its legal theory that Pope waived its lien rights by entering into the ISA or that Pope should be estopped from relying on the Mechanics Lien Act for allegedly breaching the ISA by failing to provide an acceptable lien waiver. As a result, these arguments would be deemed waived. SNA Nut Co. v. Haagen-Dazs Co., 302 F.3d 725, 732 (7th Cir. 2002) (holding that "a defense not raised in a pretrial order is deemed waived."). However, since AES did accept the September 26, 2001 Lien Waiver, this issue is moot.

Furthermore, it is found and held that Pope did not make any asserted misrepresentation supporting any promissory estoppel. According to paragraph 3 of the ISA, "Provided that Raymond performs in accordance with this Agreement, Pope agrees not to file or assert any further mechanic's liens pertaining to or arising out of the Project." (JTEx 85.) First, in order to be actionable the alleged misrepresentation has to be of a past fact, and not of some speculative future event. In addition, it is found and held that Pope performed in accordance with paragraph 3 of the ISA. Pope withdrew its Notice of Claim of Subcontractor on September 27, 2001. (FOF 252-53.) However, for the reasons discussed below, AES was on notice by virtue of the RMS March 6, 2001 Sworn Statement that Pope had an inchoate lien. AES requested the January 30, 2003 Final Lien Waiver based on the notice from RMS, and not as a result of any mechanics lien filed or asserted by Pope. Therefore, Pope did not make any actionable misrepresentation.

made those payments which AES had been withholding from RMS, its earlier objections to the

September 26, 2001 Lien Waiver had been resolved.

However, finding that AES accepted the September 26, 2001 Lien Waiver does not mean

that Pope waived its further lien rights. Calling the September 26, 2001 lien waiver a "Final

Waiver of Lien and Release", even though that is how the parties sometimes refer to it, (see FOF

217 n.19), did not make it final.

> A waiver of a mechanic's lien will not be given effect beyond its terms, and
> waivers intended to be partial lien waivers as to particular work will be enforced
> as such. A purported final waiver will be effective for work completed at the time
> the waiver is given, but may not affect work done after the date of the final waiver
> pursuant to an additional contract. . . . A waiver for a clearly expressed special
> purpose will be confined thereto, but where the waiver is general the enforcement
> thereof is broad, and when nothing shows a contrary intention, it will be enforced
> as written.

26 Ill. Law and Prac. Mechanics' Liens § 87 (2008) (internal citations omitted). Therefore, to

determine the scope of the September 26, 2001 Lien Waiver, one must look to actual language of

the document.

Raymond argues that the language waiving any lien for labor or materials furnished

"heretofore or which may hereafter be furnished," (JTEx 88) expresses Pope's intent to waive

finally all its lien rights. This argument completely ignores the last paragraph of the September

26, 2001 Lien Waiver which provides that "this waiver and release does not waive or release the

undersigned's claim for any retainage withheld for not-yet-completed punchlist work nor for any

sums owed for the work which is the subject of the pending but not-yet-resolved change order

requests." (FOF 223.)

It is this last paragraph to which AES originally objected, because the language allowed Pope to retain its lien claim for retainage and extra work. Relying on Midwest Envtl. Consulting, 620 N.E.2d at 472, Raymond now argues that Pope's lien claim and contract rights were cumulative, and therefore it contends that the "claim" referred to in the last paragraph of the September 26, 2001 Lien Waiver referred to any contract claim on the underlying obligation. However, RMS did not make this argument to AES when it was trying to convince AES to accept the September 26, 2001 Lien Waiver. Rather, Mr. Friedlander, counsel for RMS, wrote to counsel for AES, that it was unfair and unreasonable for AES to demand that Pope waive its lien rights relating to the retainage and extra work. (FOF 248.) In addition, Mr. Friedlander invoked industry custom and usage, arguing that "[i]n the typical construction project, final, unconditioned waivers of lien are exchanged for the final payment, not for a second- or third-to-last payment." (Id.) Raymond concedes that the September 26, 2001 Lien Waiver, including the last paragraph, was drafted by Mr. Friedlander. Any ambiguity should be interpreted against the drafter. Baker v. America's Mortg. Servicing, Inc., 58 F.3d 321, 327 (7th Cir. 1995). If he intended that "claim" referred merely to Pope's contract rights, he would have argued such to AES.

It must be found and concluded that under the express language of the September 26, 2001 Lien Waiver, Pope excepted certain claims for retainage and extra work and, therefore, did not therein fully and finally waive all of its mechanic lien rights.

b.   <u>Pope was not required to file and therefore did not fail to file timely its lien claim.
Accordingly, it did not allow its rights under the Mechanics Lien Act to lapse.</u>

Over Pope's objection, Raymond devoted much effort at trial to presenting evidence

regarding when Pope completed work on the Project, and the nature of that work as punch list,

warranty or repair work. Pope's objections were overruled based on Raymond's argument that

the evidence was relevant to its theory that Pope's lien rights had lapsed by January 2003 and,

therefore, the January 30, 2003 Final Lien Waiver was null and void. In its post-trial briefs,

Raymond argues that punch list, warranty and repair work is not lienable and, therefore, Pope last

performed lienable work in August 2001.[6] Raymond argues further that under the Mechanics

Lien Act a lien claimant has to perfect its lien claim by filing same with the county Recorder of

Deeds within four (4) months of furnishing labor or materials, and that Pope let its lien rights

lapse by failing to do so within four months of August 2001. However, as shown below the

Mechanics Lien Act clearly provides that a contractor or subcontractor has two (2) years to file a

lien claim against an owner, 770 ILCS 60/7 (West 2009). The owner, AES, honored the lien

claims of RMS and Pope by payment of its settlement thereof in January 2003, well within the

two years after August 2001, thus mooting any need for Pope to file its lien claim at some

subsequent date within the two years. Raymond's arguments regarding the last date on which

Pope performed lienable work are, therefore, irrelevant.

---

[6] Under Illinois law, "[w]ork that is trivial and insubstantial, and not 'essential to the
completion of the contract' does not extend the time to file a lien under the Mechanics Lien Act."
<u>SLT Realty</u>, 731 N.E.2d at 401-02 (quoting <u>Braun-Skiba, Ltd. v. La Salle Nat'l Bank</u>, 665
N.E.2d 485, 491 (Ill. App. Ct. 1996)). It is well-settled, therefore, that warranty and corrective
repair work is generally held not to be lienable under Illinois law. <u>In re Mech. Servs., Inc.</u>, 133
B.R. 441, 447 (Bankr. N.D. Ill. 1991); <u>Cyclonaire Corp. v. ISG Riverdale, Inc.</u>, 882 N.E.2d 684,
690 (Ill. App. Ct. 2007).

