## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| RAYMOND PROFESSIONAL GROUP, INC., et al., | ) ) | Bankruptcy No. 06 B 16748 |
| Debtor. | ) | |
| | ) | |
| RAYMOND PROFESSIONAL GROUP, INC., et. al. | ) ) | |
| Plaintiff, | ) | |
| | ) | |
| RAYMOND MANAGEMENT SERVICES, INC. n/k/a RAYMOND PROFESSIONAL GROUP - DESIGN/BUILD, INC., | ) ) ) | |
| Co-Plaintiff to Count VI | ) | |
| v. | ) | Adversary No. 07 A 00639 |
| | ) | |
| WILLIAM A. POPE COMPANY | ) | |
| Defendant. | ) | |
| | ) | |
| WILLIAM A. POPE COMPANY, | ) | |
| Counter-Plaintiff to Count VI | ) | |
| v. | ) | |
| RAYMOND PROFESSIONAL GROUP, INC. and RAYMOND MANAGEMENT SERVICES, INC. n/k/a RAYMOND PROFESSIONAL GROUP-DESIGN/BUILD, INC., | ) ) ) ) | |
| Counter-Defendants. | ) | |
| | ) | |
| NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, a Connecticut Corporation | ) ) | |
| Intervening Plaintiff | ) | |
| v. | ) | |
| RAYMOND PROFESSIONAL GROUP, INC., RAYMOND PROFESSIONAL GROUP-DESIGN/BUILD, INC. and WILLIAM A. POPE COMPANY | ) ) ) ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION ON
### (A). DEBTORS' AMENDED MOTION FOR SANCTIONS (DOCKET NO. 367) AND
### (B). POPE'S MOTION TO COMPEL DEBTORS TO PAY
### <u>WITNESS DEPOSITION FEES (DOCKET NO. 473)</u>

On Debtors' Amended Motion for Sanctions and the Motion of William A. Pope Company to Compel Debtors to pay the deposition fees charged by two of Pope's witnesses deposed by debtors' counsel, the following will stand as Findings of Fact and Conclusions of Law:

## **INTRODUCTION**

On December 18, 2006, Debtor, Raymond Professional Group, Inc. ("RPG") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. RPG is asserted to be the 100% shareholder of a related debtor, Raymond Management Services, Inc. n/k/a Raymond Professional Group–Design/Build, Inc. ("RMS"). RPG provided shared corporate services to each of its subsidiaries, including RMS. RMS provided engineering, architectural, design/build and other technical services to private and government clients, primarily in the power, industrial and process market sectors, and it also filed for voluntary chapter 11 relief in Case No. 06-bk-16753. An Order providing for joint administration of their bankruptcy cases was entered. The same law firm represents both RMS and RPG.

The Debtors RMS and RPG sought in Count VI of this Adversary proceeding a determination of their asserted interests against a subcontractor William A. Pope Company ("Pope"). Pope was retained by RMS through a subcontract to assume responsibility for completion of a construction project for the property owner AES Medina Valley Cogen, LLC ("AES"). RMS had entered into the general contract with AES. RPG was not a party to the Pope Subcontract, nor was RPG a party to the RMS general contract. The parties disputed ownership rights over a certain bank account (now over $3.5 million), established from a large deposit of funds paid by AES (the "Account") as its final payment under the contract with RMS. Though

monies now in the Account were paid by RMS to both AES and Pope, RPG scheduled the Account as its asset.

Soon after this Adversary was filed, Pope filed a Motion to Disqualify (the "Original Motion to Disqualify") the Raymond attorneys Schiff Hardin LLP ("Schiff") who appeared as Counsel for both Debtors, (Bankr. Docket No. 223), arguing that Schiff failed to disclose its pre-petition representation of certain Debtor entities, and that Schiff was otherwise in breach of its fiduciary duty and duty of loyalty to the bankruptcy estates (the "Multi-Debtor Conflict"). Pope argued that by taking a position that RPG owned the Account, Schiff seeks to reduce the assets available for distribution to creditors of RMS and, therefore, breached its fiduciary duty to the RMS bankruptcy estate and its creditors and Pope among the RMS creditors. It relied on Rule 2014 Fed. R. Bankr. P. That Motion was motivated by claims of Pope against the RMS bankruptcy estate based on its asserted rights against the fund deposited by AES which was subject to the claims of Pope and RMS as contractual parties. Pope thereby sought to block counsel for RMS and RPG (being the same attorneys for each) from agreeing that the disputed fund would go to the RPG estate against which Pope has no claim.

In early 2008, the parties agreed that rather than proceeding to decide the possible ownership of the Account as between RPG and RMS (which would require a decision as to whether Schiff was in conflict and whether disqualification of the firm and its attorneys was required), it was more practical to decide first whether Pope owned the entire Account in issue as it claimed against the joint claims of RPG and RMS that Pope did not own it.

RPG and RMS therefore filed an Amended Complaint adding Count VI seeking declaration that Pope does not own the Account; that the Account is not an escrow account; and

-3-

that the funds in the Account are not held in trust pursuant to the Illinois Mechanics Lien Act.

Pope counterclaimed claiming ownership of the Account, based on several legal theories.

The parties originally agreed that Pope's Original Motion to Disqualify was not to be

dealt with until after Count VI was decided. However, on July 2, 2008, Pope filed a Motion for

Leave to file a Supplemental Brief in support of its earlier Motion to Disqualify, adding a new

issue (Bankr. Docket No. 305). In that Supplemental Brief, it was represented that during pre-

trial discovery Pope learned that Schiff had received a check drawn on the Account and

containing the dual signatures of Douglas Chidley and Paul Troyke (officers of RPG and Pope) to

be used for the payment of attorneys fees then due to Schiff as lawyers for the Raymond parties.

Pope's new argument was that payment of those attorneys fees created an attorney-client

relationship between Schiff and Pope, and that Schiff's representation of the RPG and RMS

interests as attorneys for the Raymond parties was adverse to Pope and created a direct conflict of

interest (the "Schiff Check issue") that had to be decided prior to trial on Count VI.

On November 7, 2008, Pope filed a formal request to renew its Motion to Disqualify

Schiff ("Renewed Motion to Disqualify") based on the new ground (Docket No. 232). On

November 13, 2008, it was granted leave to file the Supplemental Brief and Renewed Motion to

Disqualify, and Debtors were ordered to respond (Bankr. Docket No. 358). On November 14,

2008, Debtors' Counsel sent a letter to Pope's Counsel pursuant to Rule 9011 Fed. R. Bankr. P.

("Rule 9011 Letter") demanding that Pope withdraw: (1) the then pending motion to renew

Pope's Motion to Disqualify; (2) Pope's Motion for Leave to file a supplemental brief in support

of its earlier Motion to Disqualify; (3) the Supplemental Brief that was attached as an exhibit to

the Motion for Leave; and (4) Pope's Motion to Disqualify. (Docket No. 367, Debtors' Amended

Motion for Sanctions, Ex. A.) The Rule 9011 Letter stated that the Debtors would seek sanctions if Pope failed to comply. (Id.) This warning followed the so-called "safe harbor" procedure under Rule 9011 whereby a party can withdraw a pleading thereby avoiding any issue as to whether the pleading would otherwise be sanctionable. FED. R. BANKR. P. 9011(c)(1)(A). However, the Pope pleadings were not withdrawn.

