## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE | ) |
| | ) |
| RAYMOND PROFESSIONAL GROUP, INC., et al., | ) |
|     Debtors. | ) Bankruptcy No. 06 B 16748 |
| | ) (Jointly Administered) |
| RAYMOND PROFESSIONAL GROUP, INC., | ) |
|     Plaintiff, | ) |
| RAYMOND MANAGEMENT SERVICES, INC., n/k/a RAYMOND PROFESSIONAL GROUP–DESIGN/BUILD, INC., | ) |
|     Co-Plaintiff to Count VI | ) |
| v. | ) Adversary No. 07 A 00639 |
| WILLIAM A. POPE COMPANY, | ) |
|     Defendant. | ) |
| WILLIAM A. POPE COMPANY, | ) |
|     Counter-Plaintiff as to Count VI | ) |
| v. | ) |
| RAYMOND PROFESSIONAL GROUP, INC., and RAYMOND MANAGEMENT SERVICES, INC., n/k/a RAYMOND PROFESSIONAL GROUP–DESIGN/BUILD, INC., | ) |
|     Counter-Defendants. | ) |
| NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, a Connecticut Corporation | ) |
|     Intervening Plaintiff | ) |
| v. | ) |
| RAYMOND PROFESSIONAL GROUP, INC., RAYMOND PROFESSIONAL GROUP–DESIGN/BUILD, INC., and WILLIAM A. POPE COMPANY, | ) |
|     Intervening Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AFTER TRIAL ON COUNTS II THROUGH V

Under the Bankruptcy Code, a bankruptcy debtor may avoid certain pre-bankruptcy

transfers of property interests. The debtor-plaintiffs in this Adversary proceeding seek to use that

1

power to obtain funds in an Account that was adjudicated post-bankruptcy in Count VI to belong to the defendant William A. Pope Company ("Pope"). That judgment when entered was subject to the possible issues asserted against Pope in Counts II through V. Claims in those Counts are based on different theories, but all rest on the contention that Pope's rights were obtained by a pre-bankruptcy "transfer" of rights to it that may now be set aside through those Counts. However, there was no such transfer to it prior to the bankruptcy filings, and all of the legal theories asserted are therefore inapplicable.

For reasons stated below, judgments will be entered in favor of Pope and against Plaintiffs by one separate Judgment Order dealing with Counts II through V.

## HISTORY AND PLEADINGS

On December 18, 2006, Raymond Professional Group, Inc., ("RPG") and Raymond Management Services, Inc., n/k/a Raymond Professional Group–Design/Build ("RMS") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in related bankruptcy cases numbered 06-B-16748 and 06-B-16753, respectively. RPG is asserted to be the 100 percent shareholder of RMS.[1] RPG provided shared corporate services to each of the debtor-subsidiaries, including RMS. The subsidiaries provided engineering, architectural, design/build, and other technical services to private and government clients, primarily in the power, industrial, and process market sectors. RMS contracted with a property owner, AES Medina Valley Cogen, LLC, ("AES") to build a cogeneration power facility and subcontracted with Pope to do most of

---

[1] Additional wholly owned subsidiaries include debtors Raymond Professional Group–A/E, Inc. (bankruptcy case no. 06-16749), Raymond Professional Group–Government, Inc. (bankruptcy case no. 06-16750), and Raymond International, Inc. (bankruptcy case no. 06-16754). Raymond Professional Group–Puerto Rico Engineering PSC (bankruptcy case no. 06-16755) is an affiliate of RPG through common ownership. An Order providing for joint administration has been entered.

2

the construction work. AES settled remaining lien claims against it by a final payment of $2.5 million in return for waivers of mechanics liens from RMS and Pope. That payment went into an account that RMS and Pope had earlier established that required signatures of an officer of each for any withdrawal (the "Account").