-22-

Providing labor or furnishing materials creates an inchoate lien which must be perfected in accordance with the procedural requirements of the Mechanics Lien Act. Delaney Elec. Co., Inc. v. Schiessle, 601 N.E.2d 978, 982 (Ill. App. Ct. 1992). Raymond argues that Pope let its lien rights lapse after August 2001 by failing to perfect them within the time required by the Mechanics Lien Act. It suggests that there are two steps to perfection: (1) that the subcontractor must provide the owner with a written notice of claim within ninety (90) days of furnishing labor or material, see 770 ILCS 60/24 (West 2009); and (2) that the subcontractor must file its lien with the Recorder of Deeds for the county within which the project sits within four months of furnishing labor or material. See 770 ILCS 60/7 (West 2009).

Raymond's argument regarding the ninety-day notice requirement results from a partial reading of the statute. According to the full applicable text of section 24 of the Mechanics Lien Act:

> [Subcontractors] . . . may at any time after making his or her contract with the contractor, and shall within 90 days after the completion thereof . . . cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent by registered or certified mail, with return receipt requested, and delivery limited to addressee only, to or personally served on the owner of record or his agent or architect, or the superintendent having charge of the building or improvement and to the lending agency, if known; and such notice shall not be necessary when the sworn statement of the contractor or subcontractor provided for herein shall serve to give the owner notice of the amount due and to whom due, but where such statement is incorrect as to the amount, the subcontractor or material man named shall be protected to the extent of the amount named therein as due or to become due to him or her. . . .

770 ILCS 60/24 (West 2009) (emphasis added). Therefore, apart from the procedure for a ninety-day notice, an owner can receive valid notice of a claim through a contractor's sworn statement. In this case, AES was put on adequate notice of Pope's lien claim by virtue of the

-23-

amounts listed in the "Balance to Complete" column of the RMS March 6, 2001 Sworn

Statement. See Contractor's Remedy-Mix, Inc. v. Earl Given Constr. Co., 611 N.E.2d 529, 532

(Ill. App. Ct. 1993) ("Where . . . a prior section 5 affidavit of the contractor had stated that 'the

items mentioned [in that affidavit] include all labor and material required to complete said work'

no further section 5 affidavit was required to justify payment by the owner to the contractor.").

"The purpose of the strict notice requirements of section 24 is to prevent owners from

being forced to pay subcontractors for labor or materials for which they have already paid the

contractor." Petroline Co., 711 N.E.2d at 1149-50. Furthermore, "Illinois courts have

interpreted the strict requirements of notice by examining how effectively a party did in fact

notify the other side rather than simply basing rights solely on whether every phrase of the statute

was followed in exact detail." Id. (quoting A.Y. McDonald Mfg. Co. v. State Farm Mut. Auto.

Ins. Co., 587 N.E.2d 623, 627 (Ill. App. Ct. 1992)). Therefore, "when the owner receives actual

notice and his or her rights are protected, courts have been willing to overlook minor formal

deficiencies." Id.

In this case, it is clear that AES had notice of Pope's lien claim regarding the retainage

and extra work. AES was fully protected because it had not yet parted with money, and

requested the January 30, 2003 Final Lien Waiver before making any payment. The ninety-day

notice requirement was therefore not a requirement upon which Pope's lien rights as to AES

depended, because AES had other written notice of Pope's claims.

Failure of Raymond counsel to read the entire statute is fatal to the second prong of

argument concerning recording of the mechanic's lien claim. According to the first sentence of

section 7 of the Mechanics Lien Act, "No contractor shall be allowed to enforce such lien against

or to the prejudice of any other creditor or incumbrancer or purchaser, unless within 4 months

after completion . . ." the contractor brings an action to enforce or records its lien. 770 ILCS

60/7 (West 2009). Since no litigation was filed within four months, Raymond focuses on the

alternative recording requirement. "The four-month recording requirement is intended to give

third parties dealing with the property, other than those with an ownership interest, notice of the

lien." Koglin Assocs., 680 N.E.2d at 286 (citing Federal Savs. & Loan Ins. Corp. v. American

Nat'l Bank & Trust Co., 450 N.E.2d 820, 822 (Ill. 1983)).

However, the recording requirement is different as to owners. Id. (citing 770 ILCS 60/7).

According to the second sentence of section 7, "Such claim for lien may be filed at any time after

the claimant's contract is made, and as to the owner may be filed at any time after the contract is

made and within 2 years after the completion of the contract. . . ." 770 ILCS 60/7 (emphasis

added.)

The applicable recording period in this case relative to AES is therefore set forth in the

second sentence of section 7. Assuming as held earlier that Pope's lienable work was last

performed in August 2001, based on the plain reading of section 7, it is found and held that Pope

still had until August 2003 to record and thereby to perfect its lien claim against AES. However,

Pope held an inchoate lien at the time it delivered the January 30, 2003 Final Lien Waiver in

return for the $2.5 million settlement from AES being paid into the Account, all done well within

the two year period. Accordingly:

> [W]here inchoate liens have been satisfied by timely payment, a contractor has no
> cause or need to record its verified claim for lien. In fact, if a mechanics lien
> claim has been paid or satisfied, the contractor whose claim has been paid may not
> bring a cause of action under the Act.

<u>Golfview Dev'l Ctr., Inc. v. All-Tech Decorating Co. (In re Golfview Dev'l Ctr., Inc.)</u>, 309 B.R.

758, 769 n.3 (Bankr. N.D. Ill. 2004). Because Pope held valid inchoate lien rights as of January

30, 2003, AES and RMS requested and required the execution and delivery of the January 30,

2003 Final Lien Waiver before AES would pay the $2.5 million. That money was paid, so it

cannot be said that Pope's lien rights lapsed.

    c.    <u>The January 30, 2003 Final Lien Waiver applied to Pope's outstanding lien claim
which exceeded the amount of the AES settlement.</u>

The remaining issue is raised by the Raymond argument as to what amounts were the

subject of the January 30, 2003 Final Lien Waiver.