Issues in the Renewed Motion to Disqualify were fully briefed by the parties, and an evidentiary hearing was held. The issues decided at the evidentiary hearing were whether there was ever an attorney-client relationship between Schiff and Pope that created a conflict for Schiff in representing RMS and RPG, and, if so, whether any such conflict was waived. The arguments raised in Pope's original Motion to Disqualify were not at issue at the hearing and have not yet been decided; that Motion is still pending.

Following hearing on the Renewed Motion to Disqualify, it was announced from the bench that it would be denied pursuant to an opinion to be filed. Thereafter, the trial on Count VI went forward and has since concluded. The Findings of Fact and Conclusions of Law after trial on Count VI were set forth in a Memorandum Opinion entered on July 21, 2009, In re Raymond, 408 B.R. 711 (Bankr. N.D. Ill. 2009), and amplified by an Amended Findings of Facts and Conclusions of Law, In re Raymond, 410 B.R. 813 (Bankr. N.D. Ill. 2009), on August 14, 2009. Pursuant thereto judgment was entered in favor of Pope, adjudging that it owns the entire Account in disputed.

On February 10, 2009, a Memorandum Opinion was entered (Docket No. 340) along with an Order denying Pope's Renewed Motion to Disqualify on the recently asserted grounds of direct conflict of interest under the Schiff-Check issue (Docket No. 342). In re Raymond, 400

-5-

B.R. 624 (Bankr. N.D. Ill. 2009). That Opinion made and entered Findings of Fact and Conclusions of Law that are incorporated here by this reference.

The resulting rulings may be summarized as follows:

(1)     Under Illinois law, no attorney-client relationship existed between the law firm for the Raymond parties and subcontractor Pope. That firm was employed by RPG and RMS to assume responsibility over legal issues for completion of project. It was not representing the subcontractor Pope while it negotiating with the property owner AES to obtain release of contract retainage claimed to be due.

(2)     Pope was not "an intended third-party beneficiary" of the attorney-client relationship existing between general contractor RMS and the law firm that represented RMS in negotiating with the property owner for release of monies claimed.

(3)     Even assuming arguendo that there had been a prior attorney-client relationship between Pope and the law firm that might arguably require disqualification of the firm from representing general contractor RMS in a bankruptcy proceeding in which its interests were adverse to those of subcontractor Pope, such claim if any was waived by Pope's long delay in raising this newly asserted conflict-of-interest issue relating to the Schiff Check.

The Opinion and Order addressed only Pope's allegations of a direct conflict of interest raised in its Supplemental Brief. Any ruling on Pope's original Motion to Disqualify based on the question

-6-

of whether Schiff can represent both RPG and RMS in deciding which of them is entitled to

monies paid under the RMS contract by AES is still under advisement.

Having prevailed on the Schiff check issue, Debtors filed the instant motion to sanction

Pope and its counsel for their acts and pleadings involving the Renewed Motion to Disqualify.

Sanctions were sought against all lawyers who worked on that effort, all pursuant to Rule9011

Fed. R. Bankr. P. ("Rule 9011") and 28 U.S.C. § 1927 ("Section 1927").[1] The Motion thereby

requested sanctions related to Pope's Renewed Motion to Disqualify; Motion for Leave to file a

Supplemental Brief; and the Supplemental Brief attached as an exhibit to the Motion for Leave to

File (collectively "Renewed Motion to Disqualify"). That is the first motion that must be decided

here. Also to be decided is Pope's Motion for an order on Debtors or their counsel to pay fees

charged by Pope experts for their depositions under Rule 26(b)(4)(c) Fed. R. Civ. P. [Rule 7026

Fed. R. Bankr. P.] (decided in Part VII below).

### RELEVANT FACTS FOUND EARLIER FROM HEARING ON RENEWED MOTION TO DISQUALIFY

Facts that follow were stipulated to by the parties or derived from evidence admitted at

the evidentiary hearing on the Renewed Motion to Disqualify.

On December 18, 2006, RPG, RMS, and subsidiaries of RPG each filed a voluntary

petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). See

In re Raymond, 400 B.R. 624 et seq. (Bankr. N.D. Ill. 2009). RPG listed the Account as an asset

on its Schedule B. Personal Property filed January 2, 2007. Prior to filing of the bankruptcy

cases, RMS entered into a contract with AES (the "AES Contract") to construct a cogeneration

---

[1] Susan N.K. Gummow filed the Motion for Leave, the attached Supplemental Brief and
the Renewed Motion to Disqualify. Ms. Gummow, Mr. John F. O'Brien and Mr. William Hacker
appeared for and represented Pope at the hearing.

power plant facility in Mossville, Illinois (the "Project"). RMS was involved in a three-year long

arbitration (the "Arbitration") ""with Pope based on its subcontract with Pope whereby Pope

became responsible for performing all construction services and certain other services specified

in the AES Contract. As noted earlier, RPG was not a party to the AES contract nor to the RMS

subcontract with Pope. Mark Friedlander, of Schiff, represented RMS and RPG prior to this

adversary proceeding. Mr. Friedlander was counsel for RMS in the Arbitration. Geri Votava is

the Vice President and Secretary of Pope.

At the evidentiary hearing, Ms. Votava testified that as part of the AES Contract, AES

held back five percent from each month's invoice as retainage. Mr. Friedlander testified that AES

had a contractual right to withhold a portion of each payment, and that it was typical in the

construction industry for retainage to be ten percent of monthly invoices.

In or about August 2001, RMS and Pope began to take steps to secure the release of

retainage from AES. The AES Contract was between RMS and AES. Therefore, Mr. Friedlander,

as one of RMS's attorneys from Schiff, handled negotiations with AES for release of retainage.

On December 6, 2001, a letter was sent to Ms. Votava requesting that a Pope representative

countersign four checks in compliance with controls in place on the Account. One of those

checks was made payable to Schiff in the amount of $38,772.90 (the "Schiff Check"). Ms.

Votava requested that Mr. Troyke sign the Schiff Check, and she returned it to RMS. The AES

Medina Valley Cogeneration Project, Joint Account Transaction Report dated June 20, 2002,

shows that the Schiff Check cleared on January 7, 2002. Ms. Votava testified that a Pope

representative signed the check because, at the time it was signed, Mr. Friedlander was working

on the release of retainage from AES. According to testimony by Ms. Votava, she believed that

in negotiating for the release of retainage, Mr. Friedlander, and Schiff, were representing Pope's

interests as counsel for the Project.

On cross-examination, Ms. Votava testified that she never spoke to Mr. Friedlander or

anyone else at Schiff about representing Pope. According to Ms. Votava, Pope did not have a

retainer agreement with Schiff before or during August 2001, when negotiations for the release

of retainage began. Ms. Votava testified further that Schiff never provided invoices for services

directly to Pope, but that RMS reported its attorney fee costs to Pope on a monthly basis.

According to Ms. Votava, she never confirmed her asserted belief that Schiff was the attorney for

the Project; she never sought legal advice from Mr. Friedlander or anyone else at Schiff on that

question.

According to Paragraph 6 of the Interim Settlement Agreement (the "ISA") between RMS

and Pope:

> Raymond** and Pope agree that the second priority for disbursing
> funds from the Account shall be to pay Raymond third-party
> subcontractors, vendors and other suppliers, except that neither
> Pope nor Raymond Professional Group Inc., or any of its
> subsidiaries, or affiliates, shall be considered a subcontractor of
> Raymond for the purposes of the disbursements described in this
> paragraph. Raymond and Pope shall actively cooperate with each
> other to minimize and to facilitate the disbursements to
> subcontractors described in Paragraphs 5 and 6.