RPG filed this Adversary Complaint against Pope, originally in five counts, seeking the following reliefs: In Count I, a declaration determining that RPG owns the disputed Account; in Count II, pursuant to 11 U.S.C. § 544(a), to avoid any trust found to have been imposed by an Arbitration Award following arbitration between Pope and RMS on contractual claims between them (the "Award"); in Count III, to avoid the Award as a preference under 11 U.S.C. § 547(b); in Count IV, to avoid the Award as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B); and in Count V, to disallow Pope's claim for entitlement to the debt found due to it by the Award under 11 U.S.C. § 502(d). In its Amended Answer to Complaint, Pope asserted a counterclaim seeking, among other things, a declaration that funds in the Account are held in trust for its benefit pursuant to section 21.02 of the Illinois Mechanics Lien Act, 770 Ill. Comp. Stat. Ann. 60/21.02 (West 2001), *amended by* 770 Ill. Comp. Stat. Ann. 60/21.02 (Supp. 2007).

RPG, joined therein by RMS, later filed an Amended Complaint adding Count VI, which sought declarations that Pope did not own the Account, that the Account was not an escrow account, and that the funds in the Account were not held in trust pursuant to the Illinois Mechanics Lien Act. Pope counterclaimed in Count VI, asserting ownership of the Account as an asserted "joint account" or an "escrow," or through mechanics lien or trust rights thereon. Count VI and all issues therein were then bifurcated for trial separately from the other counts.

The trial on Count VI concluded, and Findings of Fact and Conclusions of Law were

made and entered. *See generally In re Raymond Prof'l Group, Inc.*, 408 B.R. 711 (Bankr. N.D. Ill. 2009), *amended by* 410 B.R. 813 (Bankr. N.D. Ill. 2009) (Docket Nos. 415, 428). Judgment was entered therein declaring, among other things, that Pope then owned the entire Account and was entitled to recover immediately all funds held in the Account, and that RPG and RMS recovered nothing by their claims in Count VI. RPG and RMS immediately filed a Notice of Appeal, and that appeal before a United States District Judge is currently stayed pending resolution of the remaining Counts of this Adversary Complaint so that possible appeals may be coordinated with that earlier appeal.

After the Judgment on Count VI was entered and the appeal thereon was stayed, counsel for RPG and RMS announced an intent to pursue the remaining Counts of the Complaint. RMS then joined RPG as a co-plaintiff in Counts II through V, which had originally been asserted only by RPG, and a trial date was set.[2] Counsel for all parties to those Counts stipulated that all evidence admitted at the trial on Count VI would be readmitted for trial on Counts II through V. That evidence was offered and admitted, no other evidence was offered, and all parties rested. RPG, RMS, and Pope presented their closing arguments by way of post-trial briefs. The Official Committee of Unsecured Creditors adopted the briefs of RPG and RMS, and the National Fire Insurance Company of Hartford ("NFIC") adopted Pope's brief.

After considering the evidence, the following Findings of Fact and Conclusions of Law are made and will be entered as to Counts II through V.

---

[2] RMS did not join RPG as a co-plaintiff in Count I, and RPG sought to pursue that Count alone. In a separate Opinion and through separate Orders, the Schiff firm as counsel for both RPG and RMS has been found in conflict for trying to represent both. *See In re Raymond Prof'l Group, Inc.*, 421 B.R. 891 (Bankr. N.D. Ill. 2009).

## FINDINGS OF FACT

Pursuant to the parties' stipulation, the same evidence that was admitted and considered during the trial on Count VI was admitted and is considered here. All of the detailed Findings of Fact made after trial on Count VI, published at *In re Raymond Professional Group, Inc.*, 408 B.R. 711, 749–87 (Bankr. N.D. Ill. 2009), *amended by* 410 B.R. 813, 813–16 (Bankr. N.D. Ill. 2009) (Docket Nos. 415, 428), are hereby fully incorporated as part of these present Findings of Fact by this reference, as amplified in some detail by further discussion here.

A summary of the facts most directly pertinent to Counts II through IV follows. "FOF" references are to paragraphs of the original Findings of Fact made after trial on Count VI by evidence readmitted here.

On September 12, 2000, RMS entered into the EPC Contract with AES for the engineering, procurement, construction, and start-up of a cogeneration power facility (the "Project") on AES property. (Finding of Fact ("FOF") 46.) In January 2001, RMS and Pope executed a subcontract between those two parties effective September 12, 2000, pursuant to which Pope was responsible to build the Project. (FOF 89–92.)