Raymond argues that if any funds are held in trust under the Illinois Mechanics Lien Act,

the only "unpaid sums subject to the waiver of mechanics lien" is the $10.00 referred to on the

face of the January 30, 2003 Final Lien Waiver. Raymond concedes that there is no Illinois

precedent that directly address what the phrase "unpaid sums subject to the waiver of mechanics

lien" means. (Raymond Post-Trial Brief at 21.) The Mechanics Lien Act must be interpreted the

way can interpreting judge reasons that the Illinois Supreme Court would do so. <u>See</u> <u>Doing

Steel</u>, 2002 WL 31664476, at *4 (citing <u>Erie R. Co. V. Tompkins</u>, 304 U.S. 64, 78 (1938)

(additional citations omitted)). Under Illinois law, the primary goal in interpreting the language

of a statute "is to ascertain and give effect to the legislature's intent." <u>Id.</u> (quoting <u>Michigan Ave.

Nat'l Bank v. Cook County</u>, 732 N.E.2d 528, 535 (Ill. 2000)). The statutory language is the best

indication of the legislature's intent. <u>Doing Steel</u>, 2002 WL 31664476, at *4 (citing <u>Yang v. City

of Chicago</u>, 745 N.E.2d 541, 545 (Ill. 2001)).

Raymond cites <u>Doing Steel</u> for the proposition that "the unpaid sums subject to the

waiver of mechanics lien" should be read to mean those sums due that subcontractor. 2002 WL

31664476, at *5. This is so, but it is absurd to argue that Pope was only due $10.00 when it

executed the January 30, 2003 Final Lien Waiver.

The interpretation of section 21.02 is complicated by the fact that the use of the term "lien

waiver" does not appear to be consistent with the overall notice requirements and payment

scheme contemplated by the Mechanics Lien Act. For one, "the [Mechanics Lien] Act does not

define lien waivers, or explain their effect." <u>Contractor's Ready-Mix, Inc. v. Earl Given Constr.</u>

<u>Co.</u>, 611 N.E.2d 529, 537 (Ill. App. Ct. 1993) (Cook, J. concurring). Except for section 21.02,

"[t]he term 'final lien waiver' is not used in the Act." <u>Id.</u> (Section 21.02 was added to the

Mechanics Lien Act effective July 25, 1997.)

In <u>Contractor's Ready-Mix</u>, the Illinois appellate court reversed the trial court's finding

"that section 22 of the [Mechanics Lien] Act authorizes an owner to require a lien waiver from

any party." <u>Id.</u> at 534. Nevertheless, it is "a well-established practice [that] prudent owners and

contractors often demand lien waivers to support their payments to persons entitled to [those

payments]." <u>Id.</u> at 535. It is not uncommon in the construction industry for a contractor or

subcontractor to furnish a lien waiver swearing she has been paid even though, in fact, she has

not been paid. 24 Ill. Prac., Illinois Construction Law Manual § 13:46 (2007-2008 ed.) (citing

<u>Edward Hines Lumber Co. v. Dell Corp.</u>, 364 N.E.2d 368 (Ill. App. Ct. 1977) ("The evidence

amply demonstrated that [the supplier], following a building industry custom, issued its lien

waiver to [the subcontractor] before receiving payment.")). The Mechanics Lien Act, therefore,

creates a statutory trust as to monies not paid but claimed to be due when the "owner, contractor,

-27-

subcontractor, or supplier of any tier who requests or requires the execution and delivery of a

waiver of lien . . . in exchange for payment or promise of payment. . . ." Id. (citing 770 ILCS

60/21.02).

While the Act provides for certain steps that the parties may take to protect themselves,

neither the owner nor a subcontractor is required to take every precaution afforded by the Act.

Rather, "[t]he Act seeks a fair result in each case." Contractor's Ready-Mix, 611 N.E.2d at 536

(Cook, J. Concurring).

According to section 32 of the Mechanics Lien Act, "No payments to the contractor . . .

shall be regarded as rightfully made, as against the sub-contractor . . . if made by the owner

without exercising and enforcing the rights and powers conferred upon him in Sections 5, 21 and

22 of this Act."[7] 770 ILCS 60/32.

Section 21 of the Mechanics Lien Act defines who is a subcontractor and provides for a

lien for subcontractors for the unpaid amount of the value of their labor and material furnished to

the premises plus interest as provided for the contractor under section 1. 770 ILCS 60/21(a);

Contractor's Ready-Mix, 611 N.E.2d at 530. However, "in no case . . . shall the owner be

compelled to pay a greater sum for . . . the completion of such . . . improvement than the price . .

. in the original contract, unless payment be made to the contractor in violation of the rights and

interests of the persons intended to be benefited [sic] by the act." 770 ILCS 60/21(d);

Contractor's Ready-Mix, 611 N.E.2d at 531.

---

[7]Section 22 of the Mechanics Lien Act gives those providing labor and material to
subcontractors the same lien rights as contractors under section 1, and subcontractors under
section 21, Contractor's Ready-Mix, 611 N.E.2d at 533. That provision does not apply to Pope
who was a first-tier subcontractor in contractual privity with RMS.

-28-

Section 5 of the Mechanics Lien Act requires the owner, before making any payment to the contractor, to obtain from the contractor an affidavit setting forth "the names and addresses of all parties furnishing [labor or materials] and of the amounts due *or to become due* to each." 770 ILCS 60/5 (emphasis added); <u>Contractor's Ready-Mix</u>, 611 N.E.2d at 531. According to section 24 of the Act, a subcontractor "may at any time after making his or her contract with the contractor, and shall within 90 days after completion thereof . . . cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent" to the owner. 770 ILCS 60/24(a); <u>Contractor's Ready-Mix</u>, 611 N.E.2d at 531. However, a subcontractor is not required to provide notice under section 24 when the sworn statement pursuant to section 5 serves to put the owner on notice of the subcontractor's lien claim. 770 ILCS 60/24(a).

Here, AES fulfilled the requirements of section 5 by requiring RMS to provide sworn contractor's affidavits with RMS' pay requests. According to the RMS March 6, 2001 Sworn Contractor's Affidavit, Pope had a balance to complete the Project of $3,198,057.34. Therefore, pursuant to section 27 of the Mechanics Lien Act, AES was required to "retain from any money due or to become due the contractor, an amount sufficient to pay all demands that are or will become due such sub-contractor . . . of whose claim he is notified, and shall pay over the same to the parties entitled thereto." 770 ILCS 60/27. In other words, as of March 6, 2001, AES was required to retain $3,198,057.34 in order to pay Pope.