On cross-examination, Ms. Votava testified that she understood the Schiff Check was

being paid pursuant to Paragraph 6 of the ISA. Ms. Votava acknowledged that Pope and RMS

were represented by separate counsel — Clausen for Pope, and Schiff for RMS—during

negotiation of the ISA. The ISA was executed on September 26, 2001. According to Ms. Votava,

_____

** Sic, thereby referring to RMS.

she did not believe that there were ongoing disputes between Pope and RMS after the ISA was

executed. However, according to Paragraph 9 of the ISA:

> Raymond** contests Pope's entitlement to certain Project costs incurred by Pope
> through August 31, 2001, and is withholding payment from Pope with regard to
> said invoices, and in the amounts listed below. The quantification represents the
> parties' best estimate as to the value of each item Raymond contests is due Pope,
> and is based on information available as of the date of this Agreement.

Paragraph 10 outlined additional continuing disputes between RMS and Pope regarding Project

accounting, and Paragraph 11 required that payments made pursuant to the ISA were to be

subject to a final accounting.

Ms. Votava acknowledged that Pope and RMS disputed the amount due to each party out

of the account established with the AES final payment. These disputes were addressed during the

subsequent Arbitration. Ms. Votava attended the Arbitration proceeding every day. Pope's

counsel was present at the Arbitration. Ms. Votava understood during the Arbitration that Pope

and RMS were adverse, and that Schiff represented RMS. According to Ms. Votava, no one from

Pope raised an objection to Schiff's representation of RMS during the Arbitration. Ms. Votava

testified that she did not believe that Schiff's representation of RMS during the Arbitration was a

conflict, because Schiff and RMS told the Arbitration panel that the Account was owned by RMS

and Pope, and that the panel was to allocate distribution of funds to RMS and Pope. According to

Ms. Votava, it was not until Schiff, on behalf of RPG, took a contrary position regarding

ownership of the Account in bankruptcy that she believed that there was a conflict of interest.

The related bankruptcy cases were filed on or about December 18, 2006. However, Pope

did not file its Original Motion to Disqualify until December 21, 2007, and did not allege a direct

---

** <u>Sic</u>, thereby referring to RMS.

-10-

conflict of interest arising out of the Schiff Check issue until July 2, 2008, when it moved for

Leave to File Supplemental Brief in Support of its pending Motion to Disqualify. In its

Supplemental Brief, Pope alleged that it did not become aware of the Schiff Check and,

therefore, was not aware of the direct conflict of interest asserted to arise therefrom, until June 9,

2008. However, on cross-examination, Ms. Votava acknowledged that copies of Schiff invoices

were produced to Pope much earlier during the Arbitration. Ms. Votava testified that Pope never

sought legal advice from the attorneys at Clausen or from Schiff regarding propriety of

counter-signing the Schiff Check.

Mr. Friedlander, one of RMS's attorneys at Schiff, testified that he never represented

William A. Pope Co. at any time; that he never offered to represent the interests of Pope; and that

he never had a retainer agreement with Pope. Finally, he testified that he never received any

confidential information from Pope for the purpose of seeking legal advice. The American

Arbitration Association has rules and procedures for document production, and a full exchange

of documents was ordered by the Arbitration panel. Mr. Friedlander testified that any confidential

information received by Schiff from Pope during the Arbitration was produced for discovery, not

for purposes of receiving legal advice. Furthermore, Mr. Friedlander testified that he never

represented the Project; he was an attorney only for the Raymond entities. However, the work

that he did negotiating the release of retainage necessarily benefitted Pope as well as RMS. AES

was holding back Project money, so the money released benefitted RMS and RMS

subcontractors, including Pope.

Following the hearing on the Schiff Check issue, the Memorandum Opinion on Pope's

Renewed Motion to Disqualify found and held that an attorney-client relationship between Schiff

and Pope had not been established. Any confidential information received by Schiff from Pope

came as the result of discovery production ordered by the Arbitration Panel, and was not given

for the purpose of seeking legal advice. Ms. Votava's belief that in negotiating for the release of

retainage, Schiff was acting as counsel for Pope was found and held to be unreasonable and

unfounded. It was further found and held that it was unreasonable for anyone to believe that

Schiff was representing Pope when Pope's representative never spoke to any attorney from

Schiff. In addition, it was concluded that Pope had failed to establish that it was an intended or

sole beneficiary of any relationship between RMS and Schiff. It was further found and held that

representatives from Pope were aware that its representative countersigned and deposited the

Schiff Check when the check was written in 2001. Therefore, the Opinion concluded that Pope

knew of the supposed conflict when the check was countersigned, but waived any right to assert,

approximately seven years later in 2008 that a conflict existed. Accordingly, Pope's Renewed

Motion to Disqualify was denied to the extent it rested on the Schiff Check.

### HEARING ON AMENDED MOTION FOR SANCTIONS

As earlier noted, the Raymond parties moved for sanctions after it prevailed on the Schiff

Check issue. On April 3, 2009, Pope filed a response to Debtors' Amended Motion for Sanctions

(Docket No. 401). In support of its response, Pope provided expert opinions in the form of

affidavits from Professors Nancy B. Rapoport ("Rapoport") and Geoffrey C. Hazard, Jr.

("Hazard"). On April 17, 2009, Debtors filed a Reply in support of their Amended Motion for

Sanctions (Docket No. 406). In their Reply, Debtors argued that "to the extent the Court would

consider any affidavit from [Professors Rapoport or Hazard], [they] must be subject to discovery

and cross-examination." (Debtors' Reply at 6 n.3; p. 15 n.5.) On August 12, 2009, a Final Pretrial

Order was entered on Debtors' Amended Motion for Sanctions (Docket No. 426) allowing

Debtors to take the telephonic depositions of Professors Rapoport and Hazard, and providing for

their testimony at a hearing scheduled to follow the depositions. The telephonic depositions of

Professors Rapoport and Hazard took place on August 28, 2009.

On September 17, 2009, a hearing was held on the limited issues presented by the

affidavits of Professors Rapoport and Hazard filed by Pope since no other issues required

evidence. Evidence was taken through testimony of both Professors Rapoport and Hazard, and

argument heard pertaining to their opinions and related issues. Additional facts thereby found are

contained below in the Conclusions of Law.

### JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court

pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of

the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C.

§ 1409. Count VI is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), as is this

Renewed Motion for Sanctions.

### CONCLUSIONS OF LAW

**I.     RULE 9011 STANDARDS**

Rule 9011 is modeled after Fed. R. Civ. P. 11 ("Rule 11") and is "essentially identical" to

Rule 11. In re Park Place Assocs., 118 B.R. 613, 616 (Bankr. N.D. Ill. 1990). Thus, the

authorities construing Rule 11 are applicable to the case at bar. "The central goal of Rule 11 is to

deter abusive litigation practices." Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d

990, 1013 (7th Cir. 2004) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990)).

Rule 11 is not intended to function as a fee-shifting statute that requires a losing party to pay fees

and costs. State Bank of India v. Kaliana (In re Kaliana), 207 B.R. 597, 601 (Bankr. N.D. Ill.