Paragraph 7 of the Subcontract called for creation of an escrow account in which to deposit Project funds not immediately needed or distributed. (FOF 101.) On February 2, 2001, Mr. Chidley, as President of RMS, and Mr. Troyke, as President of Pope, met to discuss the opening of the account called for in the Subcontract. (FOF 117.) Mr. Chidley told Mr. Troyke that in order to create an escrow, articles of escrow would have to be drafted explaining RMS's and Pope's intent relative to an escrow account; that there would be an escrow agent designated who would be paid a fee; and that escrow accounts are not interest bearing. (FOF 118.) However,

Mr. Troyke wanted to obtain the highest possible rate of return on the deposited funds. Therefore, Mr. Chidley and Mr. Troyke agreed that instead of creating an escrow, they would open a commercial checking account requiring the dual signatures of a RMS representative and a Pope representative to disburse funds or make changes to the account. (*Id.*)

RPG was not a party to the Subcontract, and did not have any contract with Pope for the Project. (FOF 93–94.) Thus, RPG never had and does not now have any contractual claim against the Account because the Account was established by RMS and Pope pursuant to their contractual relationship, as amended by their agreement to establish the checking account instead of an escrow.

Thereafter, billing disputes arose between RMS and Pope regarding accuracy of Pope's claimed costs and whether or not Pope's invoices included profit. (*See* FOF 158.) RMS stopped remitting payment to Pope for Pope's work after March of 2001. (FOF 178.) On May 23, 2001, Pope made a claim on the RMS Payment Bond issued by NFIC. (FOF 180.) On June 19, 2001, Pope executed a Notice of Claim of Subcontractor pursuant to 770 Ill. Comp. Stat. 60/24 and delivered it to AES. (FOF 181–83.) From June 2001 through October 3, 2001, AES withheld payment for RMS's invoices covering work performed in May 2001. (FOF 184.)

On September 26, 2001, RMS, Pope, and NFIC entered into an Interim Settlement Agreement (the "ISA"), (FOF 194), in order to facilitate payment of Project funds from AES, and they agreed on the minimum amount due to Pope at the time. (*See* FOF 199.) The ISA called for the payment of certain amounts from RMS to Pope in exchange for Pope's execution of a waiver of lien. (FOF 202.) Pursuant to paragraph 7 of the ISA, RMS agreed to pay Pope $2,808,671 from the Account or as funds became available in the Account. (FOF 206.) When they entered

into that Agreement, Pope claimed that it was owed more than that amount from RMS. (FOF 212.) Only $220,000 of the amount called for in paragraph 7 was ever paid to Pope pursuant to the ISA. (FOF 273–76.)

After November 2001, disputes existed between the owner AES and RMS regarding approximately $1 million withheld as retainage, and approximately $2.8 million for contract change orders. (FOF 317.) On June 6, 2002, RMS recorded a lien against the real estate owned by AES on which the Project is located for approximately $3.8 million. (FOF 320–21.) Pope assisted RMS in attempting to collect funds from AES in connection with the Retainage and Extra Work. (FOF 324.) Its representative attended two meetings between AES and RMS where a settlement of those claims was discussed. (FOF 332.) On or about January 30, 2003, AES and RMS entered into the AES Settlement Agreement, (FOF 326), whereby RMS agreed to accept $2.5 million in exchange for delivery by RMS to AES of a waiver and release of all claims against AES. (FOF 334.) Pope agreed with RMS as to that settlement amount. Pope and RMS each gave to AES a full and final waiver of its mechanics lien rights, in return for which AES agreed to pay the settlement. (*See* FOF 332.)

On February 4, 2003, AES caused the $2.5 million settlement payment to be deposited directly into the Account. (FOF 367.) Subsequently, Pope renewed its demand for payment of its contractual claims from RMS, and RMS in turn made a written demand for an accounting of Project costs through an Arbitration. (FOF 370–72.) The respective cost- and performance-based disputes between those parties were arbitrated under American Arbitration Association (the "AAA") procedures as required by an arbitration provision of the Subcontract between RMS and Pope. The purpose of that arbitration was to resolve the contractual cross disputes between the

contracting parties regarding claimed costs, and to provide an accounting as to any project revenue contractually due to Pope or to RMS.