On June 19, 2001, Pope sent a Notice of Claim pursuant to section 24 to AES in the amount of $4.6 million. According to section 24, if a contractor's affidavit "is incorrect as to the amount, the subcontractor . . . named shall be protected to the extent of the amount named therein as due or to become due to him or her." 770 ILCS 60/24(a). Therefore, Pope's June 19,

-29-

2001 section 24 notice served to put AES on notice that Pope asserted a lien claim for more than the RMS March 6, 2001 Sworn Contractor's Affidavit, thereby protecting Pope for the difference between $4.6 million and $3,198,057.34.

Pope later withdrew that Notice of Claim. However, that withdrawal only returned the parties to their respective positions as of the RMS March 6, 2001 Sworn Contractor's Affidavit. See Contractor's Ready-Mix, 611 N.E.2d at 532 ("Where, as here, a prior section 5 affidavit of the contractor had stated that 'the items mentioned [in that affidavit] include all labor and material required to *complete said work*' no further section 5 affidavit was required to justify payment by the owner to the contractor." (Emphasis added)). Raymond has not cited, and the Court's own research has not revealed any authority that would allow AES to pay monies in derogation of sections 5, 27 and 32, as the result of the withdrawal of a section 24 notice of claim. The RMS March 6, 2001 Sworn Contractor's Affidavit, therefore, continued to serve to put AES on notice of a lien claim by Pope albeit for an amount less than Pope's Notice of Claim.

Furthermore, the January 30, 2003 Final Lien Waiver stated that is was executed "for and in consideration of Ten Dollars ($10.00) Dollars, *and other good and valuable consideration.*" (JTExs 164, 249 (emphasis added).) Raymond seeks to read the last six words as a nullity, as if those words had no meaning at all. However, the Contractor's Affidavit attached to the January 30, 2003 Final Lien Waiver identified what constituted the "other good and valuable consideration." That affidavit served to put AES on notice pursuant to sections 5 and 24 of the Mechanics Lien Act that Pope asserted a lien claim for the difference between the total contract price of $22.9 million and the payments received to that date of $19,656,738.54, or a net of $3,243,261.46. (JTEx 164.) That claimed amount was consistent with the notice of the Balance

-30-

to Complete that RMS provided to AES in the March 6, 2001 Sworn Statement. (FOF 174.) The

evidence shows that the $305,118.71 paid in reliance on the September 26, 2001 Lien Waiver

was used to pay Pope's subcontractors. (JTEx 211.) Similarly, the difference between

$19,656,738.54 received prior to the January 30, 2003 Final Lien Waiver, (JTEx 164), and

$17,151,135.03, the accumulative consideration for the September 26, 2001 Lien Waiver, (JTEx

88), or $2,505,603.51 was also used to pay Pope's subcontractors. (See JTEx 211.)

Raymond argues that Pope failed to fill out the "Contractor's Affidavit Box" thereby

admitting that it was owed nothing as of January 30, 2003. However, it is clear that the

Contractor's Affidavit Box was intended for Pope to give notice to AES of claims, if any, by

Pope's subcontractors pursuant to section 5 of the Mechanics Lien Act, and not of Pope's own

claim in the body of the Contractor's Affidavit. Therefore, as of January 30, 2003, AES was on

notice that Pope asserted a lien claim of $3,243,261.46, based on the value of the EPC Contract

as incorporated into the Subcontract, but was not reporting any of its subcontractors to be unpaid.

The Mechanics Lien Act provides for a lien against the improved premises and on the

monies due or to become due on account of such improvements. 70 ILCS 60/21 (West 2009). If

an owner (in this case AES) follows the statutory procedures set forth in the Act, it is protected

from having to pay more than it owes either to the general contractor under the prime contract or

to any unpaid subcontractors. Id.; 26 Ill. Law and Prac. Mechanics' Liens § 45. Here, AES and

RMS entered into a final settlement of both the RMS claims under the EPC Contract and Pope's

claim, all for $2.5 million conditioned, on delivery by RMS and Pope of their waivers of lien

-31-

thus protecting AES.[8]  (JTEx 165, 248 at ¶ 4).  The $2.5 million settlement paid by AES was less

than the value of Pope's asserted lien claim.  In order to protect itself, AES required that RMS

deliver its lien waiver, and that Pope execute and deliver the January 30, 2003 Final Lien Waiver

before AES would make any payment on the AES Settlement.  Pope was not directly a party to

the AES settlement, yet execution of its Lien Waiver was clearly given in consideration of that

settlement in light of information contained on the document and Pope's agreement with

Raymond to put the settlement amount into the Initial Account for protection of their respective

interests.  Payment of the settlement amount into the Account clearly provided good and valuable

consideration for the January 30, 2003 Final Lien Waiver, and the reference to "$10.00 and other

good and valuable consideration" was the scrivener's use of an accepted convention for stating

consideration so as to make the waiver document clearly binding on Pope and protective of AES

no matter what the "other good and valuable consideration" actually amounted to.  (The language

is more modern but no less binding "consideration" than the peppercorn of law school days!)

In Premier Elec. Constr., the opinion held that the subcontractor was "entitled to its pro

rata share of the settlement proceeds, not to the full amount of its claim."  658 N.E.2d 877, 884

(Ill. App. Ct. 1995).  That opinion relied on section 28 of the Mechanics Lien Act which provides

that in a suit to enforce a lien, "the owner shall be liable to the plaintiff for no more than the pro

rata share that such person would be entitled to with other sub-contractors out of the funds due to

the contractor from the owner. . . ."  770 ILCS 60/28 (West 2009).  This provision under the

Mechanics Lien Act protects an owner who follows the statutory requirements from having to

---

[8]Although RMS' waiver of lien was not introduced into evidence, it must be inferred that
it did provide one to AES, because delivery of it was required by paragraph 2(a) of the AES
Settlement and AES did in fact pay the $2.5 million pursuant to the Settlement.

pay more than it owes under the prime contract. Here, AES and RMS settled and released their

respective claims against the owner AES under the EPC Contract for $2.5 million. Therefore, if

Raymond were due any debt relating to its lien and trust claim for work performed, Pope would

have to share the Current Account in proportion to its lien claim. As the Arbitration determined

and Judgment has since confirmed here, Raymond is due nothing and so any lien and trust claim

it might have is worth nothing.

II.     RAYMOND MANAGEMENT SERVICES AND POPE OWNED THE ACCOUNT AS
        TENANTS IN COMMON SUBJECT TO OUTCOME OF THE ARBITRATION AND
        MECHANICS LIEN TRUST RIGHTS. POPE NOW HOLDS THE SOLE
        MECHANICS LIEN TRUST RIGHTS IN THE ACCOUNT.