1997) (citing Mars Steel Corp. v. Cont'l Bank N.A., 880 F.2d 928, 932 (7th Cir. 1989) (en banc)

("Rule 11 is not a fee-shifting statute in the sense that the loser pays.")). The focus of Rule 11 is

on the conduct of the parties and not the results of the litigation. Baermann v. Ryan (In re Ryan),

411 B.R. 609, 613 (Bankr. N.D. Ill. 2009).

Sanctions under Rule 11 and Rule 9011 serve an important purpose, but comprise a tool

that must be used with caution. Stotler & Co. v. Able, 870 F.2d 1158, 1167 (7th Cir. 1989).

Caution is required because the "[t]oo frequent imposition of sanctions . . . risks chilling zealous

and creative advocacy as well as potentially meritorious claims that circumstances make difficult

to prove." Tillman v. New Line Cinema Corp., No. 05 C 910, 2008 WL 5427744, at *6 (N.D. Ill.

Dec. 31, 2008); see also Fed. R. Civ. P. 11 (1983) advisory committee's note (stating that Rule

11 "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal

theories."); Szabo Food Serv., Inc. v. Canteen Corp., 823 F.2d 1073, 1081-82 (7th Cir. 1987)

(finding that Rule 11 does not require "scholarly exposition or exhaustive research" and a court

must take care not to penalize arguments for seeking evolution of legal principles.) "Rule 11

sanctions are only to be granted sparingly, and should not be imposed lightly." Lefkovitz v.

Wagner, 219 F.R.D. 592, 592-93 (N.D. Ill. 2004), aff'd, 395 F.3d 773 (7th Cir. 2005) (citation

omitted).

Rule 9011 provides:

> (a) SIGNATURE. Every petition, pleading, written motion, and
> other paper, except a list, schedule, or statement, or amendments
> thereto, shall be signed by at least one attorney of record in the
> attorney's individual name. . . .

(b) REPRESENTATIONS TO THE COURT. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,–

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) SANCTIONS. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award to the party prevailing on the motion the reasonable expenses

-15-

and attorney's fees incurred in presenting or
opposing the motion. . . .

. . .

(2) Nature of Sanction; Limitations. A sanction
imposed for violation of this rule shall be limited to
what is sufficient to deter repetition of such conduct
or comparable conduct by others similarly situated.
Subject to the limitations in subparagraphs (A) and
(B), the sanction may consist of, or include,
directives of a nonmonetary nature, an order to pay
a penalty into court, or, if imposed on motion and
warranted for effective deterrence, an order
directing payment to the movant of some or all of
the reasonable attorneys' fees and other expenses
incurred as a direct result of the violation.

. . .

(3) Order. When imposing sanctions, the court shall
describe the conduct determined to constitute a
violation of this rule and explain the basis for the
sanction imposed.

Fed. R. Bankr. P. 9011(a)-(c).

**A. Rule 9011(b)**

A court may impose sanctions if it finds a violation of any one of the four subdivisions of

Rule 9011(b). In re Collins, 250 B.R. 645, 661 (Bankr. N.D. Ill. 2000). "[T]he four subdivisions

of Rule 9011(b) fall into two general categories: the 'frivolousness' clauses (or the 'objective

component') and the 'improper purpose' clause (or the 'subjective component')." In re Am.

Telecom Corp., 319 B.R. 857, 867 (Bankr. N.D. Ill. 2004), aff'd, Am. Telecom Corp. v. Siemens

Info. & Commc'ns Network, Inc., No. 04 C 8053, slip op. (N.D. Ill. Sept. 7, 2005).

Rule 9011(b)(1) prohibits the filing of a pleading for an improper purpose, such as delay,

harassment, or causing expense, even if the filing relates to a claim that is otherwise colorable.

Id. Bankruptcy Rule 9011(b)(2)-(4) requires a party's attorney to perform a reasonable

preliminary investigation of the facts and the applicable law before filing a pleading. Id.

-16-

The "improper purpose clause" under Rule 9011(b)(1) is directed at abusive litigation practices and encompasses papers filed to cause unnecessary delay, to increase litigation costs, or filed to harass. Troost v. Kitchin (In re Kitchin), 327 B.R. 337, 366 (Bankr. N.D. Ill. 2005); Am. Telecom, 319 B.R. at 872. In determining whether a paper has been submitted for an improper purpose, inquiry must be made into why the petitioner pursued the litigation. Collins, 250 B.R. at 661. A court must look to "objectively ascertainable circumstances that support an inference" that the non-movant's purpose for filing a paper was improper within the meaning of Bankruptcy Rule 9011(b)(1). Id. at 662. "A paper interposed for any improper purpose is sanctionable whether or not it is supported by the facts and the law, and no matter how careful the pre-filing investigation." Kitchin, 327 B.R. at 366.

The "frivolousness clause" is composed of two subparts: (1) whether the party has made a reasonable inquiry into the governing law, and (2) whether a party has made a reasonable inquiry into the facts of the case. Ridge v. U.S. Postal Serv., 154 F.R.D. 182, 184 (N.D. Ill. 1992). "A violation of either subpart constitutes a Rule 11 violation." Id. A "district court may impose sanctions if a lawsuit is 'not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.'" Cuna Mut. Ins. Soc'y v. Office & Prof'l Employees Int'l Union, Local 39, 443 F.3d 556, 560 (7th Cir. 2006) (quoting Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731, 990 F.2d 957, 963 (7th Cir. 1993)). "The court must 'undertake an objective inquiry into whether the party or his counsel should have known that his position is groundless.'" Id. "The legal papers an attorney files in any case must be grounded in both a nonfrivolous legal theory and well-founded factual contentions and/or denials that, at a minimum, have a reasonable possibility of having evidentiary support

-17-

after further investigation and discovery." Am. Telecom, 319 B.R. at 867. Good faith alone is not enough to comply with the frivolousness clause of Rule 9011. Id.

A pleading is well-grounded in fact if it has some reasonable basis in fact. Home Savs. Ass'n of Kansas City, F.A. v. Woodstock Assocs. I, Inc. (In re Woodstock Assocs. I, Inc.),121 B.R. 238, 242 (Bankr. N.D. Ill. 1990). That is, investigation of the facts must have been reasonable under the particular circumstances of the case. In re Excello Press, Inc., 967 F.2d 1109, 1112-13 (7th Cir. 1992).

An objective standard should be employed in assessing the reasonableness of an attorney's pre-suit investigation. Chambers v. Am. Trans Air, Inc., 17 F.3d 998, 1006-07 (7th Cir. 1994). The reasonableness of the pre-filing inquiry is judged by the totality of the circumstances viewed at the time the pleading, motion, or other paper was filed. Moore v. Vital Prods., Inc., No. 07 C 906, 2009 WL 275475, at *10 (N.D. Ill. Feb. 3, 2009). See Fed. R. Civ. P. 11 (1983) advisory committee's note ("The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."). Furthermore, "sanctions are not automatically warranted where a party loses a dispositive motion." Walter v. Fiorenzo, 840 F.2d 427, 436 (7th Cir. 1988); see also Fed. R. Civ. P. 11, (1993) advisory committee's note ("That summary judgment is rendered against a party does not necessarily mean . . . that it had no evidentiary support for its position.").