On November 30, 2006, the Arbitration Panel issued its Award. (FOF 484.) The Award found that "[t]he total amount to be paid Pope is $3,634,714." (FOF 496.) That amount was contractually to be satisfied from funds in the Account and interest accrued thereon, and any additional funds required were due from RMS. (*Id.*) The Award denied all RMS contractual claims to be paid for any reason claimed. The Award did not determine that the Account was owned by Pope; rather, it held under the contract that the Account was to be one source of payment of the debt due to Pope. RPG and RMS filed their bankruptcy cases the following month, in December of 2006.

The Award has since been confirmed by judgment entered post-bankruptcy on December 23, 2008. That judgment was entered in favor of Pope through a separate Adversary proceeding in this Court. *See generally In re Raymond Prof'l Group, Inc.*, 397 B.R. 414 (Bankr. N.D. Ill. 2008), *supplemented by* 400 B.R. 621 (Bankr. N.D. Ill. 2008). That judgment was not appealed, and therefore it stands to fix the amount of debt owed by RMS to Pope and to determine that the entire Account was to be the source of payment to Pope through their contractual agreement.

In confirming the Award, it was found and held that the issue as to ownership of the Account was not litigated by parties in the arbitration proceeding and was not adjudicated by the Award. *Id.* However, after subsequent trial post-bankruptcy on Count VI, it was determined that all funds in the Account (which were less than the amount of the Award as to debt owed to Pope) were held in the Account for the sole benefit of Pope, and therefore those funds are property belonging to Pope, not property of the bankruptcy estate of either Debtor. *See In re Raymond*

8

*Prof'l Group, Inc.*, 408 B.R. 711, 748–49 (Bankr. N.D. Ill. 2009), *amended by* 410 B.R. 813, 813–16 (Bankr. N.D. Ill. 2009). Those Findings and Conclusions as amended focused on Pope's rights in a trust arising under the Illinois Mechanics Lien Act when AES paid the $2.5 million settlement several years before the bankruptcy cases were filed. However, Part C herein below amplifies the discussion in reference to the argument by RPG and RMS that some money in the Account before the AES settlement payment belonged to one of them. That discussion focuses on Pope's contractual rights to recover all moneys in the Account as alternative grounds for its property rights that were recognized in the Count VI Judgment even if some part of the Account had not been subject to rights under the Illinois Mechanics Lien Act.

Judgment on Count VI was entered on August 14, 2009, [Docket No. 430] and amended on September 24, 2009 [Docket No. 507]. Earlier, the Account funds had been transferred improperly and without authorization upon the bankruptcy filings from the Account (which had required joint signatures from Pope and RMS for any withdrawals) to RPG's debtor-in-possession account. After entry of the Judgment on Count VI, those funds were ordered on August 28, 2009, to be removed from RPG's control and account, and transferred to a new bank account in the name of Pope that is subject to an order freezing it until further bankruptcy judge order [Docket No. 456].

Further factual statements in the Conclusions of Law will stand as additional Findings of Fact.

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. It is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United

9

States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. §§ 1408 and 1409. This Adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

## CONCLUSIONS OF LAW

In Counts II through V of their Complaint, RPG and RMS are co-plaintiffs. They advance the following theories as to why Pope is asserted not to be entitled to funds in the Account even if entitled to those funds contractually and under the Illinois Mechanics Lien Act: To the extent, if any, that the pre-bankruptcy Arbitrators' Award imposed a trust or constructive trust, or otherwise transferred an interest of a Debtor,[3] the Award might be avoidable under the Bankruptcy Code, Title 11 U.S.C., under the strong-arm power of § 544 (Count II),[4] as a preferential transfer under § 547 (Count III),[5] or as a fraudulent transfer under § 548 (Count IV).[6]