        The Subcontract between RMS and Pope did not fix a set amount to be paid to Pope, but

provided for RMS and Pope to share profit or loss after the payment of Project costs. The

Mechanics Lien Act trust funds deposited into the Account were subject to the outcome of the

disputes between them which were to be arbitrated.

        Raymond cites In re Cloe, 336 B.R. 762, 764 (Bankr. C.D. Ill. 2006), for the proposition

that "[u]nder Illinois law, a trustee establishes a prima facie case that money in an account

belongs to the debtor when he shows that the money was in a joint account." (Additional

citations omitted). However, the mere labeling of the Account by Raymond in its briefs as a joint

account is rhetoric and of no consequence. Barber v. First Midwest Bank (In re Johnson), 355

B.R. 103, 110 n.5 (Bankr. C.D. Ill. 2006) (citing In re ANR Advance Transp. Co., Inc., 247 B.R.

771, 774 (Bankr. E.D. Wis. 2000)). The joint account in Cloe expressly referred to "[t]he

ownership of the account . . . as 'joint–with survivorship (and not as tenants in common).'"

Cloe, 336 B.R. at 763. Therefore, the holding and reasoning in Cloe applies only to accounts held in joint tenancy with right of survivorship.

No such joint tenancy account was established here. It is a statutory requirement for the creation of a joint tenancy that there be a signed agreement including the right of survivorship. Doubler v. Doubler, 107 N.E.2d 789, 791 (Ill. 1952) (interpreting 765 ILCS 1005/2). Neither the Current Account Letter of Direction nor the Signature Card, (JTEx 252, 253), include any right of survivorship. In fact, the dual signature requirement for withdrawals from the Account supports the conclusion that there was not a joint tenancy, because the dual signature requirement specifically limited each party's right and ability to use or withdraw all of the funds from the Account. Therefore, under Illinois law legal title to the account was held by RMS and Pope as tenants in common. 765 ILCS 1005/1 (West 2009). See also 34 Ill. Law & Prac. Tenancy in Common § 2 (2008) ("A tenancy in common exists whenever an estate in real or personal property is owned concurrently by two or more persons under a conveyance or under circumstances which do not call for some other form of cotenancy.").

Where a conveyance is made to two or more parties as tenants in common without designating the portion which each is to take, the law presumes that ordinarily they are to take equal shares. Sturdyvin v. Ward, 336 Ill. 594, 601 (1929) (citing Keuper v. Mette, 239 Ill. 586, 592 (1909)). However, this presumption can be rebutted by evidence to the contrary. Id. "A court of equity, though, is not foreclosed from looking behind the form of the transaction and determining the real, beneficial interest or interests as between the parties themselves." Graves v. Graves, 192 N.E.2d 616, 620 (Ill. App. Ct. 1963). In this case the actual beneficial interest of

-34-

each party was subject to both their respective rights under the Mechanics Lien Act and to the outcome of arbitration liquidating their disputes and claims.

Raymond relies in part on an internal "Savings Account Profile" generated by JPMorgan Chase, to argue that RPG, Inc. is the sole owner of the Account. (JTEx 196.) The asserted portion of the document reads:

| Name | Tax ID | Relationship | Date of Birth |
|------|--------|--------------|---------------|
| RAYMOND PROFESSIONAL GROUP IN | 363869389 | Sole Owner | 00/00/0000 |
| DOUGLAS CHIDLEY | | Signer | 01/01/1903 |
| PAUL TROYKE | 000000000 | Signer | 01/01/1903 |

Raymond's reliance on the Savings Account Profile has neither logic nor legal support. It is clear from original Signature Card which controlled rights of the parties to dispose of the Account that signatures of a representative of each was required for any change. Pope never consented to placing the account into a "sole owner" account. The Bank, as mere depository, had no authority to change the rights of the parties, and Raymond had no authority to allow the Bank to do so. If the transfer of purported ownership by unauthorized parties could have any significance in changing title, a party guilty of conversion of another's interest might as well be able to claim legal rights.

"It is a fundamental principle of banking law that the relationship between a bank and its depositor is created and regulated by the express or implied contracts between them." Symanski v. First Nat'l Bank of Danville, 609 N.E.2d 989, 991 (Ill. App. Ct. 1993) (citing Bieze v. Coca, 369 N.E.2d 106, 112 (Ill. App. Ct. 1977)). "A binding contract between a bank and its depositor

is created by signature cards and a deposit agreement." Cont'l Cas. Co., Inc. v. Am. Nat'l Bank and Trust Co. of Chicago, 768 N.E.2d 352, 357 (Ill. App. Ct. 2002).

The parties did not offer into evidence the reverse side of the Letter of Direction which contained the deposit agreement, (see JTEx 252), but the Signature Card in evidence provided that the name on the bank account was "Raymond Professional Group – Pope Joint Account." The corporate name of Raymond Management Services ("RMS") had been changed to Raymond Professional Group–Design/Build as of December 28, 2000. (FOF 1 n.1.) Therefore, the reference to Raymond Professional Group on the Letter of Direction and Signature Card is ambiguous when read in isolation, but it is undisputed that the Account was opened pursuant to the Subcontract between RMS and Pope and required signature on behalf of both Pope and RMS before anything could be done with the account. Therefore, the Chase Bank and RMS acted without authority when it transferred funds into a purported single owner account. Such transfer must be viewed as a nullity, or else an unauthorized conversion.

Alternatively, Raymond argues that it controlled and owned the Account because RPG, Inc.'s tax identification number was associated with the Account and RPG paid taxes on interest accruing on the Account. Because of their corporate structure, RPG and its subsidiaries were able to file a consolidated federal income tax return. The funds at issue were evidently reported as excess Project funds earned by RMS and Pope, and the Initial Account was listed as an asset of RMS on RPG's Financial Statements for 2001 through 2003. (FOF 380.)

Raymond asserts that Pope's representatives were aware that interest was accruing on the Account, and that taxes had to be paid thereon. The parties now disagree whether Pope should have volunteered to pay a portion of the taxes due, or whether it was Raymond's burden to ask

-36-

for an appropriate contribution. Arguably, taxes paid on the interest income was a Project cost

that could have been apportioned by the Arbitration Panel so that each party bore the tax burden

for its share. However, the Panel actually adjudicated all issues as to the Project accounting, the

Award was made and has been reduced to judgment. The Panel's decision and reasoning cannot

be revisited here because all accounting issues, including any as to a possible tax burden on

interest, is barred by *res judicata*. For the foregoing reasons, it is found and held that Raymond's

unilateral and self-serving tax elections do not affect ownership of the Account and cannot be the

basis for any claims here.