### B. Rule 9011(c)

Under Rule 9011(c)(1), "sanctions proceedings may be initiated in two ways, by motion or at the initiative of the trial court." Party-initiated sanctions must proceed by motion and satisfy the

requirements of 9011(c)(1)(A). <u>Kitchin</u>, 327 B.R. at 359. The motion must describe the specific

conduct alleged to be sanctionable and cannot be made in conjunction with any other motion. <u>Id.</u>

The motion must be served, but not filed or presented to the Court unless, within twenty-one

days of service, the non-movant has not withdrawn or corrected the "challenged paper, claim,

defense, contention, allegation, or denial." Fed. R. Bankr. P. 9011(c)(1)(A) ("safe harbor

provision"). The purpose of the safe harbor provision is to give the offending party the

opportunity, within twenty-one days after service of a motion for sanctions to withdraw the

offending pleading and thereby escape sanctions. <u>Kitchin</u>, 327 B.R. at 359-360. An imposition of

sanctions by party motion without adhering to this twenty-one day safe harbor provision is an

abuse of discretion. <u>Johnson v. Waddell & Reed, Inc.</u>, 74 F.3d 147, 150-51 (7th Cir. 1996). This

provision "serves the laudable purpose of requiring litigants to dispose of frivolous claims

without judicial involvement." <u>Kitchin</u>, 327 B.R. at 361. Rule 11(c) was designed to ensure due

process and give the potentially offending party a "full and fair opportunity to respond and show

cause before sanctions are imposed." <u>Divane v. Krull Elec. Co., Inc.</u>, 200 F.3d 1020, 1025 (7th

Cir. 1999).

A motion for sanctions should be filed "as soon as practicable after discovery of a Rule

11 violation." <u>Kaplan v. Zenner</u>, 956 F.2d 149, 151 (7th Cir. 1992).

## II.     **DEBTORS' COUNSEL COMPLIED WITH RULE 9011 FED. R. BANKR. P. PROCEDURAL REQUIREMENTS**

Pope's first argument was that the Debtors' Motion fails to comply with procedural

requirements of Rule 9011 Fed. R. Bankr. P. It contends that the Debtors did not comply with the

Rule 9011 safe harbor provision because its motion for sanctions was both served and filed on

March 6, 2009. According to Pope, the November 14, 2008 letter was not a "motion" and

therefore did not "trigger the safe harbor provision of Rule [9011], and further may not substitute

formal service of the Rule [9011] motion." <u>Dearborn Fin. Servs. Corp. v. Heath</u>, No. 98 CV 522,

1999 WL 1011860, at *5 (N.D. Ill. Sept. 30, 1999). However, Seventh Circuit precedent allows

for discretion in deciding whether "defendants have complied substantially with Rule 11 [the

Civil Procedure version of Bankruptcy Rule 9011] and are entitled to a decision on the merits of

their request for sanctions under Rule 11." <u>Nisenbaum v. Milwaukee County</u>, 333 F. 3d 804, 808

(7th Cir. 2003); <u>see also</u> <u>Divane</u>, 200 F.3d at 1026-27 (finding that the plaintiff complied with the

Rule 11 safe harbor provision where the plaintiff's motion to strike defendant's counterclaim

informed defendant of plaintiff's intent to seek sanctions and there was at least 21 days for

defendants to withdraw the offensive pleading).

 The Rule 9011 letter was sufficient in this case to give Pope the notice and opportunity to

withdraw as is required by the safe harbor provision. The letter contained a detailed recitation of

the same violations set forth in the Debtors motion for sanctions and expressly informed Pope of

the Debtors' intent to seek Rule 9011 sanctions on Pope's Renewed Motion. The subsequent

ruling rejected the Schiff Check issue raised by the Renewed Motion to Disqualify on December

5, 2008, twenty-one days after Debtors first informed Pope of their intent to seek sanctions by

letter on November 14, 2008. In this case, Pope did thereby receive the intended benefit of the

full safe harbor period, and therefore the Debtors are entitled to a decision on the merits of their

request for sanctions.

 Pope further argues the procedural objection that Debtors failed to comply with the Rule

9011 requirement that notice should be given "promptly upon discovering a basis for doing so."

Fed. R. Civ. P. 11 (1983) advisory committee's note. Pope argues that it first raised the Schiff

Check conflict of interest issue on July 2, 2008, when it filed the Motion for Leave and

Supplemental Brief. Pope argues that the November 14, 2008 letter was sent more than four

months after that filing and was therefore untimely. However, Pope was not given leave to file

the Motion for Leave and Supplemental Brief until November 13, 2008 when the Renewed

Motion to Disqualify was considered. At that time, the Debtors were first ordered to respond.

The Rule 9011 letter was sent to Pope the next day, on November 14, 2008. Under these

circumstances, it is found and concluded that timely notice was provided "as soon as practicable

after discovery of [the asserted Rule 9011] violation." Northlake Mktg. & Supply, Inc. v.

Glaverbel, S.A., 194 F.R.D. 633, 634 (N.D. Ill. 2000) (quoting Kaplan, 95 6 F.2d at 151).

## III.   POPE'S RENEWED MOTION TO DISQUALIFY WAS ARGUABLY WARRANTED BY EXISTING LAW AND WAS NOT LEGALLY FRIVOLOUS

The Debtor contends that Pope violated Rule 9011(b)(1), (b)(2), and (b)(3). Debtors first

argue that Pope and Clausen should be sanctioned under 9011(b)(2) for ignoring dispositive

authority and for filing a motion that was not well grounded in law or fact. Specifically, Debtors

argue that when Pope and Clausen sought to disqualify Schiff based on the Check, they ignored

applicable legal precedent.

Pope cited Zych v. Jones for the proposition that "[t]he relationship of an attorney and

client is a contractual relationship. It is only created by a retainer or an offer to retain or a fee

paid." 406 N.E.2d 70, 74 (Ill. App. Ct. 1980) (citations omitted). Pope argued that

counter-signature by Mr. Troyke (an officer of Pope) on the Schiff Check disbursing funds from

the joint account for the payment of Schiff's attorney fees created an attorney-client relationship

between the Schiff firm and Pope. Debtors argue that in presenting this argument, Pope ignored

existing precedent more recent than <u>Zych</u>. Since <u>Zych</u>, the Illinois Supreme Court has held that

privity of contract is no longer an indispensable element for finding an attorney-client

relationship in legal malpractice cases. <u>Warren v. Williams</u>, 730 N.E.2d 512, 515 (Ill. App. Ct.

2000) (<u>citing</u> <u>Pelham v. Griesheimer</u>, 440 N.E.2d 96, 99 (Ill. 1982)). Indeed, the payment by a

party's attorney fees alone does not create an attorney-client relationship. <u>Int'l Paper Co. v. Lloyd</u>

<u>Mfg. Co., Inc.</u>, 555 F. Supp. 125, 132 (N.D. Ill. 1982) ("What determines whether an

attorney-client relationship exists has nothing to do with the payment of legal fees.") (<u>citing</u>

<u>Westinghouse Elec. Corp. v. Kerr-McGee Corp.</u>, 580 F.2d 1311, 1317 (7th Cir. 1978)).

Instead, it is generally held that an attorney-client relationship is established only when

the lay party submits confidential information to a lawyer "with reasonable belief that the latter is

acting as the former's attorney." <u>Kerr-McGee</u>, 580 F.2d at 1312, 1321. Debtors argue that Pope

knew or should have known that it could never establish that an attorney-client relationship

existed under this standard because there was no evidence concerning any confidential

information transmitted or services that Schiff lawyers actually rendered in return for the Check,

or to whom Schiff rendered those supposed services and who Schiff billed for any such work.

Debtors further argue that Pope was aware that no one at Pope or Clausen ever believed that

Schiff represented Pope.