---

[3] The parties dispute whether RPG and RMS are bound by the language of their Complaint, which seeks to avoid the award only to the extent it imposed a trust or constructive trust. In their post-trial brief, RPG and RMS argue more broadly that "the Award directly 'liquidated' and/or disposed of" RMS's interest in the funds. (Debtors' Post-Trial Brief on Counts II Through V, at 4.) Pope argues that this constituted an improper attempt at fashioning an entirely new Count post-trial. However, it is clear from Count III and from the record of this case that RPG and RMS sought to avoid any transfer of any interest in the funds to Pope if the Award effected any such transfer, whether by way of imposition of a trust or otherwise. Viewing the record as a whole, it cannot be said that RPG and RMS waived this argument or that they inadequately pleaded it so as not to give pretrial notice to Pope.

[4] A debtor-in-possession is vested with the rights of certain hypothetical creditors and "may avoid any transfer of property of the debtor . . . that is voidable" by such creditors. See 11 U.S.C. § 548; *In re Wheaton Oaks Office Partners Ltd. P'ship*, 27 F.3d 1234, 1244 (7th Cir. 1994); see also 11 U.S.C. § 1107(a) (vesting the debtor-in-possession with the rights, powers, and duties of a trustee).

[5] A debtor-in-possession may avoid certain preferential transfers and recover properties transferred for benefit of the estate. See 11 U.S.C. §§ 547(b), 1107(a). To be avoidable, the transfer must be:
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made . . . on or within 90 days before the date of the filing of the petition; . . . and
(5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and

They further argue that to the extent Pope was the recipient of an avoidable transfer, its claim against the Debtors should be disallowed under § 502(d) (Count V).[7]

The common element to all of these claims, and what RPG and RMS must establish in order to prevail, is whether the pre-bankruptcy Award effected any prepetition "transfer" of some property interest of one or more of the Plaintiffs to Pope, either through the imposition of a trust or by some other means. Indeed, that issue is the only issue disputed by the parties. For reasons stated below, it is found and held that the Award did not effect any transfer. Therefore, judgment will be entered against RPG and RMS on Counts II through V.[8]

## THE ARBITRATION AWARD DID NOT EFFECT A "TRANSFER" OF ANY PROPERTY INTERESTS OR RIGHTS

Under the Bankruptcy Code, a "transfer" is "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(I) property; or (ii) an

---

(C)  such creditor received payment of such debt to the extent provided by the provisions of this title.

§ 547(b).

[6] A debtor-in-possession may avoid any transfer of an interest of the debtor in property that was made or incurred on or within 2 years before the date of filing of the petition, if: (1) the debtor received less than equivalent value in exchange for the transfer; and (2) the debtor (a) was insolvent, (b) was left with unreasonably small capital, or (c) intended to incur or believed that it would incur debts that it would not be able to pay as they became due. 11 U.S.C. §§ 548(a)(1)(B), 1107(a).

[7] "[T]he court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section . . . 544, . . . 547, [or] 548 . . . of this title, unless such . . . transferee has paid the amount . . . for which such . . . transferee is liable." 11 U.S.C. § 502(d).

[8] RPG and RMS say in their post-trial brief that Count II is moot because they seek relief in that Count only to the extent the Award imposed a constructive trust, and (they argue) it was already found and held after trial on Count VI that the Award did not impose a constructive trust. They also say that they "withdraw" Count IV because the relief sought in that Count is based upon allegedly improper actions by the Arbitration Panel, and (they argue) that issue was resolved by judgment in Adversary No. 07-137. Counsel for RPG and RMS thereby concede defeat on those Counts. However, no motion to dismiss them has been made by either party under Fed. R. Civ. P. 41 [Fed. R. Bankr. P. 7041]. Both Counts are disposed of by the same facts and legal conclusions that resolve Counts III and V: the Award did not effect any "transfer." Therefore, judgment will be entered on Counts II and IV to resolve them.

11

interest in property." *Id.* § 101(54). This definition is intentionally broad. *See* S. Rep. No. 95-989, at 27 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5811 ("The definition of transfer is as broad as possible.").