Finally, Raymond points to Mrs. Chidley's ability to request unilaterally and obtain from

the bank a change in the Current Account after the filing of the bankruptcy petition. Somehow,

her working relationship with and influence over the bank is asserted to establish ownership

rights. In order to address this argument, the circumstances surrounding Debtors ceasing

business and filing for bankruptcy should be addressed.

Raymond Professional Group and its subsidiaries funded its working capital needs

through a line of credit with JPMorgan Chase. (J. Chidley Test. 291:2-6, Dec. 12, 2008.) The

line of credit was limited to a certain percentage of eligible accounts receivable. (Id. at 291:7-9.)

As a result of a downturn in business, RPG was unable to maintain the ratio of accounts

receivable to credit and, therefore, JPMorgan Chase withdrew RPG, Inc.'s line of credit on May

18, 2005. (Id. at 291:9-17.) The Raymond family of companies ceased doing business that day.

(FOF 26.)

Chase swept the Operating Account in order to setoff outstanding amounts owed to it on

the line of credit. (J. Chidley Test. 291:18-22, Dec. 12, 2008.) On cross-examination, Mrs.

Chidley testified that Chase did not sweep the Current Account, but that she did not know why. (Id. at 507:5-15, Dec. 15, 2008.) On re-direct, she clarified that Chase did threaten to sweep the Account, but that RPG's counsel advised the bank that remaining amounts owed were being paid down as accounts receivable were being collected, and asked that the Account not be swept because it was subject to an upcoming arbitration. (Id. at 507:16-23.)

After RPG and its subsidiaries filed for bankruptcy protection on December 18, 2006, the name of the Current Account was changed to Raymond Professional Group, Inc. DIP. (FOF 510.) Mrs. Chidley testified that she unilaterally made the change in her capacity as the authorized representative of RMS on the account without obtaining signature of Mr. Troyke (of Pope) approving the change as required by the Letter of Direction and Signature Card. (FOF 513.) Mrs. Chidley was not an authorized signor on the Account, and therefore had no authority to make that change.

It is hereby found and held that the December 2006 Account Name Change was clearly made in breach of the parties' agreement with each other and in derogation of the bank's duties to Pope to make no changes without its consent. As a potential creditor of Debtors, the bank may have had an incentive to go along with Raymond's request to transfer the Current Account into the name of RPG, Inc. as debtor in possession. But Raymond and the Bank had no authorization from Pope to do that and the Account should have remained under control of both Pope and RMS until conclusion of this litigation. When the improper transfer came to light, an Order was entered in this proceeding and the bankruptcy case, prohibiting the Bank or any party from disbursing funds from the Account without Court permission, (Docket Nos. 336 and 431,

respectively), and the parties supplied a bank statement showing that funds remain in the Account.  (Supra, n.4.)

### Conclusion as to the Mechanics Lien Act and Ownership of the Account

For reasons stated above, it is found and held that the $2.5 million AES Settlement and all interest proceeds therefrom are now held in the Account under the trust created by Illinois Mechanics Lien Act for the sole benefit of Pope.  That settlement was deposited into the Initial Account subject to adjudication of RMS' and Pope's respective contract claims against one another, but this did not change the nature of the funds as Mechanics Lien trust funds. Subsequently, the Arbitration Panel found that RMS was owed nothing on the Subcontract, and entered an Award for Pope in the amount of $3,634,714.  Based on the contractual history, that arbitration decision found that the Award was to be satisfied from funds in the Current Account plus interest accruing thereon, with any deficiency to be paid by Raymond, although the Award did not determine legal ownership of the Account.  The Award was confirmed by judgment here that was not appealed.  Since RMS is due nothing at all under the Award, its mechanics lien trust claim is worth nothing, leaving the mechanics lien trust on the Account only in favor of Pope.

III.    POPE'S ALTERNATIVE TRUST THEORIES ARE WITHOUT MERIT.

The foregoing discussion found and held that the Current Account is held in trust for benefit of Pope under the Illinois Mechanics Lien Act and, therefore, is not property of the estate of either Debtor.  Therefore, it is unnecessary to decide Pope's alternative theories in Count VI as to why the funds are not property of either of Debtors' bankruptcy estates.  See Adamszewski v. Local Lodge 1487 et al., 496 F.2d 777, 786 (7th Cir. 1974) ("But we need not decide that point since another ground exits for dismissing this action under any theory. . . .").  However, for the

same reasons that the parties were given wide latitude in developing a factual record and much

stipulated but redundant evidence was allowed into the record, it is appropriate to address the

other arguments by Pope for benefit of any reviewing court.

Pope argues in the alternative that the Account funds are held in a constructive or

resulting trust.  It is wrong in both of those theories.

a.       There is no constructive trust.

Constructive trust is an equitable remedy that must be adjudicated by a court.  Peterson v.

Berg (In re Berg), 387 B.R. 524, 554 (Bankr. N.D. Ill. 2008) (citing Stevens v. Century Furniture

Co. (In re CL Furniture Galleries, Inc.), 95-C-50103, 1995 WL 756853, at *8 (N.D. Ill. Dec. 20,

1995)).  However, a constructive trust cannot be imposed post-bankruptcy, as any rights

recognized in bankruptcy must have been found under non-bankruptcy law to exist prior to the

filing of the bankruptcy petition.  Id. (citing In re GGSI Liquidation, 351 B.R. at 593; In re

Davenport, 268 B.R. 159, 163 (Bankr.N.D.Ill.2001) (citing Stevens, 1995 WL 756853, at *8)).

In other words, the interest of the bankruptcy trustee, as a hypothetical judicial lien creditor, lien

creditor or bona fide purchaser of real property, would be superior to that of any equitable

interest granted post-bankruptcy and could be avoided using the trustee's strong-arm powers.

See Matter of Pubs, Inc. of Champaign, 618 F.2d 432, 439 (7th Cir.1980).