Pope, contends that it did not ignore contrary precedent, but rather acted with a good faith

belief that its conflict of interest argument was "warranted by existing law" within the meaning

of Rule 9011(b)(2) when it filed the Renewed Motion to Disqualify. Pope argued that since the

check was issued with Pope's consent at a time when RMS and Pope were on friendly terms and

had a common interest in maintaining the Account for their joint benefit, Pope believed that the

payment to Schiff was evidence of Schiff's representation of Pope and RMS's common interests.

The earlier Opinion denying disqualification specifically rejected these arguments,

finding that any belief that Schiff was then representing Pope was objectively unreasonable.

However, Pope's position was not based entirely on the formation of a "formal attorney-client

relationship" but was based also on "the representation of common-interests." Pope asserted in

its Supplemental Brief that "[a]t a minimum, the [Schiff Check] demonstrates that Schiff

formerly represented the concurrent interests of both Pope and RMS relating to the Project. Their

mutual interests were embodied in the Project." (Supplemental Brief, Bankr. Docket No. 304,

Ex. No. 1 at 4). Pope argued that its position was objectively reasonable at the time because there

was no authority addressing this specific factual situation, and a "common-interest

representation" in fact did exist due to the assistance provided by Schiff for joint benefit of the

parties. Pope contended that this concept should apply here. At the November 13, 2008 hearing,

Ms. Gummow stated that "as officers of the court we felt it necessary to put the evidence before

the court. And it's the court's determination whether or not there's a conflict. But we felt it

necessary to put this evidence before this court and the U.S. Trustee." (Debtors' Reply Ex. C, Tr.

11:14-20, November 13, 2008.)

As evidence of the reasonableness of this belief of its counsel under circumstances of this

case, Pope presented two expert witnesses with extensive backgrounds that qualified each to give

opinions as to the issues involved here, Professors Rapoport and Hazard.

Pope relied upon Professor Rapport to argue that it had sought expert advice prior to

filing the Renewed Motion to Disqualify. Pope submitted two affidavits of Professor Rapoport.

The First Affidavit, dated November 25, 2008, was submitted as "Exhibit 3" to Pope's Reply in

support of its Renewed Motion (Docket No. 241). The Second Affidavit, dated April 1, 2009,

was submitted as "Exhibit K" to Pope's Response to Debtors' Amended Motion for Sanctions

(Docket No. 401). In Pope's Reply in support of its Renewed Motion, Pope stated " . . . prior to

the filing of the motion to disqualify by Pope, counsel for Pope contacted two bankruptcy ethics

experts as part of its due diligence investigation. Both experts stated that the conflict was so

obvious, that it was unnecessary to retain an expert analyze the issue." (Pope's Reply at ¶ 12.) In

support of this assertion, Pope cited to Professor Rapoport's First Affidavit but did not specify

which "motion to disqualify" it was addressing, and did not there identify the "two bankruptcy

ethics experts" referred to. In the First Affidavit, Ms. Rapport stated, " . . . the conflicts of

interest in this case were so obvious that I didn't believe that [Ms. Gummow's] firm needed to

hire me as an expert." (First Affidavit ¶ 5). In its Response to Debtors Motion for Sanctions,

Pope stated, "[a]s earlier mentioned, in pursuing the 'direct conflict' issue, Respondents

consulted with bankruptcy-ethics expert Nancy Rapoport, who attested to the 'obvious' nature of

Schiff's conflicts of interest." (Pope's Response at 10). Again, Pope cited to Professor

Rapoport's First Affidavit to support this assertion. Pope indicated that the "direct conflict" issue

raised in Pope's Supplemental Brief was the Schiff Check issue but did not therein specify the

conflict that was "so obvious". Some confusion was created by these vague references by Pope,

and additional testimony was required through deposition and at the evidentiary hearing to clarify

the conflict issues discussed with Professor Rapport prior to raising the Schiff Check issue here.

Professor Rapoport's testimony at the hearing revealed that she was not consulted on the

Schiff Check issue before Pope raised the issue in its Renewed Motion. (Tr. 65:24-67:20, 74:22-

75:1, September 17, 2009). Professor Rapoport's statements in the First Affidavit were utterly

irrelevant to Pope's assertions on that issue, since she was not referring to the Schiff Check issue.

Professor Rapport's testimony showed that her remark as to the "obvious" conflict solely

pertained to the Multi-Debtor Conflict raised in Pope's Original Motion to Disqualify. (Tr. 51:2-

53:1; 64:17-65:23; 67:11-19, September 17, 2009.) Professor Rapoport did not learn of the Schiff

Check issue until November 21, 2008, after the Renewed Motion had been filed. (Tr. 28:18-31:4

September 17, 2009.)

Professor Hazard was not contacted regarding the Schiff Check issue until after the

Renewed Motion was filed (Tr. 122:8-14, September 17, 2009); Pope did not represent that he

had been consulted before it asserted the Schiff Check issue. Pope's Post-Hearing Response in

Opposition to Debtors' Closing Argument asserted that its counsel consulted with a third

bankruptcy expert, Gerald K. Smith, one of the "two bankruptcy ethics experts" referenced in

Pope's Reply in Support of its Renewed Motion, yet Pope failed to attach his affidavit or identify

him in their Reply (Docket No. 532 at 9 n.7), and Professor Smith was not offered as a witness.

In short, Pope did not present any evidence demonstrating that it consulted with any

experts on the Schiff Check issue before filing the Renewed Motion. Thus, Pope's arguments

implying that it consulted with experts as part of its pre-filing investigation of the new Schiff

Check issue as part its Renewed Motion to Disqualify were not accurate.

Pope's Renewed Motion was filed as "supplemental" to the Original Motion to

Disqualify. It argues that the Renewed Motion was filed to draw the Court's attention to

additional evidence further supporting the Multi-Debtor Conflict raised in Pope's Original

Motion to Disqualify (Bankr. Docket No. 305, Ex. No. 1 at 4; Tr. 59:5-8, September 17, 2009),

and therefore its arguments pertained in part to the Original Motion as well as the new Schiff

Check issue. Maybe so, but those arguments should have been more precisely presented so as to

avoid obscuring their meaning.

Professor Rapoport testified that Pope and its counsel were acting in good faith when they raised the Schiff Check issue with the Court. (Tr. 76:17-24, September 17, 2009.) In her Second Affidavit, Professor Rapport stated that, ". . . in adding the question of whether a payment from the settlement account to Schiff Hardin made the ethics issues more prominent (raised during the Motion to Renew), I believe that Pope, Clausen Miller, Ms. Gummow, Mr. O'Brien, and Mr. Hacker were trying to ensure that the Court had all the facts before it." (Second Affidavit ¶ 10.)

In his affidavit, Professor Hazard stated that it was objectionably reasonable to raise the question of whether a payment from the settlement account to Schiff created a conflict of interest (Pope's Response Ex. J ("Hazard Affidavit") ¶ 3.) Professor Hazard further stated that he was "unaware of any decisional authority addressing the specific situation here, namely where the prior matter was a common-interest representation." However, "[i]n light of the *Westinghouse* decision, the common-interest representation engaged Schiff Hardin in a fiduciary relationship with each of the parties to the common interest. Accordingly, the legal contention that Schiff Hardin was burdened by a conflict of interest under Rule 1.9 was warranted by a 'nonfrivolous argument for extending . . . existing law,' as provided in Rule 11(b)(2)." (Hazard Affidavit ¶ 12.)