A transfer occurs when the debtor had ownership of, or an interest in, a certain property, and that right was relinquished or lost. *See, e.g., In re Commodity Merchants, Inc.*, 538 F.2d 1260, 1263 (7th Cir. 1976) ("The essence of a transfer is the relinquishment of a valuable property right."); *In re Corey*, 449 F. Supp. 628, 630 n.1 (N.D. Ohio 1977) ("Absent ownership or interest no transfer occurred, and there is no transfer to be declared void or voidable."). Determining whether a "transfer" occurred is an issue under federal law, while state law provides the definition of "property" and "an interest in property." *Barnhill v. Johnson*, 503 U.S. 393, 397–98 (1992).

## A. RMS Had a Potential Interest in the Account Funds Both Contractually and Under the Illinois Mechanics Lien Act Until Ownership of the Account was Established Post-Bankruptcy

It was earlier found and held that only Pope and RMS had potential interests in the funds in the Account. *In re Raymond Prof'l Group, Inc.*, 408 B.R. 711, 738–41 (Bankr. N.D. Ill. 2009). As moneys were paid by AES during construction in return for lien waivers, and finally on February 4, 2003, when the $2.5 million settlement was deposited in the Account by AES in return for final mechanics lien waivers delivered by Pope and RMS, those funds were impressed with a statutory trust in favor of both Pope and RMS pursuant to section 21.02 of the Illinois Mechanics Lien Act, 770 Ill. Comp. Stat. 60/21.02. As of the date AES deposited the settlement, Pope and RMS each held beneficial interests in the Account funds and contractual claims against them, although the value of each interest was contingent upon resolution of contractual disputes

and claims between them. These disputes and claims were later resolved through the Arbitration Award that was confirmed post-bankruptcy, and subsequent determination through trial of Count VI as to who owned the Account.

It is important to distinguish between property interests in the Account itself and property interests in the funds at issue. It has earlier been found and held that when the Account was originally established, RMS and Pope held title to it as tenants-in-common. *In re Raymond Prof'l Group, Inc.*, 408 B.R. 711, 738–41 (Bankr. N.D. Ill. 2009). However, the $2.5 million later deposited in that Account by AES in final settlement of claims against it and in return for lien waivers from Pope and RMS was subject to a statutory trust under the Illinois Mechanics Lien Act that arose when that settlement was paid (years before the bankruptcies were filed), with both RMS and Pope then having potential beneficial interests. *Id.* at 728–38. Indeed, the contractual rights of Pope in that Account that were recognized by the Award also arose under their agreements entered into years earlier.

It is not relevant here whether Pope and RMS each originally had a fifty percent interest in the Account when it was established due to the requirement at the depositary bank of joint signatures to withdraw from the Account, or whether they intended to fractionalize ownership in some other way, a subject the parties discuss at length in their briefs. Whatever interest each originally held in the Account through their continued signature requirement, after deposit of the AES settlement in return for their lien waivers, together they held those funds and earlier funds to the extent paid by AES in return for earlier lien waivers in the Account in trust under the Illinois Mechanics Lien Act subject to resolution of claims as to which of them owed debt to the other. Determination of debt was subject to the Arbitration that determined the contractual debts of

13

each party, to post-bankruptcy confirmation of the Award, and to subsequent adjudication of ownership issues through trial on Count VI.

**B. The Award Did Not Transfer Any Property Right of RMS**

The Arbitration between RMS and Pope took place under Illinois law. In Illinois, the role of an arbitrator or arbitration panel is to make findings. *Adam Martin Constr. Co. v. Brandon P'ship*, 481 N.E.2d 962, 964 (Ill. App. Ct. 1985). These findings are final and binding on the parties to the arbitration and may be vacated only under limited circumstances. *See* 710 Ill. Comp. Stat. 5/12; *Garver v. Ferguson*, 389 N.E.2d 1181, 1183 (Ill. 1979) (*citing Merritt v. Merritt*, 11 Ill. 565, 567 (1850)).