Pope argues that the Arbitration Award imposed a constructive trust on the funds held in

the Account.  However, nowhere does the Award declare a constructive trust, and the Award

itself was not reduced to judgment until it was confirmed post-bankruptcy.  It is unnecessary,

therefore, to discuss the merits of a claim for constructive trust that was not adjudicated pre-

bankruptcy.

b.  <u>There is no resulting trust.</u>

For the reasons discussed above concerning Raymond's estoppel arguments, it is found

and held that Pope waived its arguments regarding resulting trust by failing to raise them in its

pre-trial Proposed Findings of Fact and Conclusions of Law as required by the Second Amended

Final Pre-Trial Order.  Pope suggests that it could make a motion to conform the pleadings to the

evidence.  If Pope were to make such a motion, Raymond would be entitled to respond.  But

Pope has not made any such motion and the Court will not treat what could hypothetically be

done as though it had been done.  Indeed such a motion would be required to specify what theory

or theories should be decided and what evidence it or they would be based on.  Without such a

record, conjecture should not be used here to speculate on what such a motion would say.

Furthermore, although a party can impliedly consent to the trial of an unplead issue by

failing to object to the introduction of evidence on that issue, "implied consent cannot be based

on the introduction of evidence that is relevant to an issue already in the case when there is no

indication that the party presenting the evidence intended to raise a new issue."  <u>Green Country</u>

<u>Food Market, Inc. v. Bottling Group, LLC</u>, 371 F.3d 1275, 1280 (10th Cir. 2004) (citing

<u>Moncrief v. Williston Basin Interstate Pipeline Co.</u>, 174 F.3d 1150, 1162 (10th Cir.1999)).

Therefore, Raymond cannot be found to have consented to the trial of Pope's new resulting trust

theory, because evidence admitted at trial or other theories was arguably relevant to this

additional but unpleaded theory.  It could therefore be said that Pope waived its possible rights to

assert the theory of resulting trust.

That being said, waiver is a disfavored remedy, and Rule 15(b) Fed. R. Civ. P. "is

'intended to promote the objective of deciding cases on their merits rather than in terms of the

relative pleading skills of counsel.'" Brandon v. Holt, 469 U.S. 464, 471 n.19 (1985) (quoting 6

C. Wright & A. Miller, Federal Practice and Procedure § 1491 at 453, 454 (1971 ed. and

Supp.1983); Green Country Food Market, 371 F.3d at 1280. It is therefore appropriate to discuss

the merits.

On the merits of this issue, Pope failed to establish the creation of a resulting trust by

clear and convincing evidence. See Judgment Servs. Corp. v. Sullivan, 746 N.E.2d 827, 831 (Ill.

App. Ct. 2001). "A resulting trust generally arises where one person purchases property with his

own funds and allows title to be taken in the name of another." Id. (citing In re Estate of Wilson,

410 N.E.2d 23, 26 (Ill. 1980)). It is possible that "[w]here money is placed in the hands of a

person to be delivered to another, a resulting trust arises in favor of the latter." Norton v. City of

Chicago, 690 N.E.2d 119, 126 (Ill. App. Ct. 1997) (citing In re Estate of Habel, 231 N.E.2d 616,

620 (Ill. App. Ct. 1967)). However, "a resulting trust is designed to carry the presumptive

intention of the parties . . . ," Habel, 231 N.E.2d at 620, and there is no evidence that AES paid

the funds into the Account with intent that they be delivered to Pope or be owned entirely by

Pope, nor did RMS have such intent. AES was concerned with meeting the requirements of the

Mechanics Lien Act so that it was protected from subcontractors' lien claims. By complying

with those requirements, a statutory trust arose in favor of the lien claimants RMS and Pope. But

that does not establish that AES or RMS intended for the funds to be delivered to Pope. Indeed,

at the time RMS and Pope were about to confront issues to determine through arbitration how the

Account would be distributed. For the foregoing reasons, it is found and held that Pope's

resulting trust arguments are without merit.

-42-

IV.    THE INITIAL ACCOUNT AND CURRENT ACCOUNT IS NOT AND NEVER WAS
AN ESCROW ACCOUNT.  POPE WAIVED THE CONTRACTUAL REQUIREMENT
FOR AN ESCROW.

As a general rule, money held in an escrow account is not property of a debtor's

bankruptcy estate.  In re Johnson, 355 B.R. at 110 n.5 (citing Affiliated Computer Sys., Inc. v.

Sherman (Matter of Kemp), 52 F.3d 546, 550-52 (5th Cir. 1995)).  In support of its argument that

the Initial Account was and the Current Account is an escrow account, Pope seems to rely largely

on the various references to the Account as an "escrow" by it, RMS, and the Arbitration Panel, to

show that the parties intended to treat the Account as an escrow account.  However, "[m]erely

attaching the label 'escrow' to property or to a document does not make it such. . . ."  Id. (citing

In re ANR Advance Transp. Co., Inc., 247 B.R. 771, 774 (Bankr. E.D. Wis. 2000)).  For the

following reasons, it is found and held that Pope waived the Subcontract provision calling for the

creation of an escrow account, and that the Initial and Current Accounts are not, and never have

been, an escrow account under applicable legal standards.

Under Illinois precedent, an escrow account is held to be "[a] bank account, generally

held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid

to a third person on the fulfillment of escrow condition."  In re Handy Andy Home Improvement

Ctrs., Inc., 196 B.R. 87, 92 (Bankr. N.D. Ill. 1996) (quoting Black's Law Dictionary (6th ed.)).

An escrow is:

> [A] written instrument which by its terms imports a legal obligation, and which is
> deposited by the grantor, promisor or obligor, or his agent with a stranger or third
> party, to be kept by the depository until the performance of a condition or the
> happening of a certain event and then to be delivered over to the grantee, promisee
> or obligee.

-43-

In re Johnson, 355 B.R. at 110 (quoting Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc., 649 N.E.2d 511, 517 (Ill. App. Ct. 1995)).

Moreover, "[t]o make an escrow arrangement valid, delivery of the instrument involved must be made to a stranger thereto." 17 Ill. Law and Prac. Escrows § 1 (2008) (citing Kraetsch v. City of Chicago, No. 21,255, 1916 WL 1940, at *4 (Ill. App. Ct. Mar. 1916)). Pope cites no contrary authority permitting parties to an escrow agreement to act as the escrow agent or agents. The present dispute between RMS and Pope highlights the rationale for requiring a disinterested third-party to act as escrowee; an escrow agent would have a fiduciary duty to act impartially in carrying out the terms of the escrow agreement. Meyers v. Rockford Sys., Inc., 625 N.E.2d 916, 921-22 (Ill. App. Ct. 1993) (additional citations omitted). Here, there was no impartial escrowee who could or would be authorized to distribute the property placed in an escrow upon the happening of some stated event. Indeed, the Bank was not even authorized to deliver the Award funds to Pope after Pope prevailed in the Arbitration, and could not do so without signatures by the presidents of both companies.