At the hearing, Professor Hazard testified that although he would have framed the issue as a fiduciary relationship rather than a lawyer-client relationship, "[Schiff] did work for a . . . they created, I think, a fiduciary responsibility, and that the Seventh Circuit has seen and said that kind of relationship could be treated, can be treated as similar to that of an attorney-client relationship as such." (Tr. 183:15-20, September 17, 2009.) Professor Hazard further testified that "a lawyer-client relationship could be created without the disclosure of confidential information." (Tr. 199:7-12, September 17, 2009.) He opined that it was objectionably reasonable to assert that because the assistance provided by Schiff redounded to the benefit of

-26-

Pope as well as RMS, Schiff was governed by fiduciary duty in providing such assistance. (Tr.

174:4-16, September 17, 2009.) Professor Hazard stated that, "[i]n such circumstances a lawyer

or law firm undertaking such assistance may be regarded as having assumed either a lawyer-

client relationship or, as expressed in <u>Westinghouse Elec. Corp v. Kerr-McGee Corp.</u>, 580 F.2d

1311 (7th Cir. 1978), 'a fiduciary obligation or an implied professional relation.'" (Hazard

Affidavit ¶ 9.) According to Professor Hazard, the fiduciary or implied professional relationship

arising "between parties to a joint defense arrangement where each party is represented by

different counsel" identified in <u>Westinghouse</u> could be read to apply to the circumstances of this

case. (Hazard Affidavit ¶ 9; Tr. 187:13-25; 189:6-24, September 17, 2009.)

     Rule 9011 is violated "[w]here it is patently clear that a claim has absolutely no chance of

success under the existing precedents, and where no reasonable argument can be advanced to

extend, modify, or reverse the law as it stands." <u>Diversified Tech. Corp. v. Jerome Tech. Inc.</u>,

118 F.R.D. 445, 451 (N. D. Ill. 1988)(quoting <u>Eastway Construction Corp. v. City of New York</u>,

762 F.2d 243, 254 (2d Cir. 1985)). Some precedent "has required that the party against whom

sanctions would be imposed must actually make the reasonable argument, not merely assert

after-the-fact that a reasonable argument could have been made (even if the party didn't make it).

That means the litigant must acknowledge the precedent against its position and then asset the

basis for a modification of that existing precedent." <u>Diversified</u>, 118 F.RD. at 451 (citing <u>In re</u>

<u>Central Ice Cream Co.</u>, 836 F.2d 1068, 1073 (7th Cir. 1987)). While Pope did not specifically

state that it was arguing for a modification, extension or reversal of existing law, it did make an

argument that Schiff represented the concurrent interests of Pope and RMS, relying on <u>Zych</u> and

other legal authority cited in their Supplemental Brief. As Professor Hazard opined, there is no

clear requirement that the legal argument be specifically labeled as a modification, extension or reversal of existing law. (Tr. 185:11-24, September 17, 2009.)

Although the evidence was found not to justify granting Pope's motion to disqualify, its counsel had a reasonable basis for believing that the facts of this case warranted a judicial determination of whether or not a conflict of interest existed. See Smith v. Nat'l Health Care Servs. of Peoria, 934 F.2d 95, 98-99 (7th Cir. 1991) (denying a motion for Rule 11 sanctions where the party made good faith arguments for the modification of existing law and holding that "[t]he argument . . . need not be convincing or likely to succeed" if it is made in good faith). While Pope's argument for disqualification was not found convincing, its reasoning cannot be found baseless or founded on a knowingly false presentation of authority. To satisfy the frivolous test, a claim need only be colorable and contain a plausible view of the law. Kitchin, 327 B.R. at 366. The mere absence of legal precedent, the presentation of a flawed legal argument, or the failure to prevail on the merits of a particular legal contention cannot justify a finding of frivolousness. Id. (citing Lerch v. Boyer, 929 F.Supp. 319, 324 (N.D. Ind. 1996)).

A Seventh Circuit panel has stated that "one standard for frivolousness is risibility—if you start laughing when repeating the argument, then it's frivolous." Mars Steel Corp., 880 F.2d at 934. Pope's "common-interest representation" argument was more than laughable, and it must be concluded that Pope's counsel made sufficient reasonable inquiry into the law and facts. Moreover, the opinion of Professor Hazard and his references to reasoning in the Westinghouse opinion are particularly pertinent.

Therefore, there was an adequate basis in law and the facts to support Pope's Renewed Motion to Disqualify. Sanctions sought under Bankruptcy Rule 9011(b)(2) will be denied.

IV.    **POPE'S RENEWED MOTION TO DISQUALIFY DID NOT LACK SOME FACTUAL SUPPORT**

Debtors also argue that sanctions should be awarded under Rule 9011(b)(3) because the Renewed Motion lacked evidentiary support at the time it was filed. Debtors contend that Pope failed to offer any evidence that anybody at Pope or Clausen ever believed that Schiff represented Pope. Pope responds that it based its argument on the facts that (1) the Schiff Check was paid out of the Account and (2) an assertion that Schiff provided services benefitting the common interests of RMS and Pope.

The evidentiary support was enough to avoid sanctions under Rule 9011(b)(3). Pope had some basis to argue that there was a possible conflict of interest. The Schiff Check itself represented a payment to Schiff from the Account at issue and was signed by Mr. Troyke, an officer of Pope. Even though Votava's testimony was overcome by the weight of contrary evidence at the hearing, and she was not a persuasive witness, her testimony provided some evidentiary support. For the purposes of Rule 9011(b)'s reasonable preliminary investigation standard, the Schiff Check combined with Votava's account of the events must be given weight as possibly credible and persuasive in the eyes of Pope and its counsel. See Kitchin, 327 B.R. at 364.

Sanctions will therefore be denied under Bankruptcy Rule 9011(b)(3).

V.    **THE DEBTORS HAVE NOT DEMONSTRATED THAT POPE FILED THE RENEWED MOTION TO DISQUALIFY FOR AN IMPROPER PURPOSE**

Debtors' final argument under Rule 9011 is that Pope's Renewed Motion to Disqualify was brought for an improper purpose because it was: (1) frivolous and (2) filed too close to the date of the lengthy trial of the Adversary scheduled in Count VI to address ownership of the Account. Since it has been held that Pope did not violate Rule 9011(b)(2) or 9011(b)(3), Debtors

-29-

cannot claim a violation of Rule 9011(b)(1) on grounds that Pope's arguments were legally or

factually baseless when filed, or that they were brought for an improper purpose. See Moore,

2009 WL 275475 at *15; Kitchin, 327 B.R. at 367. Moreover, the Debtors did not produce

persuasive evidence showing that Plaintiffs intentionally sought merely to delay the trial or to

harass Debtors or their counsel on the eve of trial of Count VI. Kitchin, 327 B.R. at 367; see also

Jackson Nat'l Life Ins. Co. v. Greycliff Partners, 226 B.R. 407, 421 (E. D. Wis. 1998) (holding

that movant's characterizations of improper purpose do not, by themselves, provide a basis for

the imposition of sanctions). In fact, the trial was not delayed.

      For the foregoing reasons, sanctions will be denied under Bankruptcy Rule 9011(b)(1).

## VI.    SANCTIONS UNDER 28 U.S.C. § 1927 ARE DENIED

      Section 1927 of title 28 of the United States Code provides that an attorney "who so

multiplies the proceedings in any case unreasonably and vexatiously may be required by the court

to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because

of such conduct." It applies to actions in a "court of the United States." 28 U.S.C. § 1927.