However, a binding factual or legal finding is not the same thing as the creation or relinquishment of a property interest. An arbitrator or arbitration panel lacks power to implement an Award, so a prevailing party seeking to enforce an arbitration award against a recalcitrant opponent must turn to the courts. *See Adam Martin Constr. Co.*, 481 N.E.2d at 934. In a court, the prevailing party may obtain a judgment confirming the award and then execute on that judgment under state law. *See id.*; 710 Ill. Comp. Stat. 5/11 and 14. Only upon execution on property of the losing party or creation of a lien that results from post-judgment proceedings does an interest in property pass from the losing party to the prevailing party; only then does a transfer occur that might be avoidable in bankruptcy. *In re Freedom Group, Inc.*, 50 F.3d 408, 410–12 (7th Cir. 1995) (finding that a transfer occurs only when final order of attachment is issued, not when judgment is entered or a notice of garnishment served).

RPG and RMS cite a laundry list of cases to support their argument that an arbitration award is effective and final when issued. (*See* Debtors' Post-Trial Brief on Counts II Through V,

14

at 6–8; Debtors' Post-Trial Reply Brief on Counts II Through V, at 8–13.) However, they fail to address what an arbitration award actually does (it makes findings) and how that differs from an actual transfer of a property interest (which, as discussed, requires a judgment by a court confirming the Award and execution on that judgment).

The Award was made on November 30, 2006. While it determined the amount of debt due to Pope and identified the Account as one contractual source of payment, the Award did not relinquish, transfer, or affect any interest of RMS in the Account or Account funds. As earlier found and held, the Arbitration Panel merely adjudicated that RMS had a preexisting contractual obligation to pay a specified amount, and a preexisting contractual obligation to pay that debt partly out of the disputed Account and partly from other sources. *In re Raymond Prof'l Group, Inc.*, 400 B.R. 621, 623–24 (Bankr. N.D. Ill. 2008). The Arbitration Panel thereby determined that RMS owed Pope $3,634,714, and that Pope did not owe anything to RMS. *Id.* No right of RMS was relinquished or transferred; no money or other property interest was thereby taken away and given to Pope or some other party for Pope's benefit. RMS's mechanics lien legal interest in the Account and its contractual claims were not divested by the Award, and they remained alive even after the Award was confirmed post-petition (on November 19, 2008) and until judgment was entered on Count VI disposing of the ownership issues (on August 14, 2009) and funds in the Account were ordered transferred to a new account belonging to Pope (on August 31, 2009).

RPG and RMS further argue that the Award created a trust under section 21.02 of the Illinois Mechanics Lien Act. This argument also lacks merit. First, the statutory mechanics lien trust in the Account arose on February 4, 2003, with the final AES payment and earlier to the

extent of earlier AES payments made in return for earlier lien waivers—all more than three years prior to the Award. Second, as discussed above, the Award was simply a finding of debt that under the Illinois Arbitration Act did not and could not have imposed any trust on the Account or funds therein.

In addition, RPG and RMS urged that "all other trust theories" must be considered, but they cite no authority for that and discuss no law or applicable facts. "Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *In re Golfview Developmental Ctr., Inc.*, 309 B.R. 758, 771 (Bankr. N.D. Ill. 2004) (*citing United States v. Lanzotti*, 205 F.3d 651, 657 (7th Cir. 2000)). Therefore, RPG and RMS waived such a nebulous argument.

**C. The Award Did Not Transfer Any Property Right of RMS in Funds Other than the AES Settlement and Its Prior Payments That Were in the Account**

RPG and RMS assert in their Reply brief an argument that there were funds in the Account before AES deposited the $2.5 million settlement, that only RPG or RMS had an interest in those other funds, and that those other funds were not impressed with a statutory Mechanics Lien Act trust on February 4, 2003. Therefore, they argue, the Award improperly transferred *those* funds from RMS to Pope.

The first response to that argument is that the Award only resolved competing contractual claims and fixed the amount of debt due, but did not "transfer" anything.

Second, the evidence shows that there was $376,622.45 in the Account before AES deposited the $2.5 million settlement. (JTEx 272, at 2113–14.) However, despite arguing that one of the Debtors had an exclusive interest in those other funds, RPG and RMS do not even

16

attempt to trace from evidence the sources of those funds or to show why Pope does not have any interest in them.