While an escrow account was originally provided for by agreement of the parties, it is found from the evidence and held that Pope waived the opening of an escrow account as a condition of the Subcontract. According to what was asserted to be an integration clause in the Subcontract:

> Any term of this Agreement may be modified or deleted, but only if the modification or deletion is put in writing and signed by the parties. . . . This Subcontract represents the entire and integrated agreement between RMS and [Pope] for the Project and supersedes all prior negotiations, representations or agreements, either written or oral.

(JTEx 2 at ¶ 11.) However, an integration clause "has no application when the issue is whether

one of the parties later waived strict compliance with those terms." Wisconsin Knife Works v.

Nat'l Metal Crafters, 781 F.2d 1280, 1289 (7th Cir. 1986). "In contract law, if a party indicates

by its conduct that compliance with a particular provision is not required, then waiver of that

provision may be implied." Midwest Builder Distrib., Inc. v. Lord & Essex, Inc., 891 N.E.2d 1,

28 (Ill. App. Ct. 2007) (additional citations omitted). Waiver is the intentional relinquishment of

a known right. Braden v. Weinert, 423 N.E.2d 1326, 1332 (Ill. App. Ct. 1981).

        In this case, Pope specifically and intentionally waived the escrow provision of the

Subcontract. On February 2, 2001, Mr. Chidley and Mr. Troyke met to discuss the opening of

the escrow account called for in the Subcontract. (FOF 117.) When Mr. Chidley told Mr.

Troyke that there would be a fee associated with the opening of an escrow account and that

escrow accounts are not interest bearing, Mr. Troyke responded that he wanted to obtain the

highest possible return on the excess funds deposited in the account. (FOF 118.) Therefore, Mr.

Troyke and Mr. Chidley agreed to open a commercial checking account that required the dual

signatures of a RMS representative and a Pope representative to disburse funds or make changes

to the account. (Id.) Thereafter, the Initial Account was established subject to the agreed-upon

dual signature requirement. (FOF 122-24.)

        This was not the only occasion that Mr. Troyke expressed his desire that the Project funds

be invested so as to earn the highest interest rate. On March 12, 2003, at Mr. Troyke's request,

the funds were transferred from the Initial Account to the Current Account. (FOF 383-84.) The

transfer to the Current Account was made after AES made the $2.5 million settlement payment,

after RMS had notified Pope of a dispute over Pope's costs, and after RMS had refused Pope's

-45-

renewed demand for payment under paragraph 7 of the ISA. (FOF 370-72.) Despite being aware

of this payment dispute, Pope did not insist that the funds be deposited with an independent

third-party escrowee who could disburse the funds upon the resolution of the dispute. (FOF

385.) The only controls on the Current Account were the same dual signature requirements that

were on the Initial Account. (FOF 381-82, 397-98.) For reasons stated above, this dual signature

requirement was not legally sufficient to create an escrow account.

Therefore, it is hereby found and held that Pope waived the Subcontract provision calling

for the opening of an escrow account and the Current Account is not legally an escrow account.

## V.    POPE HAS NOT ESTABLISHED THAT THERE WAS AN ACTIONABLE MISREPRESENTATION OR THAT IT REASONABLY RELIED ON ANY MISREPRESENTATION BY RAYMOND.

Finally, Pope argues that Raymond is equitably estopped from asserting that the funds in

the Account are property of either of the bankruptcy estate of either RMS or RPG. The elements

of equitable estoppel are: (1) a misrepresentation; (2) reasonable reliance on that

misrepresentation; and (3) detriment. Fed. Deposit Ins. Corp. v. Rayman, 117 F.3d 994, 1000

(7th Cir. 1997) (citing Kennedy v. United States, 965 F.2d 413, 417 (7th Cir.1992)). Equitable

estoppel can be distinguished from promissory estoppel in that "[w]hereas promissory estoppel is

used offensively, to create a cause of action, equitable estoppel functions defensively 'to bar a

party from raising a defense or objection it otherwise would have, or from instituting an action

which it is entitled to institute.'" Northrop Grumman Corp. v. United States, 42 Fed.Cl. 1, 8

(1998).

The misrepresentations that Pope allegedly relied on were the RMS promise in the ISA to

pay Pope $2,808,671 from the Account as funds became available, and RMS' characterization of

-46-

the Account as an escrow account during the Arbitration. While fraudulent intent is not a

requirement of estoppel, "[t]o be actionable, a false representation must generally relate to an

existing or past event, not to a promise or prognostication concerning a future happening. . . ."

Sinclair v. Sullivan Chevrolet Co., 202 N.E.2d 516, 518 (Ill. 1964) (citing Brodsky v. Frank, 342

Ill. 110, 117-18 (1930); Bielby v. Bielby, 333 Ill. 478, 485 (1929)). Therefore, RMS' promise to

pay the $2,808,671 at some point in the future is not a misrepresentation that would support

Pope's theory of promissory estoppel. There is certainly a difference between a

misrepresentation relied on and a contractual promise that may be breached. While RMS made a

promise to pay certain amounts at the time it entered into the ISA, its intention regarding a future

event was subject to change and developing disputes; Pope could not reasonably rely on that

promise to create an estoppel. See 28 Am. Jur. 2d Estoppel & Waiver § 50.

Similarly, Pope has not established that it did in fact reasonably rely to its detriment on

the RMS alleged characterization of the Account as an escrow account. Throughout this

litigation, Pope has argued that Debtors should be estopped from arguing that the Account is not

an escrow account based on the characterization by RMS during the Arbitration that it was an

escrow account. Earlier iterations of the estoppel argument rested on Pope's assertion that the

Arbitration Panel decided and declared that the Account was an escrow account and, therefore,

Raymond is collaterally estopped from arguing otherwise.

Collateral estoppel requires that an actual adjudication of the issue be made in prior

litigation. H-D Michigan, Inc. v. Top Quality Serv., 496 F.3d 755, 760 (7th Cir. 2007); In re

Consol. Med. Transp., Inc., 280 B.R. 633, 639 (Bankr. N.D. Ill. 2002). Such an adjudication was

not made. The Arbitration merely provided an accounting of Project costs and a resolution of

-47-