Bankruptcy judges are judicial officers of the District Court, 28 U.S.C. § 151, the bankruptcy

judges comprise a unit of the District Court, 28 U.S.C. § 451, and the District Court is doubtless

a Court of the United States. Therefore, bankruptcy judges have been held to have authority to

sanction under this statute. See In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 105 (3d Cir.

2008); United States v. Yochum (In re Yochum), 89 F.3d 661, 669 (9th Cir. 1996); Grewe v.

United States (In re Grewe), 4 F.3d 299, 304 (4th Cir. 1993); United States v. Guariglia, 962 F.2d

160, 162-63 (2d Cir. 1992); see also Adair v. Sherman, 230 F.3d 890, 895 n.8 (7th Cir. 2000)

(finding that a bankruptcy judge could sanction an attorney under authority of 28 U.S.C. § 1927);

In re Volpert, 110 F.3d 494, 501 (7th Cir. 1997) (holding that the language of 11 U.S.C. § 105

furnishes bankruptcy courts with ample authority to sanction conduct that abuses the judicial

process, including conduct that unreasonably and vexatiously multiplies bankruptcy

proceedings). However, § 1927 is penal in nature and should be strictly construed. See Kitchin,

327 B.R. at 368.

Discretion lies to impose sanctions under § 1927 "when an attorney has acted in an

objectively unreasonable manner by engaging in serious and studied disregard for the orderly

process of justice; pursued a claim that is without a plausible legal or factual basis and lacking in

justification; or pursued a path that a reasonably careful attorney would have known, after

appropriate inquiry, to be unsound." Jolly Group, Ltd. v. Medline Indus., Inc., 435 F.3d 717, 720

(7th Cir. 2006) (internal quotations and citations omitted). "Sanctions under Section 1927 cannot

be awarded simply because a claim is meritless; . . . the attorney must intentionally file or

prosecute a claim that lacks a plausible legal or factual basis." Moore, 2009 WL 275475 at *18

(internal quotations and citation omitted). "In determining whether an attorney acted

intentionally, a court can rely on direct evidence of an attorney's subjective knowledge or on a

total lack of factual or legal basis for suit." Id.

No basis is found to award sanctions against counsel under § 1927. Such sanctions would

be appropriate only in the face of unreasonable and vexatious conduct, which was not present in

the filing of the Renewed Motion to Disqualify by Pope. See Kotsilieris v. Chalmers, 966 F.2d

1181, 1184-85 (7th Cir. 1993) (holding that the word "vexatiously" in § 1927 requires "either

subjective or objective bad faith" to warrant sanctions). It was earlier determined in this Opinion

that Pope's Renewed Motion to Disqualify was not filed in bad faith. Debtors' have not

presented any specific evidence that Pope intentionally filed the Renewed Motion based upon

knowingly false pretenses or engaged in any wrongful conduct in doing so.

Therefore, sanctions will be denied under § 1927.

## VII. POPE'S MOTION TO COMPEL DEBTORS TO PAY FEES RELATED TO THE DEPOSITIONS OF PROFESSOR HAZARD AND PROFESSOR RAPOPORT IS ALLOWED AS TO PROFESSOR HAZARD, DENIED AS TO PROFESSOR RAPPORT

Pope has moved that Debtors or their counsel pay the fees associated with the depositions of its expert witnesses, Professors Rapoport and Hazard, pursuant to Fed. R. Civ. P. 26(b)(4)(C), made applicable by Fed. R. Bankr. P. 7026.

Since Debtors and their counsel requested the depositions of Professors Rapoport and Hazard, the fees related to their depositions should ordinarily be paid by Debtors or their counsel. Fed. R. Civ. P. 26(b)(4)(C)(i) provides, "[u]nless manifest injustice would result, the court must require that the party seeking discovery . . . pay the expert a reasonable fee for time spent in responding to discovery."

However, manifest justice would result if the Debtors were required to pay the expert fees charged by Professor Rapoport for her deposition. As previously discussed, the First Affidavit of Professor Rapoport referenced in Pope's pre-hearing arguments was found from her testimony not to address the Schiff Check issue. Her deposition clarified the ambiguity caused by Pope's use of the affidavit in support of the Schiff Check issue. Debtors had to elicit deposition testimony from Professor Rapoport in order to clarify the vague references by Pope's counsel to her opinions addressing the conflict of interest issues. Manifest injustice would result if the Debtors were required to pay for the need to clean up the confusion created by the imprecise use of language in arguments by Pope's counsel. Thus, Pope must bear the burden of compensating Professor Rapoport for her deposition testimony.

The requested fees for Professor Hazard's deposition are reasonable. Opinions in this District have concluded that the reasonable costs associated with the time spent preparing for a

deposition are recoverable, as well as the time attending the deposition. See Waters v. City of

Chicago, 526 F.Supp.2d 899, 900-01 (N.D. Ill. 2007); Profile Prod. v. Soil Mgmt. Tech., Inc.,

155 F.Supp.2d 880, 886 (N.D. Ill. 2001). The following factors are used to assess the

reasonableness of expert's fees under Rule 26(b)(4)(c)(i) Fed. R. Civ. P.:

> (1) the witness's area of expertise; (2) the education and training
> required to provide the expert insight that is sought; (3) the
> prevailing rates for other comparably respected available experts;
> (4) the nature, quality and complexity of the discovery responses
> provided; (5) the local cost of living; and (6) any other factor likely
> to be of assistance in balancing the interests implicated by Rule 26.

Profile Prod., 155 F. Supp.2d at 886. "In addition, the court may consider: (1) the fee actually

charged the party who retained the expert; and (2) fees traditionally charged by the expert on

related matters." Liquid Dynamics Corp. v. Vaughan Co., Inc., No. 01 C 6934, 2002 WL

31207212, at *3 (N.D. Ill. Oct. 2, 2002).

Including one and one half hours preparation time and one and one half hours of

deposition time, billed at $800 per hour, Professor Hazard's fees total $2400. (Pope's Motion to

Compel Ex. D.) Professor Hazard's curriculum vitae clearly establishes that he is a qualified

expert in bankruptcy ethics. (Hazard Affidavit Ex. B.) Professor Hazard testified that his hourly

rate was $800 (Tr. 267:20-268:13, September 17, 2009.), and he bills at that rate. (Pope's Motion

to Compel Ex. D.) This evidence is enough to determine that $800 an hour is what is ordinarily

billed and collected by him as a qualified expert in the pertinent area of expertise.

Therefore, Pope is entitled to be reimbursed for the reasonable fee of $2400 charged by

Professor Hazard for his deposition, but not for the deposition fee charged by Professor

Rapoport.

## CONCLUSION

For the foregoing reasons, it is held that sanctions pursuant Rule 9011(b) Fed. R. Bankr. P. and 28 U.S.C. § 1927 are not appropriate. A separate Order will therefore be entered entirely denying Debtor's Amended Motion for Sanctions.

Pursuant to Rule 7026 Fed. Bankr. P., Pope is entitled to be paid the fees associated with the deposition of Professor Hazard. However, Pope is not entitled to recover the fees associated with Professor Rapport's deposition, as manifest injustice would result. Pope's Motion to Compel Payment will thereby granted in part and denied in part, and a separate Order will be entered accordingly.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 25th day of November, 2009.