Twelve deposits were made into the Account before AES paid the $2.5 million settlement:

(1) and (2): The Account was initially funded on February 22 and 28, 2001, by two deposits totaling $2,134,930. (FOF 162, 166.) These funds came from monies received by RMS from AES that had been deposited in the RPG Operating Account. (FOF 167.)

(3): On September 27, 2001, $371,352.41 was deposited in the Account from the RPG Operating Account. (FOF 235, 240.) That deposit was made pursuant to paragraph 1 of the Interim Settlement Agreement between RMS and Pope. (FOF 236.)

(4), (5), and (6): On October 3 and 12, 2001, AES made three payments totaling $1,815,917. (FOF 250.) AES made these payments to RMS, which then deposited the funds in the Account. (FOF 251, 262.) AES made these payments in reliance on the September 26, 2001, Lien Waiver. *In re Raymond Prof'l Group, Inc.*, 408 B.R. 711, 730 (Bankr. N.D. Ill. 2009).

(7): On November 5, 2001, RMS caused $73,773.11 to be deposited into the Account. (FOF 263.) These funds came from monies received by RMS from AES for sales taxes. (*See* JTEx 211.) On November 19, 2001, AES was instructed to wire any future Project payments directly to the Account. (FOF 264.)

(8): On November 14, 2001, AES caused $179,470 to be deposited directly into the Account. (FOF 265.)

(9): On January 23, 2002, AES caused $789,889 to be deposited directly into the Account. (FOF 267.)

(10): On January 25, 2002, $500,000 was deposited into the Account from the RPG Operating Account. (FOF 268, 269). That deposit was made pursuant to paragraph 2 of the Interim Settlement Agreement between RMS and Pope. (FOF 270.)

(11): On May 29, 2002, AES caused $57,890 to be deposited directly into the Account. (FOF 277.) Those funds were paid in response to an RMS invoice for sales taxes. (*See* JTEx 211.)

(12): On September 13, 2002, a check payable to Pope from Kelso-Burnett Co. in the amount of $5,756.67 was deposited into the Account. (FOF 278.) The parties did not discuss or explain this deposit. Because it is relatively small and because there is no colorable claim that these funds belonged only to RPG or RMS, the Kelso Burnett Co. check will not be discussed further in this Opinion.

RPG and RMS made no attempt to trace those twelve deposits to show which were the sources of funds in the Account when the AES settlement was deposited, but in the end it does not matter. Most of the foregoing deposits into the Account were made by AES, directly or indirectly, in payment for work on the Project. It was AES's practice to make payments only after receiving lien waivers. The evidence shows that at least some of the deposits were made pursuant to lien waivers, and therefore would be protected by rights of Pope and RMS under the Illinois Mechanics Lien Act. But, most telling, all those payments and rights to those moneys were subject to terms of the Subcontract and other agreements between RMS and Pope. The remaining two deposits (other than Kelso-Burnett Co. check) were made pursuant to the Interim Settlement

Agreement, another contract between RMS and Pope.

As discussed above, the Arbitration Award determined under the contract between RMS and Pope that RMS had a preexisting contractual obligation to pay Pope $3,634,714, and a preexisting contractual obligation to pay that debt partly out of the Account and partly from other sources. Regardless of the specific source of the $376,622.45 in the Account before AES deposited the $2.5 million settlement, and regardless of whether all of those particular funds were impressed with a statutory mechanics lien trust, the Award determined that Pope had a contractual right to recover the Award from the Account and other sources. However, no property right or interest of RMS in those funds was thereby transferred because the Award was simply a finding as to amount of debt due that did not and could not have legally effected a transfer of those funds or ownership rights therein.

## CONCLUSION

Because the Award did not impose a trust or otherwise effect a "transfer," RPG and RMS cannot avoid it under the strong-arm power of § 544, as a preferential transfer under § 547, or as a fraudulent transfer under § 548. Likewise, because there was no avoidable transfer, there is no reason to disallow Pope's claim under § 502(d). Therefore, judgments will separately be entered by a single Judgment Order covering each of Counts II, III, IV, and V in favor of Pope and against RPG and RMS.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 20th day of May, 2010.